UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

Civ. No. 12-5044 JLV

| | | |
|---|---|---|
| BROOKE LEBEAU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S STATEMENT OF** |
| | ) | **DISPUTED AND UNDISPUTED** |
| PROGRESSIVE NORTHERN | ) | **FACTS IN OPPOSITION** |
| INSURANCE COMPANY, | ) | **TO DEFENDANT'S MOTION FOR** |
| | ) | **PARTIAL SUMMARY JUDGMENT** |
| Defendant. | ) | |

COMES NOW the Plaintiff, by and through her attorney Robin L. Zephier, and hereby submits her Plaintiff's Statement of Material Facts of Plaintiff's Response in Opposition to the Defendant's Motion for Partial Summary Judgment.

**PLAINTIFF'S STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS**

**Pertinent UM Portion of Insuring Agreement Between Progressive & Lebeau**

1.  The pertinent portion of Brooke Lebeau's policy containing the Insuring Agreement for uninsured motorist coverage states as follows:

    PART Ill - UNINSURED/UNINSURED MOTORIST COVERAGE
    INSURING AGREEMENT

    Subject to the Limits of Liability, if you pay the premium for Uninsured/Underinsured Motorist Coverage, we will pay for damages, other than punitive or exemplary damages, which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of bodily injury:  1. sustained by an insured person; 2. caused by an accident; and 3. arising out of the ownership, maintenance, or use of an uninsured motor vehicle or

1

>underinsured motor vehicle.  We will pay under this Part III only
>after the limits of liability under all applicable bodily injury
>liability bonds and policies have been exhausted by payment of
>judgments or settlements.

(Uninsured Motorist Coverage Insuring Agreement of Brooke Lebeau in force at time of this UM claim.)

**Applicable Good Faith Claims Handling Practices Admitted by Progressive Rule 30 (b) (6) Representatives in the Lebeau v. Progressive case # 12-5044 JLV**

2. Plaintiff's insurance expert Steve Strzelec stated in his report, regarding claims handing standards, that "[w]hile statutes, regulations, or other standards set outlines for good claim handling, they do not completely define the parameters required for every specific situation; that requires internal standards of fairness by the insurer." (Strzelec Report, **Ex. 1**, at 5, Affidavit of Robin L. Zephier, **Ex. 1**.)

3. Progressive claims supervisor, Dee Hoime, and Progressive manager in charge of South Dakota claims, Scott Krank, are the two Progressive employees, supervisors or managers designated by Progressive under Rule 30 (b)(6) as the individuals giving responses under oath on another pending Progressive case, Kern v. Progressive, Civil No. 09-1197 (S.D. Second Circuit Court), as corporate designees under Rule 30 (b) (6).

4. Delores "Dee" Hoime, based in Sioux Falls, South Dakota was at all times pertinent to Brooke Lebeau's UM claim, the immediate claims supervisor of Lori Rear, based in Rapid City (Rear Dep. 51-55 (Lebeau) **Ex. 2**).

5. When Hoime was Rear's claims supervisor on the Lebeau UM claim file, one of her duties with regard to claims like Lebeau's was to review her activity on the file and correct mistakes made by Rear as the claim handler.  (Rear Dep. 93-95).

6. That an insurance company has a duty to perform a full and fair and reasonable investigation of a UIM claim, the investigation must be thorough and objective, and that in the investigation, an adjustor is required to look for reasons to support payment of the claim, as well as reasons for denial in a first-party situation. (Rear Dep. 93-96)

7. Rear also admits that Progressive must treat its insured's interests and its own with equal consideration. (Rear Dep. 93-100)

8. Rear admits the insurer must treat the insured's interest with equal regard as it does its own interest. (Rear Dep. 93-100).

9. Rear admits the business of insurance is highly specialized, with policyholders particularly vulnerable and dependent on the insurance company. (Rear Dep. 93-100).

10. Rear admits the company must crate and implement reasonable standards fro the prompt investigation of claims. (Rear Dep. 93-100).

11. Rear admits those standards must be in writing. (Rear Dep. 93-100).

12. Rear admits that insurers must act in good faith when investigating and evaluating a first-party claim. (Rear Dep. 93-100).

13. Rear admits that the failure to fully and fairly investigate a first-party claim does noes not permit the company to deny or devalue a claim due to lack of information. (Rear Dep. 93-100).

14. Rear admits that she does not agree that insurers must fairly, reasonably and promptly pay the first-party claim if payment is warranted. (Rear Dep.93-100).

15. Rear admits that the company should pay the first-party claim unless there is a good reason not to. (Rear Dep.93-100).

16. Rear disagrees that the company cannot attempt to settle a first-party claim for an unreasonably low amount as calculated by the claims adjustor. Rear believes it is okay for Progressive to do this on first party claims. (Rear Dep. 93-100).

17. Rear admits that the denial or diminishment of the first-party claims should not be based upon speculation. (Rear Dep. 93-100).

18. Rear admits that the company cannot misrepresent the important facts or policy provisions. . (Rear Dep. 93-100).

19. Rear admits that the insurance company must disclose to its insured all benefits, coverages and time limits that may apply to the first-party claim. (Rear Dep. 93-100).

20. Rear admits that the company may not conceal or fail to disclose how it interprets its policy. (Rear Dep. 93-100).

21. Rear admits that the company must fully comply with the Unfair Claims Practices Act and applicable regulations. (Rear Dep. 93-100).

22. Rear admits that the claims department is not a profit center. (Rear Dep. 93-100).

23. Rear admits that the company must promptly pay all legitimate first-party claims. (Rear Dep. 93-100).

24. Rear admits that the insurance process involved in the relationship between the insurance company and the policyholder is not an adversarial process. (Rear Dep. 93-100).

25. Rear admits that if there is an uncertainty about the facts, the company must conduct a full and fair investigation of the facts before making any decision to deny a first-party claim. (Rear Dep. 93-100).

26. Rear admits that the a fair investigation conducted with equal consideration of the

insured person's interests means the company must look for the reasons that support payment of the claim and not just look for reasons to deny or diminish the claim.  (Rear Dep. 93-100).

27. Rear admits that the company must look for reasons that support the payment of the claim.  (Rear Dep. 93-100).

28. Rear admits that if a claim supervisor reviews a claim file, it is a supervisor's job to look for and to correct mistakes made my claim handler.  (Rear Dep. 93-100.

29. Rear admits that the company's activities in investigating and handling the first-party claim must be documented in the file so that if there is any question later the activities undertaken by the claim handler can be reconstructed.  (Rear Dep. 93-100).

30. Rear admits that the company must never force a claimant to file unnecessary litigation in order to get the claims paid.  (Rear Dep. 93-100).

31. Rear admits that it is improper for an insurer to tie, in any manner, claim personnel compensation to claim decisions or payments to its insured.  (Rear Dep. 93-100).

32. Rear admits that an insurer has an obligation to recognize and promptly retain independent and qualified experts to assist in the fair, reasonable, objective and prompt investigation of the claim.  (Rear Dep. 93-100).

33. Rear also admits that if a claim falls into an area of uncertainty, the benefit of the doubt goes to the policyholder, rather than the insurance company, which is a duty under fair claims handling practices.  (Rear Dep. 93-100).

34. Rear admits that even though Progressive is a for-profit corporation, it is regulated by the states within which it does business, that Progressive has to follow state law and regulation from the South Dakota Division of Insurance, and Progressive also has contractual

duties to its policyholders. (Rear Dep. 93-98).

35. Rear also admits that it is Progressive's policy to protect the interest of it's policyholders and discharge its contractual obligations on all claims in accordance with all applicable laws and regulations. (Rear Dep. 93-98).

36. Rear also admits that when someone like Brooke Lebeau purchases UM coverage, Progressive is promising to pay out to the insured what they are legally entitled to collect. (Rear Dep. ).

37. Expert Strzelec states in his report that

> Part of every policy is a promise that the parties will deal fairly with one another. This implied covenant of good faith and fair dealing requires that neither party do anything to impact the right of the other to receive the benefit of the agreement. With an insurance policy, a special relationship arises out of the parties' unequal bargaining power and the special nature of the insurance contract. The insurer has a much greater obligation to perform under the policy than the typical insured who knows little of insurance transactions. An insurer is in a position to take advantage of an insured's misfortune by bargaining for settlement or resolution of the claim for less than the true amount owed. The insurer has control over the investigation, evaluation, processing, and denial of the claim. The insurer also has superior knowledge and buying power for the repairs and services following a loss. This unequal power creates an enhanced duty on the insurer to place the interests of its insured at least equal as its own.

(Strzelec Report, at 30. Affidavit of Robin L. Zephier, **Ex. 1**.)

38. John Charles Jones, who was in charge of Progressive's compensation programs, including Gainshare, during the pendency of the Lebeau UM claim, and the Kern UIM claim in Kern v. Progressive case, admitted that if Progressive is selling and servicing auto policies in South Dakota, Progressive has to follow South Dakota law and regulation with respect to

insurance.  (Jones Dep. 115:4-8, <u>Kern</u>, **Ex. 3**, excerpts of Jones' transcript is filed under seal, in caution that it could be protected unless declared unprotected by this Court).

      39.      However, while Jones was in charge of Gainshare and compensation programs for Progressive, there was never a discussion he had with anyone at Progressive to be careful not [to allow the Gainshare program] to violate any state laws or regulations or to violate the policies of insurance Progressive had with insurance customers, and Jones did not even understand what the connection would be between contractual promises to policyholders and the bonus or compensation programs at Progressive.  (Jones Dep. 117:2-118:1.), (<u>Kern v. Progressive</u>, Civil No. 09-1197, S.D. Seventh Cir. Court, date of depo. June 21, 2012).

      40.      In fact, asked about how he, the Chief Financial Officer of Progressive and the Compensation Committee of the corporate Board of Directors kept track of or made sure that the Gainsharing targets didn't influence claims handling, Jones admitted that "there were no conversations of claims handling in any of those conversations.  So, to the extent that we didn't overtly discuss it all, no, it was not a factor in the conversation about setting those objectives."  (Jones Dep. 121:3-14., <u>Kern</u> case).

      41.      Jones testified again later that when he ran the Gainsharing program, neither he, the CFO in his presence, or the Compensation Committee ever discussed potential or actual conflicts of interest or violations of state insurance law or regulation as it relates to the Gainsharing program.  (Jones Dep. 122:7-13, <u>Kern</u>)

      42.      Jones admits that the annual corporation-wide incentive plan for Progressive is called "Gainshare," and this program is applicable to all employees, <u>including claims handlers</u>, who are part of the Gainshare compensation program. (Jones Dep. 16:1-7, <u>Kern</u> case).

43. In fact, everybody participates and there is no opting out of the Gainshare program. (Jones Dep. 100:19-21, <u>Kern</u> case).

44. Jones admits that the Progressive corporation, like a lot of other corporations, ultimately wants its employees in line with the company's business goals and Gainsharing is just one of the many ways to do that. (Jones Dep. 136:23-137:5, <u>Kern</u> case).

45. Progressive uses Gainsharing to measure performance and reward employees when their performance meets or exceeds those measures. (Jones Dep. 133:23-134:2, <u>Kern</u> case).

46. Jones admits that the Gainshare Program is "intended to motivate all employees to achieve the same performance objectives in a given year for [Progressive]." (Jones Dep. 16:14-19.) <u>Kern</u> case.

47. The claims adjuster who worked on the Brooke Lebeau UIM claim, Lori Rear, understood the Gainsharing Program as depending on how Progressive does, you basically get a bonus at the end of the year, and that she participates in Gainsharing and has received bonuses. (Rear Dep. 54-57, 82-87).

48. Claims adjustor Robert Hupp took over the Lebeau UM claim from Lori Rear, and handled it up to the point of suit on or about February 3, 2010. (Rear Dep.46-49, 91-94). **Ex. 1**.

49. Adjustor Hupp knew Lebeau had a wage claim but intentionally withheld even considering paying the wage claim because Lebeau's attorney never referenced the wage claim in the demand letter asking for $85,304.40. (Stzelec Report p. 1-20, Strzelec Dep. 50-59, 86-98).

50. Lori Rear admitted that Progressive, as a corporate policy, will never pay one cent to a Progressive insured for a UM claim, unless or until that Progressive insured has signed a

written UM settlement release form.  (Rear Dep. 60-78, 88-89).

51.     Claims Representative Kurle admitted that he never advised Lebeau that her unpaid/unreimbursed medical expenses from the MVA, would or could be paid under the first party UM bodily injury portion of the claim.  (Rear Dep. 82-86; Strzelec Dep. 50-65; **Ex. 1**, p. 1-20).

52.     Progressive has a long standing policy of refusing to pay any "undisputed amounts of first party UM or UIM benefits to its own insureds, without a signed written UM/UIM claim settlement release form.  (Rear Dep. 60-80; **Ex. 11** (Harvieux Motion p. 3-10).

53.     Progressive has recently, in a UM case in South Dakota State Court, Nicole Harvieux v. Progressive, Civil No. 11-1386, attempted to formally enforce an alleged verbal settlement agreement upon its own insured, Harvieux, without her having signed or executed a written UM settlement agreement release (**Ex. 10, 11**).

54.     That in the Harvieux v. Progressive case, Harvieux successfully amended her complaint to include additional bad faith claims and a barratry claim against Progressive, as a result of Progressive's formal attempt to enforce a so-called "verbal" UM settlement agreement (without a signed and executed written UM settlement release).  (**Ex. 10, 11**).

55.     Mr. Arndt served as defense counsel on the Harvieux case also.  (**Ex. 10, 11**).

56.     Progressive never advertises to its insureds or prospective insureds that if they have a first party UM or UIM claim against Progressive, that the insured must sign a release to be paid any benefits at all.  (Rear Dep. 80-104; **Ex. 10, 11**).

57.     Progressive never discloses to the insurance consuming public, that Progressive claim personnel participate in Gainsharing.  (PST 27).

58. Progressive knows that undermining UIM benefits carries the risk of increasing the insured's emotional and financial distress. With such knowledge, the public should expect an insurer to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured. (**Ex. 1**, **p. 19**).

59. The organizational values underlying Progressive's claims processes and their incentive-based program, Gainshare, create a significant question about the reasonableness of the claim decision-making and overall handling of the claim. The insurance buying public is misled by Progressive' claims its people are guided by their independent judgment. (**Ex. 1**, **p. 19**).

60. Defendant misrepresented the policy and available policy benefits to the insured. (**Ex. 1**, **p. 19**).

61. Defendant failed to conduct an objective investigation, giving equal consideration to the insured's interests to determine what was owed. (**Ex. 1**, **p. 20**).

62. Defendant failed to conduct an objective evaluation, giving consideration to the insured's interests. (**Ex. 1**, **p. 20**).

63. Defendant failed to attempt to effectuate a prompt, fair, and equitable settlement of the claim when liability has become reasonably clear. (**Ex. 1**, **p. 20**).

Dated this 4th day of August, 2014.

>ABOUREZK & ZEPHIER P.C.
>Attorney for Plaintiff
>Post Office Box 9460
>2020 West Omaha
>Rapid City, South Dakota 57709
>(605) 342-0097
>
>By:/s/ Robin L. Zephier
>    Robin L. Zephier

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 4th day of August, 2014, he had served, a true and correct copy of the foregoing ***Plaintiff's Statement of Disputed and Undisputed Facts in Opposition to Defendant's Motion for Partial Summary Judgment*** by electronic filing to:

    Mark J. Arndt
    6805 South Minnesota Avenue, Suite 100
    P.O. Box 88738
    Sioux Falls, SD 57109-8738
    (605) 336-2565; Fax: (605) 336-2604
    marndt@mayjohnson.com
    Attorneys for Defendant

and that the same were provided by postage prepaid, first class mail.

                                                      /s/ Robin L. Zephier
                                                      Robin L. Zephier