# Stephen L. Strzelec
**Strzelec Consulting Services**

November 27, 2013

## PRELIMINARY DISCLOSURE AND REPORT OF STEPHEN L. STRZELEC

**Brook LeBeau v. Progressive Northern Insurance Company**
**U.S. District Court, Western Division, South Dakota,**
**Civ. 12-5044**

## BACKGROUND AND QUALIFICATIONS:

I was an employee of State Farm Insurance from January 14, 1985 through August 5, 2002. During my tenure at State Farm, I rose from my initial position as a Trainee Claim Representative (CR) in the Fire Company to Fire Reinspector/Trainer, Fire Superintendent, Auto CR, Auto Superintendent, Auto Divisional Claim Superintendent, and to the Auto/Fire Section Manager for the State of Alaska. I handled or supervised thousands of insurance claims under various types of policies in various States. My work included the investigation, evaluation, negotiation and resolution of these claims.

As a Superintendent, I was responsible for decision-making on coverage, liability, amounts owed, and procedures. I directly supervised claim supervisors, claim representatives, estimators, and support staff, handling both first and third party claims. I was also responsible for hiring, training and developing new employees as well as the continued training of employees.

As State Farm's Auto Divisional Claim Superintendent for Alaska, then later as State Farm's Auto/Fire Section Manager for Alaska, I was responsible for setting and maintaining claim-handling standards. I was also responsible for ensuring corporate policies, practices, and procedures were followed by every employee. I prepared and reviewed management reports that addressed numerous issues in the Claims operation. I was responsible for supervision of all litigation in

LeBeau 1



PLAINTIFF'S EXHIBIT

Alaska, including suits against the company for bad faith or extra-contractual damages.

I also served as the Claim Manager for the Alaska Insurance Guarantee Association from 1996 to 2002, overseeing the handling of all claims presented to the Alaska Insurance Guarantee Association.

While at State Farm, I attended various training classes and seminars. These included: Fire Claim Training Series, Evaluating Structural Losses, Fire Basic Claim School, Fire Intermediate Claim School, Fire Estimatics School, Training for Trainers, Management Orientation, Management I-IV, Management Overview, Supervisory Skills, SST Goal Setting, Performance Management Skills, Managing the PP&R Process, Fire Claim Management Course, Situational Leadership, Strategic Planning, Presentation Excellence, BCC I-IV, Auto Claim School, Bodily Injury Claim Management Course, Physical Damage Claim Supervision, Auto Claim Management Course, Auto Divisional Claim Supt. Workshop, Fire Divisional Claim Supt. Seminar, Field Claim Management, Leadership Principles, XACTIMATE Software Training, First Party Seminar, CAT/CMR Redesign, Training, TEACH, Auto Section Manager Forum, and the Fire Section Manager Forum.

I also attended training outside of State Farm. This included: VALE National Building Loss Evaluation School, ICAR (6 parts), and TTI Advanced Auto I.

I was recognized for my contributions at State Farm including:
- I was selected to serve on a committee to reorganize Fire Claim School
- I received special recognition for the supervision of the Alaska wildfires.
- I was selected to be a member of the Steering Committee for the new Section Manager Forum.

As a claim representative, Reinspector/Trainer, Superintendent, Divisional Claim Superintendent, and Section Manager, I participated in numerous catastrophes and handled or supervised the handling of thousands of claims in both Auto and Fire.

My formal education includes a BS degree in Business Administration from City University of Seattle in 1987. I obtained the Chartered Property and Casualty Underwriter (CPCU) designation in 1994 and the Chartered Life Underwriter (CLU) designation in 2000.

I have been working as a claims practices expert since November 2002 after approximately eighteen years in the insurance industry. I have been retained as a national claim-handling expert or consultant in numerous States including; Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maryland, Michigan, Mississippi, Montana, Nevada, New

LeBeau 2

Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, South Dakota, Texas, Washington, West Virginia, and Wisconsin. I have provided affidavits, declarations, and testimony in numerous cases and I have qualified as an expert in both State and District Federal Courts. Attached, as Exhibit B. is a listing of cases where I have provided testimony during the last four years.

From my casework, developing and presenting seminars on claim practices trends, and from the subjects I constantly study, I have specialized experience and training in insurance claim practices and the practices of the insurance industry.

I have spoken on insurance claim practices subjects to lawyer groups and at various Bar Association CLE Seminars in Arizona, Illinois, Nevada, New Mexico, and Washington from 2003 to the present. *(See Exhibit C, Presentations and Publications)*

My opinions expressed herein are based on my experience and training in the insurance industry, my knowledge of statutory and regulatory standards applicable to property and casualty claim handling, my review and knowledge of claim files, claim handling requirements, the documents I have reviewed in this case, my review and knowledge of texts, literature, and articles discussing claim handling. I am qualified by training and experience to provide the opinions I am expressing in this case.

## LISTING OF TESTIMONY:

A list of testimony is attached as Exhibit B.

## PUBLICATIONS AND PRESENTATIONS:

Many of my presentations included articles published within the course resources and course guides. These are listed under Exhibit C, Presentations and Publications.

## COMPENSATION:

My billing guide is attached as Exhibit D.

## ENCLOSURES:

LeBeau 3

1. Curriculum vitae – Stephen L. Strzelec
2. List of recent testimony.
3. List of presentations and publications.
4. Billing information
5. Insurance Industry Standards and Principles.

## DOCUMENTS AND OTHER INFORMATION CONSIDERED:

1. First Amended Complaint
2. Accident Report
3. Claim File (as produced)
4. Progressive Policy
5. LeBeau recorded statements
6. Deposition of Brooke LeBeau
7. Underwriting file (as produced)
8. Misc. correspondence
9. Insurance industry literature and texts from commonly obtainable sources. Examples include:

   a) *Casualty Claim Practice* – Donaldson
   b) *Best's Key Rating Guide* - A.M. Best Company
   c) *Insurance Claims and Disputes* - Windt
   d) *How to Draft and Interpret Insurance Policies* - Wollner, (1999)
   e) *Aggressive Good Faith ...* - Rokes
   f) *Insurance Practice for the Millennium* (2000) - Petittla
   g) *Organizational Behavior in Insurance* - White, et al
   h) *The Claims Environment* - Markham, (1st Edition)
   i) *The Claims Environment* - Hoopes (2nd Edition)
   j) *Casualty Claim Practice* (1996) - Hirsch
   k) *The Legal Environment of Insurance* – Lorimer
   l) *Property Investigation Checklists* - Boyer
   m) *Insurance Company Operations* - Webb
   n) *Principles of Insurance* - Mehr, (5th ed.)
   o) *Principles of Risk Management and Insurance* – Rejda (8th ed)
   p) *Claims Operations: A Practical Guide* – Murdock
   q) *Fundamentals of Risk and Insurance* - Vaughn

## GENERAL INSURANCE PRINCIPLES

Insurance is a risk transfer device. The insured pays a premium, and an insurer assumes the risk of something bad happening. The risk of loss or some part of that risk is transferred to the insurance company. The process works by the combining of homogeneous units, the same type of exposure units, and the application of the law of large numbers. Unpredictable individual losses become collectively predictable. When an insured pays a premium into a pool of funds, the insurance company uses actuarial science to predict frequency and severity of loss.

LeBeau 4

Frequency is the number of losses, usually expressed as a number per thousand policies. Severity is how much the average loss will cost.

People place great importance on their health and property, so they buy insurance to minimize the economic impact of accidents and losses. The premium pays for a conditional promise to pay if loss occurs that is covered by the policy. During any given policy period, most insureds receive only peace of mind for their premium dollars, while the few that suffer a covered loss typically receive significantly more than the premium paid. Most insurance contracts are offered to the insured on a take it or leave it basis; they are written by the insurer without input from the insured.

## CLAIMS-HANDLING STANDARDS

An insurer owes the insured a duty of good faith and fair dealing separate from the duties under the insurance contract and those arising from statute, regulation, or case law. The insurer's duty of good faith and fair dealing is affirmative and unconditional. Internal claim guidelines usually acknowledge this and give guidance on how to deliver the required level of service.

In one form or another, most states have enacted statutes, regulations, or supervision that governs claim-handling practices. These claims practices standards impose certain duties and obligations on an insurer in the handling of a first-party claim. While statutes, regulations, or other standards set outlines for good claim handling, they do not completely define the parameters required for every specific situation; that requires internal standards of fairness by the insurer. A detailed review of these industry standards and good faith obligations is attached to this disclosure as **Exhibit E**.

## CLAIMS PROFIT

Profit is properly addressed and the responsibility of other departments of an insurer. This would include such departments as sales, marketing, underwriting, and others. Within the insurance industry, it customarily has been considered inappropriate for claims to be responsible in any way for profit. After all, a department whose responsibility is to assist their insureds in obtaining all benefits available under the policy, cannot fulfill this obligation in good faith if there are incentives or pressure to pay less.

LeBeau 5

## PRELIMINARY REVIEW, ANALYSIS AND FINDINGS:

### Auto Policy

According to the Progressive Declarations page, Policy 43547971-5 had a policy period from June 11, 2009 to December 11, 2009. The policy provided coverage for a 1997 Ford F250 PK, a 2008 Chevrolet Equinox AWD, and a 1977 Chevrolet C10. The following limits applied to all three vehicles:

| | |
|---|---|
| Liability | $25,000 each person/50,000 each accident |
| Property Damage Liability | $25,000 each accident |
| Uninsured Motorist | $25,000 each person/50,000 each accident |
| Underinsured Motorist | $25,000 each person/50,000 each accident |

The following policy language applies:

### PART III – UNINSURED AND UNDERINSURED MOTORIST COVERAGES

#### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** or an **underinsured motor vehicle** because of **bodily injury**:
1. Sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance, or use of an **uninsured motor vehicle** or an **underinsured motor vehicle.**

### Facts

- September 18, 2009, Brooke LeBeau was injured when her vehicle was struck from being by an uninsured driver on North D Street and Highway 212 in Eagle Butte, South Dakota.

- September 21, 2009 loss reported to Progressive

- September 21, 2009 recorded statement of LeBeau

LeBeau 6

- September 30, 2009 Progressive claim handler John Kurle decides no insurance on tortfeasor vehicle. Uninsured claim opened for Brooke LeBeau.

- September 30, 2009, recorded statement of LeBeau.

- September 30, 2009 file reviewed by supervisor Dee Hoime:

> NO INS. ON C/V CONFIRMED -- LET'S PR FOR OUR FILE, TOO. NO DAMAGES??? AND SHE IS INJURED??? NEED TO GET COMPLETE INFORMATION ABOUT THAT, WHY, PMH? THEN LET'S DISCUSS AN EVAL AND PLAN TO RESOLVE, LORIE.

- October 1, 2009 review by Hoime:

> ...IF COVERAGE APPLIES, PUT TOGETHER EVAL TO INCLUDE PERHAPS A LITTLE TREATMENT AND MILEAGE FOR SAME PLUS P&S...

- October 6, 2009 log notes range of 575 to 1500.

> EVALUATION RANGE LOW:    575 HIGH:    1500
> COMMENTS:
> \*\*
> 30 YEAR OLD FEMALE SINGLE MOTHER OF TWO LITTLE BOYS
> POE: CHEYENNE RIVER HOUSING AUTHORITY
> \*\*
> DX: NECK BACK
> TX: IHS - ER EAGLE BUTTE
> DR. KUEHL PIERRE - X-RAYS TAKEN
> TXTING ONCE TO TWICE A WEEK OR EVERY 7-10 DAYS.
> \*\*
> HX: WAITRESS AND SLIPPED AND FELL AND JUST RECOVERING FROM BACK AND NECK INJURY FROM FALLING.
> \*\*
> LOE: POSSIBLE LOE AS MISSING TIME TO GO TO CHIRO AND DOCTORS APPOINTMENT. WILL ADDRESS HOURS AT IPC - HOURLY WAGE OF $12.41.
> CX:
> 1. MECHANISM FOR INJURY:

LeBeau 7

ID DOESN'T BELIEVE ANY DAMAGE TO IV. LOOKING AT IV
TOMORROW AND WILL RO ANY DAMAGE.  NOT TRUE LOW
IMPACT LOSS - NI STATED AFTER IMPACT FELT/HEARD NECK
AND BACK POP.  SHE WENT TO IHS ER ON DOL.
MECHANISM FOR INJURY IS POSSIBLE AS PRIOR INJURY.
2. RELATEDNESS:
ID COULD BE CONSIDER A POSSIBLE EGG SHELL.  WILL
ADDRESS PRIOR INJURIES  AND TXMNT.

ADLS:
DRIVING 90 MILES ONE WAY FOR CHIRO TXMNT – ID MAY
REQUEST PAYMENT FOR MILEAGE.

- October 7, 2009 Rear notes visit to insured's work.  Notes dent and small scrapes to rear bumper from accident.

- October 8, 2009 log notes value range 724 – 1649

- October 8, 2009, Progressive adjuster Rear requests Debbie order current bills/records

> EAGLE BUTTE INDIAN HEALTH SERVICES/EMERGENCY
> ROOM IN EAGLE BUTTE KUEHL CHIROPRACTIC IN PIERRE SO
> EAGLE BUTTE INDIAN HEALTH SERIVES FOR PHYSICAL
> THERAPY DEPARTMENT.
> PLEASE ORDER 10 YEAR HX FROM ID - BROOKE LEBEAU
> EAGLE BUTTE INDIAN HEALTH SERVICE HOSPITAL/ER
> KUEHL CHIROPRACTIC IN PIERRE SO

- October 8, 2009, Progressive adjuster Rear offers $724 plus payment of bills (unspecified)

- October 8, 2009 Rear sends out letter for income verification

- October 8, 2009 Rear notes vehicle estimate completed, just below deductible.

- October 8, 2009, the file is reviewed by Dee Hoime:

LeBeau 8

KEEP F/U EXPECTATION, REOFFER, OPEN MEDS BUT AT
THAT POINT MAY NOT WANT TO OFFER FUTURES...

- October 21, 2009 Rear sends letter verifying conversation.   Offered $724 plus bills to date and additional 60 days.

- October 22, 2009, Rear requests Debbie to order Bills/Records for Brooke LeBeau From - Korey's Karing Touch

- October 27, 2009, Dee Hoime notes in log:

  NO DAMAGES AT ALL TO CAR BUT N/I HADD JUST
  RESOLVED PRIOR INJURY - NOW SEEING
  M/T. LAR TO KEEP REGULAR CONTACT W/HER AND
  REEVAL WHEN NEC.  WATCH RES. BASED ON
  TREATMENT.

- November 10, 2009 Rear documents communication with LeBeau in log. Will meet.  Rear evaluates with range 1405 to 2655.  Notes meds at $200 states:   IF ABLE TO SETTLE WILL OFFER MEDS INCURRED. Evaluation states:

  1. MECHANISM FOR INJURY:
  THIS WAS LOWER IMPACT TO REAR BUMPER OF IV.
  HOWEVER ID IS SOMEWHAT OF POSSIBLE EGG SHELL
  AS PRIOR NECK AND BACK INJURY FROM FALLING.
  JUST RESOLVED
  THIS TXMNT WHEN LOSS OCCURRED. APPEARS FROM
  RECORDS AND TXMNT TODATE SOFT TISSUE INJURY.
  MECHANISM IS THERE FOR A SOFT TISSUE INJURY OR
  REAGGRAVATED PRIOR INJURY.  WILL ALLOW 12 TO
  EVEN 14 WEEKS OF TXMNT. DAMAGES TO IV IS REAR
  BUMPER AND WROTE 2.5 REPAIR. MEETING TOMORROW
  AND WILL OFFER OPEN MEDS FOR UP TO ANOTHER
  4-6 WEEKS. (HAVE ORDERED PMH FOR NI TO CONFIRM
  PRIOR INJURY AND HAVEN'T RECEIVED YET.)

  2. RELATEDNESS:
  TXMNT MAY BE EXCESS FOR LOW IMPACT BUT
  CONISDERING PRIOR HX WILL AGAIN

LeBeau 9

*Strzelec Consulting Services*

CONSIDER UP TO 16 WEEKS OF TXMNT. STILL
WAITING ON PHM.
\*\*
WITNESS POTENTIAL:
ID WOULD MA GOOD WITNESS 6 OR 7/10.
\*\*
STRENGTHS:
+ LOWER IMPACT
+ SOFT TISSUE INJURY
+ CHIRO NOTED BELIEVE 4-6 WEEKS AND DOESN'T
KNOW WHY WOULDN'T FULLY RESOLVE.

WEAKNESSES:
UM CLAIM
PRIOR HX AND EGG SHELL
TL~NT RIGHT AWAY - ER AND FU CARE
\*\*
THEME:
LOW IMPACT/SOFT TISSUE INJURY THAT APPEARS TO
AGGRAVATED OLDER INJURY.

- November 11, 2009, Hoime reviews and agrees in log:

  EXTENDED MEDS FOR 1ST PARTY WITH WOMAN WHO HAD
  JUST RECOVERED FROM A MORE SERIOUS INJURY AND
  HAD TO BEGIN TREATING AGAIN EVEN THOUGH MINOR
  IMPACT.

- November 13, 2009 Rear meets with insured. Insured does not want to settle
  or discuss at this time. Sends letter, still gathering records and bills.

- December 11, 2009, Rear sends letter confirming conversation and notes
  same in file:

  ... FROM WHAT I HAVE RECEVIED AND FROM HER
  ACCOUNTS IT APPEARS SHE WAS DX WITH SOFT TISSUE
  INJURY FROM THIS MVA. NOW HER PAIN IS GETTING
  WORSE INSTEAD OF BETTER....
  NI STATED THE ONLY TXMNT SHE RECEIVED FOR THIS
  PRIOR INJURY WAS CHIRO. SHE NEVER SAW MEDICAL
  DOCTOR OR HAD ANY TYPE OF OX TXTING COMPLETED.
  EXPLAINED TO ID USUALLY WITH THIS MINOR OF
  IMPACT DO WE SEE A EXTENSIVE INJURY. ID STATED

LeBeau 10

*Strzelec Consulting Services*

> SHE IS NOT A DOCTOR BUT WHEN SHE FU WITH CHIRO AND PT WILL AGAIN INFORM THEM TO CONTINUE OR START GETTING INFORMATION TO US. UNDERSTOOD. WILL CONTINUE TO FU WITH HER. ID STATED SHE WILL CONTINUE TXTING AS SHE IS NO WHERE NEAR DONE WITH TXMNT.

- December 11, 2009, Rear raises reserves to $25,000 and asks Debbie to follow up with 10 years of meds from Kuehl Chiro.

- December 16, 2009, log by Hoime.

> WE WILL DEFINITELY HAVE TO REVIEW PMH TO SEE WHAT TYPE OF TREATMENT SHE RECD. FROM THIS MORE SERIOUS INJURY VS. THIS MVA BUT SHE KEEPS TREATING SO AGREE WITH INC. IN RES. TO P/L DUE POTENTIAL EXPOSURE OF SAME

- January 4, 2010, Rear notes receipt of med bills and records. Notes in part:

> ...COMPLETLY PAIN FREE UNTIL THIS MVA...11/11/09 - 12/12/09 - RETURNS TO CHIRO AND STATED REGRESSED PAST 3 WEEKS. ADJUSTS C-SPIN AND L5 AND S1. WITHIN FOUR VISITS CHIRO NOTES INDICATE ID HAS REACHED PREINJURY STATUS ADJUSTMENT. DISCHARGES NO MORE FOLLOW UP CARE.

- January 5, 2010 Rear reviews meds, contacts insured and restates offer $1,405 and pay bills.

- January 5, 2010 Rear notes evaluation range 2164 to 3414 with 759 in meds and 155 in loss of earnings. (net 1250 p/s)

- January 5, 2010 Rear notes call from insured.

> STATED SHE CALLED AND S/W CHIRO AND CHIRO STATED HAS RELEASED HER FROM TXMNT FOR SOFT TISSUE

LeBeau 11

INJURY. ASKED WHAT OTHER INJURY THERE WAS AND ID
STATED HER BONE INJURY AND NEEDS X-RAY AND THEN
WILL BE ABLE TO TELL IF THIS IS HEALED...ID
REQUESTED MILEAGE...I DIDN'T REMEMBER DISCUSSING
MILEAGE AND SIMPLE MISTAKE.  I WILL CALCULATE
MILEAGE... 1700 MILES X 4.24 = $408.

- January 5, 2010 Rear notes new range 2932 to 4182

- January 6, 2010 Hoime notes mileage at $.55 per mile

- January 6, 2010 Rear notes new range 3459 to 4709 Requests authority to 4709.

        Meds     759
        Mileage  935
        LOE      515

- February 1, 2010 Rear notes call to insured.  Insured now represented.

- February 3, 2010 letter from Rebecca Kidder, representing LeBeau, asking for pictures, witnesses, dec. page, and communications with LeBeau.

- February 3, 2010 log notes file now assigned to Robert Hupp. Hupp notes:

    ...DMGS SUGGEST 5-10 SPEED AT IMPACT...
    PENDING: UM TO ID BROOKE LEBEAU. SEE PRIOR FSN W/
    EVAL. I DO NOT HAVE H/F YET.
    ISSUES: LOW IMPACT BUT PRIOR INJY IN FEB 09 (SLIP
    AND FALL) SO MAY HAVE MADE HER MORE PRONE TO
    INJY.

- March 15, 2010, Hupp notes conversation with insured's attorney Rebecca:

    OBC TO ATTY. VISITED W/ ATTY, REBECCA. I'LL FAX HER
    COPY OF THEAX REPORT.  I'LL ALSO EMAIL HER PHOTOS WE
    TOOK AND COPY OF THE STMTS WE TOOK FROM BROOKE PER
    HER REQ IN FEB 3 LETTER.  ALSO DEC PAGE.  SHE APPREC.
    SAME. I ASKED IF SHE EVER GOT CONFIRMFMATION OF LACK
    OF CVG W/CC. SHE STATES NO. I ADVISED HER OF MY RECENT
    CALL. SHE U/S. WILL GET CONFIRMATION OF CVG OR NOT,
    AND GO FROM THERE. HER CLIENT IS STILL TX'ING. SOFT

LeBeau 12

TISSUE INJYS. I EXPRESSED MY INITIAL IMPRESSION OF LOW SPEED/MINIMAL DMGS LOSS.

- April 22, 2010 letter from Dairyland Ins., no coverage for Merrill.

- May 13, 2010 Hupp notes in log:

  OBC TO ATTY TO DISC AND EXTEND OFFER. SHE WAS NOT AVAIL. LMTCB. SENDING HER LETTER W/ OFFER OF $3459 (PLUS ANY MEDICAL BILLS FROM ER AND EAGLE P.T) ALSO ENCLOSING THE CC DENIAL AND RECORD FROM CHIRO INDICATING SHE WAS PRE INJURY STS AS OF 12/12/2009.

- October 13, 2010, Hupp notes in file:

  OBC TO ATTY OFFICE. TT REBECCA. SHE HAS MY OFFER. PER ATTY, CLIENT STILL HAVING SOME NECK PAIN, STILL GETTING CHIRO TX. I ADVISED ATTY AGAIN OF MINIMAL IMPACT, LENGHT OF CARE. SHE U/S.SHE IS WORKING TO GET THE NEW MEDS/REX. ATTY NOT IN POSITION TO MOVE ANY FURTHER ON NEGS UNTIL ADDL INFO OBTAINED.

- May, 10, 2011 Hupp notes telephone call with Robin Z.

- November 18, 2011 Demand letter and package from LeBeau's attorney, Zephier with documentation. Total damages listed $85,304.40. Itemized as follows:

  | | |
  |---|---|
  | Past Medical Expenses | $4,354.80 |
  | Future Medical Expenses (estimated) | $10,000 |
  | Mileage | $949.60 |
  | Past Loss of Enjoyment of Life | $15,000 |
  | Future Loss of Enjoyment of Life | $5,000 |
  | Past Pain & Suffering | $30,000 |
  | Future Pain & Suffering | $20,000 |

- November 22, 2011 Hupp notes receipt of demand for $85,304 and notes $4,300 in meds with no expiration date to demand.

- December 1, 2011 Hupp notes range of 6997 to 8997 and comments

  CAUSATION: NOT A HARD IMPACT, CV R/E IV. ID SOMEWHAT

LeBeau 13

EGGSHELL AS PRIOR NECK AND BACK INJY FROM FALLING, RESOLVED NOT LONG BEFORE THIS CURRENT MVA. MECHANISM IS THERE FOR A MINOR NECK/BACK STRAIN &/OR REAGGRIVATION TO PRIOR INJY...

HAND EVALUATION:

| | |
|---|---|
| CERVICAL SPRAIN: | 500 - 1000 |
| THORACIC SPRAIN: | 500 - 1000 |
| LUMBAR SPRAIN | 500 - 1000 |
| PERSISTANT H/A_S   2M: | 500 – 1000 |

| | | | |
|---|---|---|---|
| SPECIALS | 3699.00 | - | 4048.00 |
| ADDLS MILEAGE | 949 | - | 949 |
| GENERALS | 2000.00 | - | 4000.00 |
| TOTALS | 6648.00 | - | 8997.00 |

NEGOTIATION POINTS
+ LOWER IMPACT
+STI
+CHIRO RELEASE 3M POST LOSS.
-1ST PARTY UM
-PRIOR HX. EGGSHELL
-LONG DURATION OF CARE

This log entry is summary of evaluation which also includes, in part, the following:

CAUSATION: NOT A HARD IMPACT, CV R/E IV. ID SOMEWHAT EGGSHELL AS PRIOR NECK AND BACK INJY FROM FALLING, RESOLVED NOT LONG BEFORE THIS CURRENT MVA. MECHANISM IS THERE FOR A MINOR NECK/BACK STRAIN &/OR REAGGRIVATION TO PRIOR INJY.

INJS: CERVICAL/THORACIC/LUMBAR STRAIN WITH PERSISTANT HEADACHE COMPLAINTS

MEDS OF $3699 WHICH IS ER, ALL OF PT, MASSAGE TX IN 2009 AND KUEHL CHIRO THRU 1/14/10. IF MEDS BECOME AN IMPEDIMENT TO RESOLUTION MAY CONSIDER UPTO $4048 (ALL MEDS LESS TX AFTER DEER HIT).

WAGES: NONE INDICATED IN ATTY'S DEMAND. AS SUCH, I DID NOT CONSIDER ANYTHING IN THIS EVAL.

ADDLS: MILAGE TO/FRO CHIRO CLAIMED. SHE LIVES IN REMOTE AREA OF SOUTH DAKOTA. NEAREST CHIRO FACILY OVER AN HOUR AWAY. I ALLOWED THIS CONSIDERATION $949

LeBeau 14

- December 1, 2011 Hupp notes offer of 6650.

- December 14, 2011 Hupp faxes offer to attorney Robin Z.

- April 17, 2012 Hupp notes call to attorney office. Restates offer.

- May 23, 2012 file reviewed by Erik Schrank.  He notes

  REVIEWED-WITH THE EGGSHELL NATURE OF THE INSURED, AS WELL AS THE LENGTHY OF TXMT (ALBEIT SPORATIC AND BASICALLY RELEASED AT THE 3 MONTH K~K), I WOULD LIKE TO CONSIDER A RANGE OF 4000-6000 IN GENERAL DAMAGES. PLEASE CONSIDER THIS RANGE, ALONG WITH SPECIALS (ROB FELT ON THE TOP END AT JUST OVER 4K, YET IF THIS WAS TO BE AN IMPEDIMENT, THE TOTAL IS LESS THAN 5K-THAT MAY NEED TO BE CONSIDERED). MILEAGE APPEARS FINE AS WELL.

- May 31. 2012 Amy Hyde notes new range 8997  to 10997.  Notes call to attorney. Advises policy limits are $25,000.  Notes offering $9K.

- July 3, 2012 Hyde notes call to attorney

- July 16. 2012 Mary Toole notes receipt of Summons and Complaint.  Offer of Judgment of $25,000.  Open for 14 days

## Analysis and Summary

The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), summarizes the required good faith claim handling that needed to take place in this claim when it states; "When a policyholder submits a claim to an insurance company, he or she does so on the belief that the matter in question is covered by the policy.  Yet, policyholders generally do not understand all of the circumstances that are or are not covered in the policy and are not familiar with every provision in the policy affecting the amount they can recover." (p59)

LeBeau 15

In the September 21, 2009 recorded interview, Progressive adjuster, John Kurle, misrepresents the claim process as well as the Progressive policy.

A.   Yeah it does. Umm so then like I can just keep going to the chiropractor cause he wants to see me back Wednesday or Thursday.

Q.   Weill mean you can, but the....

A.   I may get stuck

Q.   Yeah, it's possible. You there is always a possibility without having that MedPay, medical payments coverage,

A.   Okay

Q.   So I mean you can do whatever you feel you need to do, but you know there is a chance it could possibly be your responsibility

A.   Oh...

Q.   But I can't you know, I just can't tell you one way or the other

A.   you don't know yet.

Q.   Yeah

A.   Okay, alrighty well I guess I'll just keep going; I got to get it done

Q.   Alright.

This was inappropriate and clearly misleading. If the at fault driver was uninsured, the uninsured motorist coverage on the Progressive policy would include payment for the medical bills. This should have been explained to the insured. Progressive's UM coverage has the essential purpose to protect the injured insured from the economic consequences of an accident caused by someone without adequate means to pay for the damages. Progressive promises to pay the sums recoverable, that is the verdict value of the claim, so the insured doesn't have to sue or fight for the money. By misrepresenting the coverage and/ or the process, Progressive failed to fulfill this basic purpose.

There are several instances within the claim handling where the adjuster did not give consideration to the insured's interests. The insuring agreement states that Progressive will pay will pay for damages that the insured is legally entitled to collect. Progressive adjusters failed to fulfill this part of the bargain during the claim handling. Examples are found in the handling of the insured's damages involving travel costs and loss of earnings.

LeBeau 16

The insured's costs for travel to and from medical services are included and payable under damages the insured is legally entitled to collect and are covered under the first party uninsured motorist coverage. Progressive is made aware of this at least by September 30, 2009 during a recorded interview. Then, on the following day, Supervisor Dee Hoime states to include it in the evaluation. The adjuster, Lorie Rear notes in her October 6, 2009 evaluation that the insured is, "driving 90 miles one way for chiro. treatment. Insured driver may request payment for mileage." This, "don't ask, don't tell" mentality is not addressed or corrected by management.

Ms. Rear gets caught by the insured on January 5, 2010 and explains it in her log where she states,

> Insured driver requested mileage. Explained will add mileage. She asked why I haven't add mileage already and stated I promised would add when we met. Explained I don't recall her asking for mileage. Insured driver stated I promised and she can't believe didn't do this. Explained to insured driver again I really sorry. I didn't remember discussing mileage and simple mistake.

The adjuster calculates travel to date at 1700 miles and allows $.24 per mile. This is corrected to $.55 per mile for a total of $935 for travel to date and included in the January 6, 2010 evaluation with the $759 in total meds.

The insured's loss of earnings claim is another example of Progressive failing to give consideration to the insured's interests and failing to pay what is owed on the claim. Wage loss is identified on or before September 30, 2009 and discussed in Progressive's October 6, 2009 evaluation. By January 6, 2010 Progressive had calculated the insured was owed $515 for lost earnings due to medical treatment caused by the accident. At that time the medicals totaled $759.

On or about December 1, 2011, Progressive adjuster, Robert Hupp completed his evaluation of the injury. According to his evaluation accepted medical charges ranges from $3699 to $4048. He also added mileage charges totaling $949. This increase of $14 for travel expense relates directly to the additional $3,289 in medical care incurred after January 5, 2010. Hupp details the additional 33 dates of treatment in this evaluation that appear to account for the $14 in added travel expense.

Hupp not only fails to properly address the increase in owed lost wages attributable to these additional 33 visits to medical providers, he chooses to ignore what is owed and his good faith obligations and makes the following entry under WAGES:

> **None indicated in attorney's demand, As such, I did not consider anything in this evaluation.**

LeBeau 17

None of the evaluations in the file address how this accident and injury have impacted the insured's life. The file contains evidence that there was the possibility of a significant impact, but the area is never investigated. The file is unclear as to how or why general damages are determined or changes during the handling. The ranges of value evolve as follows:

- October 6, 2009      $575 - $1,500

- October 8, 2009      $724 - $1,649

- November 10, 2009    $1,405 - $2,655    (meds $200)

- December 11, 2009      – reserves raised to $25,000 –

- January 5, 2010      $2,164 - $3,414      (759 meds, 155 LOE)

- January 6, 2010      $3,459 - $4,709      (above plus 935 mileage)

- December 1, 2011    $6,997 - $8,997      (meds 4048, 949 mileage)

- May 31, 2012      $8,997 - $10,997      (meds 4048, 949 mileage increase in GD suggested by Erik Schrank)

Progressive's valuation of general damages (pain and suffering – past, present and future; loss of enjoyment of life – past, present and future; and other compensable articles) was not proper and did not meet minimum industry standards as this was never properly investigated or evaluated. The evaluations that did take place failed to consider everything owed to the insured under the contract. The evaluations did not appear to be objective and appears designed to minimize payout. There was little to no adjustment as new information was received. The ranges for general damages as determined by Progressive were:

- November 10, 2009    $1,200 to $2,400

- January 6, 2010      $1,250 to $2,500

- December 1, 2011      $2,000 to $4,000

This is not appropriate when you consider that during this same period of time the insured was required to; stay employed and put in a full work week, take care of her small children and home, drive hundreds of miles to obtain medical treatment, all the

LeBeau 18

while dealing with an ongoing injury. None of these issues were addressed by the progressive adjusters in completing their evaluations.

Progressive knows that undermining UIM benefits carries the risk of increasing the insured's emotional and financial distress. With such knowledge, the public should expect an insurer to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured.

The organizational values underlying Progressive's claims processes and their incentive-based pay program, GainShare, create a significant question about the reasonableness of the claim decision- making and overall handling of the claim. The insurance buying public is misled by Progressive's claims its people are guided by their independent judgment.

Progressive initiated the GainSharing program in 1992 and its continued use of the GainSharing program demonstrates the effectiveness of this financial strategy which is to pay less so the profits of The Progressive Corporation can increase.

The Progressive Corporation establishes Progressive's compensation practices for all employees. These practices apply to claim handlers. A claim handler is rewarded by increased compensation through GainSharing and other cash bonuses and by salary and merit payments, if the claim handler achieves certain levels of performance and the corporation also profits.

The Gainsharing program was described in 1992 as "designed to support improvement of our cost structure to enhance growth opportunities." The 1996 Gainsharing Program is described as being "designed to motivate Progressive people to work together to help the company achieve our short-term and long-term business goals." The business goal is a 96% combined ratio which can be very easily accomplished by paying less than should be paid. The 1997 Gainsharing program was headlined by a drawing of Progressive claim handlers picking money off of the Progressive money tree under the caption of "Share in Progressive's Success."

To summarize, Progressive Insurance Company failed to meet minimum industry standards as well as their obligations of good faith and fair dealing in the handling of the LeBeau claim. Progressive failed to give at least equal consideration to the insured's interests. Specifically,

:

- .Misrepresented the policy and available policy benefits to the insured

LeBeau 19

- Failed to conduct an objective investigation, giving equal consideration to the insured's interests to determine what was owed.

- Failed to conduct an objective evaluation, giving consideration to the insured's interests

- Failed to attempt to effectuate a prompt, fair, and equitable settlement of the claim when liability has become reasonably clear.

This preliminary report is being completed prior to completion of discovery, including, but not limited to, the taking of depositions, and is subject to revision or modification based upon any additional documents or materials I may review or information I may receive on this matter subsequent to this report.

Dated November 27, 2013 at Sammamish, Washington

Stephen L. Strzelec

LeBeau 20

# Exhibit A

## Stephen L. Strzelec, CPCU, CLU

20719 NE 8th Street
Sammamish, WA 98074

Phone 206-427-4322
Phone/Fax 425-898-8588

### EMPLOYMENT

**Strzelec Consulting Services 2002 – Present**
Claims practices analysis

**State Farm Insurance Companies, 1985-2002**

Positions Held
- Auto/Fire Section Manager, Anchorage AK
- Auto Divisional Claim Superintendent, Anchorage, AK
- Auto Claim Superintendent, Vancouver, WA
- Auto Property Superintendent, Tacoma, WA
- Auto Claim Representative, Redmond, WA
- Fire Claim Superintendent, Tacoma, WA
- Fire Reinspector/Trainer, Redmond, WA
- Fire Claim Representative, Tukwila, WA

## Other Employment and Responsibilities

**Claim Manager, AIGA, 1996-2002**
Responsible for oversight of the handling of claims for the Alaska Guarantee Association
**Flood Coordinator State Farm Pac.NW Region 1987-89**
Responsible for training on Flood Policy and claim handling for region. Coordinated and supervised all flood claims.

**L & S Construction, 1980-1984**
Managing partner

### EDUCATION

LeBeau 21

*Strzelec Consulting Services*

BS Business Administration
CPCU
CLU
2 Parts AIC

Seattle City University, Seattle, WA 1987
Insurance Institute of America, 1992
The American College, 2000
Insurance Institute of America,

## RECOGNITION

- Served on committee to reorganize Fire Claim School
- Recognition for Supervision of Alaska wildfire losses.
- Served on Steering Committee for State Farm Section Manager Forum.

## INDUSTRY TRAINING

**State Farm**

Fire Claim Training Series, Evaluating Structural Losses, Fire Basic Claim School, Fire Intermediate Claim School, Fire Estimatics School, Training for Trainers, Management Orientation, Management I-IV, Management Overview, Supervisory Skills, SST Goal Setting, Performance Management Skills, Managing the PP&R Process, Fire Claim Management Course, Situational Leadership, Strategic Planning, Presentation Excellence, BCC I-IV, Auto Claim School, Bodily Injury Claim Management Course, Physical Damage Claim Supervision, Auto Claim Management Course, Auto Divisional Claim Supt. Workshop, Fire Divisional Claim Supt. Seminar, Field Claim Management, Leadership Principles, XACTIMATE Software Training, First Party Seminar, CAT/CMR Redesign Training, TEACH, Auto Section Manager Forum, Fire Section Manager Forum

**Other**

VALE National Building Loss Evaluation School, ICAR (6 parts), ITTI Advanced Auto I

LeBeau 22

# Exhibit B

I have been working as a claims practices consultant since November 2002 after spending approximately eighteen years in the insurance industry.  I have been retained in; Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nevada, New Mexico, North Dakota, Oklahoma, Pennsylvania, South Dakota, Texas, Washington, West Virginia and Wisconsin.

## Testimony

During the past four years I have provided testimony in the following cases:

| Case Name | Court | Lawyer Retaining | Dep | Trial |
|---|---|---|---|---|
| Low Clearance v. Truck I.E. | Superior Court of WA, King County  NO 09-2-31638-4 KNT | Malling | X | |
| Kadrich v. Farm Bureau | Superior Court of AZ Pima Co. C2009-1318 | Watkins | X | |
| Boxx v. USAA | US Dist. Court MS | Lovelace | X | |
| R&M v. Progressive | 11th Judicial District McKinley Co,. NM D-1113-CV-200800590 | Vogel | X | X |
| Nguyen v. Allstate | Superior Court of WA King County 08-2-11831-2 KNT | Malling | X | X |

LeBeau 23

| | | | | |
|---|---|---|---|---|
| Helm v. West Coast Life | Superior Court of AZ Maricopa County CV2007-021253 | Howell | X | |
| Swinney v. State Farm | US Dist Co. KS 10-2021-CM  6/28-29/11 | Vogel | X | X |
| E/ W Bank v. American Modern | US Dist. Co. Southern District, Houston TX 4:09-CV-03212 | Merlin | X | |
| Marinetti v. Ford Motor Co. | Circuit Court for Macomb County, MI 09-2336-NF | Zebrowski | X | |
| Boesel v. State Farm | U.S. District Court of AZ CV-10-1039-PHX-DGC | Moore | X | X |
| Nelco v. State Farm FL. | 15th Judicial Circuit, P. B. County, FL 502008CA008035XXXXMB | Petinato | X | X |
| Tilkemeier v. CW/Fidelity | First Judicial District Santa Fe, NM County D-101-CV-2009-02503 | Zamura | X | X |
| Leonard v. State Farm | Superior Court Maricopa Co. AZ CV2010-000214 | Harward | X | |
| McAlpine v. State Farm | U.S. District Court for Western WA in Tacoma 10-05630-BS | Williams | X | X |
| Hautula v. Progressive | U.S. District Court of SD CIV 08-5003-JLV | Zephier | X | |
| Hindin v. State Farm | Superior Court of Ca, L.A. County Case No. BC 190783 | Hindin | X | |
| Nguyen v. ACIC | AZ Superior Court of Maricopa County CV2009-033330 | Langerman | X | X |

LeBeau 24

| | | | | |
|---|---|---|---|---|
| Columbia Ind. v. Zurich | Superior Court of WA for Benton and Franklin Cos 10-2-00029-9 | Bridges | X | |
| Rudolph v. State Farm F&C | Cook County Il Circuit Co 2007 L 010724 | Garstki | X | |
| Cueva v. Garrison Ins. | Pierce County Superior Court of WA 10-2-06680-8. | Williams | X | |
| Lord-Flynn v. Allied/NW | Clark Co. Superior Court of WA 09-2-00022-4 | Flynn | X | |
| Gray v. American Family | U.S. District Court of AZ 2:11-CV-01635-DGC | Dillenberg | X | |
| Beckett v. State Farm MAIC | U.S. District Court, District of S.D.   11-5017 | Zephier | X | |
| Kern v.Progressive | 7th Judicial Circuit, S.D. CIV-09-1197 | Abourezk | X | |
| Woods v. State Farm | Superior Court King Co. WA  12-2-01911-8 | Malling | X | X |
| Fuentes v. State Farm Lloyds | 11th Judicial District Court of Harris, Texas, Cause No. 2010-61039 | Mostyn | X | X |
| Santos v. Farmers NW Life | 1st Judicial District, New Mexico D-101-CV-2012-01485 | Green | X | |
| Yorke v. AICA | Circuit Court, Macomb County, MI  CT NO: 11-5323-NF | Boyer | X | |

LeBeau 25

Strzelec Consulting Services

| Putnam v. Western National | Superior Court of WA for King County NO. 11-2-44757-0 SEA | Bearb | X | |
|---|---|---|---|---|
| Baker | U.S. District Ct. Western WA at Seattle 2-12-CV-01788-JLR | Williams | X | |

LeBeau 26

# Exhibit C

## Publications and Presentations

Claims Practices Workshop "The Effects of Performance-Based Pay for Adjusters" Regional Law Firms; Reno, NV November 8-9, 2002

"Claim Evaluation systems at SF; Why Colossus is Not Necessary" Colorado Trial Lawyers Assoc. Meeting, March 6, 2003

"First Party Coverage Nuggets: Getting Payment on Undisputed Amounts" Washington State Trial Lawyers Assoc. Meeting, March 27, 2003

"First Party Good Faith and Receiving Payment on Undisputed Amounts" Arizona Trial Lawyers Association Meeting, May, 16, 2003

"Incentive-Driven Claims Practices" Claims Practices Workshop; Regional Law Firms; Reno, NV February 20-21, 2004

"Recognizing Improper Claim Practices" Claims Practices Seminar; National Law Firms. Deadwood, SD May 7-8, 2004

"The Chronology of Communications From the Claims Adjuster: When you can expect to hear from them and Why" The Settlement Institute October, 12-14, 2006

"The Chronology of Communications From the Claims Adjuster: When you can expect to hear from them and Why" Tennessee Trial Lawyers Association Meeting, January 31, 2007

"Navigating Insurance Claim Quagmires" Claims Practices Seminar; New Mexico Trial Lawyers Foundation; Albuquerque, NM May 25, 2007

"Helping the Adjuster Handle the Claim in Good Faith and Reach a Proper Resolution" American Association for Justice 2007 Annual convention, July 15, 2007

"The Coherent Claim Practices Case" Claims Practices Seminar; National Law Firms. Reno, NV November 30 – December 1, 2007

LeBeau 27

"The Coherent Claim Practices Case" Claims Practices Seminar; National Law Firms. Las Vegas, NV  February 9, 2008

"Disruptive Innovation in Claims Practices" National Law Firms. Reno, NV April 18-19, 2008

"Claims Practices Update" National Law Firms.  Reno, NV  October 10-11, 2008

"Coherence in Claim Practices Litigation" – Faculty member & Panelist on Claim Practices Issues; National Law Firms, Miami, FL  May 1-2, 2009

"Fundamentals of Insurance and Insurance Claim Handling" 360 Advocacy Institute, August 26-28, 2009 Las Vegas, NV

"Laying Track for the Lowball Express"  Claim Practices Seminar; National Law Firms; Reno, NV  December 4-5, 2009

"Steve Strzelec and Gary Fye on Claim Handling"  National Law Firms;  Reno, NV  April 20-21, 2010

"Claim Practices Workshop" National Law Firms; Reno, NV  August 24-25, 2011

"Black Hills Bad Faith Seminar" National Law Firms; Custer State Park, SD, April 4-5, 2013

Seattle University Law School; Seattle WA, October 28, 2013

# Exhibit D

### Billing Guide

My charges associated with consulting are as follows: $300.00 per hour for consulting and deposition or trial testimony, an additional $500.00 flat fee for a videotaped deposition, $100.00 per hour for travel time, and actual costs incurred. A $3,000 retainer is required. While charges are billed against the retainer, it is considered fully earned upon receipt.

Based on prior experience, I require a $1,200 advance deposit for each half-day of deposition testimony. A full day deposition (more than 5 hours) requires a $2,400 deposit. Actual time and expenses for the deposition, including travel, are billed against the advance.

Strzelec Consulting Services
Stephen Strzelec
Federal EIN   04-3736604

LeBeau 29

# Exhibit E

## Industry Standards for the Handling of Claims

Part of every policy is a promise that the parties will deal fairly with one another. This implied covenant of good faith and fair dealing requires that neither party do anything to impact the right of the other to receive the benefit of the agreement. With an insurance policy, a special relationship arises out of the parties' unequal bargaining power and the special nature of the insurance contract. The insurer has a much greater obligation to perform under the policy than the typical insured, who knows little of insurance transactions.

An insurer is in a position to take advantage of an insured's misfortune by bargaining for settlement or resolution of the claim for less than the true amount owed. The insurer has control over the investigation, evaluation, processing, and denial of the claim. The insurer also has superior knowledge and buying power for the repairs and services following a loss. This unequal power creates an enhanced duty on the insurer to place the interests of its insured at least equal as its own.

The duties of good faith and fair dealing are embedded within the industry and are taught and accepted as claim handling industry standards. These require an insurer to do nothing to injure the rights of the insured to receive benefits under the policy. Knowing and following the underlying precepts of claims work is crucial to fair claim practices. For example, an insurer must:

- Adopt and implement reasonable standards for handling claims,
- Give at least equal consideration to the insured's interests
- Assist the insured in presenting the claim.
- Adequately and promptly investigate a claim,
- Respond timely to letters and phone calls,

LeBeau 30

*Strzelec Consulting Services*

- Adjust the claim (either pay it or deny it) within a reasonably prompt time,
- Attempt in good faith to effectuate prompt, fair and equitable settlement of claims, where liability is reasonably clear,
- Attempt to find a basis to pay the claim rather than find reasons to deny,
- Timely pay all undisputed amounts owed under the policy.
- Disclose all relevant coverages, conditions and restrictions under the policy.
- Provide in writing a detailed reason for denying the claim specifying each contract term or provision upon which it relies,
- The insurance company must interpret its policies reasonably, pursuant to the well-recognized insurance industry rules for insurance policy construction, which include the following:
  - exclusions are to be interpreted narrowly;
  - insuring agreements are to be interpreted broadly
- Know and be in compliance with those laws and regulations that impact claims to the appropriate state, and treat policyholders consistent with requirements of the law.
- Deal fairly and be completely honest with the insured.

These generally accepted claim handling principles or insurance industry standards are well known within the industry and they are taught at many claim schools. They are often written within procedural and claim handling guides, and found in numerous publications including industry-sponsored educational textbooks. Industry standards include this obligation and are clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p12) where it states, in part, "claims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages"

Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act that provide statutory and regulatory standards for the handling of insurance claims. Over 45 states have adopted the Model Unfair Claims Practices Act, either in part or in its original form.

The industry recognizes the importance of the Model Act and address it in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p249) when it states, "insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a recommended standard of care. It was developed [by the National Association of Insurance Commissioners] as a guide for insurance regulators in every state to establish reasonable claim practices" .

LeBeau 31

The claim representative's chief tasks are to investigate, evaluate, and resolve the claim. When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation. It is the duty and responsibility of the insurer to investigate both liability and damages. It is the insured's responsibility to cooperate with the investigation, not to undertake the investigation or incur the cost.

This duty to investigate is central to proper claim handling. Industry standards include this obligation and are clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p249) where it states, "A thorough investigation is the foundation of good faith claim handling. Claim representatives must conduct a prompt and objective investigation, using the right personnel and collecting all relevant evidence. Investigation should continue as long as new facts develop or become available."

The importance of proper investigation of coverage is detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p13) where it states, "Coverage disputes are delicate and serious matters. The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims." The text goes on later to state, "Determining coverage may be very simple or extremely complicated depending on the specific facts of the case. An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely." (p29)

The AIC 33 textbook, "Aggressive Good Faith and Successful Claims Handling" (Rokes, First Edition, 1987) discusses the failure to conduct a proper investigation and states:

> Where the insurer fails to investigate the case properly, however, there is no question that the insurer is in breach of contract. Further, there is no question that the insurer has been negligent by omitting to conduct a proper investigation, one of the responsibilities under the contract. The right to recover for breach of contract or for the tort of negligence would seem to be apparent. Whether the failure to investigate constitutes an extraordinary showing of disingenuous or dishonest failure to carry out a contract is certainly a question of fact. It certainly demonstrates the existence of a nebulous threshold between negligence and what is considered to be "bad faith."

LeBeau 32

The standard within the insurance industry is that if it is not in the claim file, it didn't happen. This standard is detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p340) where it states, "The standard for documentation is that the file should speak for itself. The basis for all decisions should be clear, all communications to and from the claim representative should be recorded, and is should be possible at any stage in the file's life to transfer it from one claim representative to another. Upon transfer of a file, what has been done and what remains to be done should be clear." It also states, "Good claim handling alone is not enough to avoid bad faith claims. Supporting evidence must be in the file to establish that the good work was indeed done. If the documentation is not in the file, then it can only be assumed that nothing happened. The absence of good log notes, correspondence, and investigative and evaluative material is another indicator that the claim representatives were not doing their job properly." (p249)

LeBeau 33

LeBeau 34