# Transcript of the Testimony of
# **Lorie Rear**

**Date:** April 21, 2014

## **Case:**

Lebeau v. Progressive Northern Insurance Company

## **Apex Court Reporting**

Phone: (605) 877-1806
Email: Cindy@ApexCourtReporting.com
Internet: www.ApexCourtReporting.com

**PLAINTIFF'S EXHIBIT**
tabbies'
_2_

Lorie Rear
April 21, 2014

Page 22

Q  Are you aware of the amount of litigation that Progressive is involved in in South Dakota?

A  No.

Q  Well, this is the second time that I've actually taken your deposition. You understand that those are lawsuits?

A  Yes.

Q  And that's litigation, do you understand that?

A  Yes.

Q  Have you testified in any other lawsuits?

A  No.

Q  Just these two?

A  Yeah.

Q  Okay. Have you ever testified at a trial?

A  No.

Q  Now, where did -- when you were talking about you and Loren handling bodily injury claims at the Rapid City office here for Progressive, you mentioned some other person. Is there somebody else that handles bodily injury claims here in Rapid City?

A  No.

Q  Just you two?

A  Yes.

Q  Okay. We already talked about Chad Blumer, John Kurle, John Lemon as people who only handle property

Page 23

damage, right?

A  Yes.

Q  Okay. So there were eight people that you were referencing at this Rapid City office. Let's talk about the other two.

A  Heather Rose and Bradley Williams handle special lines claims.

Q  Okay. And what do you mean by that, "special lines"?

A  They handle like boat claims, motorcycles.

Q  Boats?

A  Snowmobiles.

Q  Okay. What was the other person other than Heather Rose?

A  Bradley Williams.

Q  Okay. That -- according to -- that only brings us up to seven.

A  Yep. And then Carrie Ohman.

Q  Could you spell that person's name?

A  Sure. C-A-R-R-I-E, and then Ohman, O-H-M-A-N.

Q  Okay. And what does Carrie do?

A  Regular auto claims.

Q  When you say "regular auto claims," what does that mean?

A  Just your normal standard claims that come in,

Page 24

everyday -- like deer hits, just the normal.

Q  Non bodily injury?

A  Yes.

Q  What's the distinction between what she does and what the -- Chad and John and John do?

A  They write estimates so they're looking at the property damage.

Q  Okay. When I make reference to a term called "reserves" in the insurance context, do you know what that is?

A  Yes.

Q  What is that?

A  What we have the claim reserved at for the worst case possibility on the claim.

Q  Okay. The worst case possibility, you're talking about?

A  Yes.

Q  So in -- can you explain that further what exactly you mean, the "worst case" situation?

A  Maybe what we feel the total bills or total possible -- what the claim value could be.

Q  Okay. Does that take into consideration at all what the policy limits are?

A  Yes.

Q  In your experience with Progressive, has there ever

Page 25

been a reserve set on a bodily injury claim that you've handled that was -- where the reserve was set higher than the policy limits?

A  No.

Q  What goes into setting a reserve on a bodily injury claim with Progressive?

A  Just looking at the amount of treatment, type of accident, what you would expect maybe their ongoing treatment to ...

Q  "Type of accident," could you explain? What do you mean?

A  If it was a catastrophic accident I -- reserves would probably be set higher. Or if it was, you know, a vehicle was torn apart or somebody was life flighted, those reserves would probably be set higher.

Q  Or somebody was killed?

A  Yes.

Q  Okay. Now, is there a classification in Progressive's claim handling structure where claims that Progressive deems to be minimal impact collisions are funneled into?

A  No. I guess I handle -- I mean, I handle minimal impact claims.

Q  Is that part of your job description?

7 (Pages 22 to 25)

**Lorie Rear**
**April 21, 2014**

Page 26

A   Yes.

Q   So who makes the determination whether a claim is a minimal impact claim?

A   I don't know if it's one person. I suppose there's a lot that goes into determining if it's a minimal impact claim because that's a vast of claims. I mean, there could be different situations. So it's probably a lot of people's different input if it's a minimal impact or if it's a greater --

Q   Okay. So is this something that is put before some kind of a roundtable?

A   No.

Q   When you say there's a lot of people or a lot of factors, what do you mean, that goes into determining what's minimal impact?

A   I guess I'm saying like if a supervisor reviewed your file and felt that maybe there was some other issues and maybe it wasn't minimal impact or -- I mean, so I think that's just a generic word, "minimal".

Q   Is it a fallback position for Progressive to classify every claim as minimal impact unless other factors come into play?

A   No. I don't know that we classify anything minimal impact. I certainly handle lower impact claims.

Page 27

Q   Okay. Well, you handled -- part of your involvement in this claim was you handled part of this claim involving Brooke Lebeau?

A   Uh-huh.

Q   How was it that you got assigned to handling this type of a claim?

A   She was injured in the accident, and the claim was assigned to me.

Q   Okay. Was there any consideration given to that assignment to you that you were the adjuster for Progressive that was handling minimal impact claims?

A   I don't know that it came into factor that it was a minimal impact. I think I was the adjuster assigned to the claim.

Q   You went out and looked at the vehicles, didn't you?

A   Yes.

Q   Didn't you go see and met in Pierre?

A   Yes, I met her in Pierre.

Q   Did you ever look at the tortfeasor's vehicle?

A   No.

Q   Did you ever take any pictures of the tortfeasor's vehicle?

A   No.

Q   You understand that the tortfeasor is now deceased?

A   No, I did not know that.

Page 28

Q   Did you ever interview the tortfeasor?

A   I believe I spoke with the owner, or I might have spoken with the driver myself and they had said they didn't have insurance. And my conversation with them was brief.

Q   Do you know whether that was recorded in a claim activity log?

A   Yes.

Q   It was?

A   Yes.

Q   And would that have been sometime within the first month of the accident itself which was in September of '09?

A   That I spoke with them?

Q   Yes.

A   Um, I think I got the claim in October, so I think within --

Q   You could look, if you wish. The claim log is toward the back of Exhibit 1 there.

A   I spoke with -- on August (sic) 6th it says, Claimant Driver: Follow up again to verify whether claimant driver has insurance. Claimant vehicle owner stated claimant driver does not have any vehicle and believes does not have any insurance and no -- as no reason. Received message that today

Page 29

nobody is available to take calls and then hung up the phone.

Q   And you're saying that that is indicating that you spoke with the other driver?

A   I believe I spoke with the owner of the vehicle.

Q   Not the other driver?

A   Yeah.

Q   Because actually the car was owned by somebody else other than the driver, right?

A   Yeah.

Q   So going back to my question now that you've read that entry there: Isn't it true that you really never did speak directly with the tortfeasor himself?

A   The driver?

Q   Yes.

A   I did not.

Q   So therefore you had no direct information through your investigation as to what he would have said directly to you about how the accident occurred or the damage resulting thereof, right?

A   No.

Q   Did you ever go to Eagle Butte at all on the investigation of this case?

A   I met her in Eagle Butte.

8 (Pages 26 to 29)

Lorie Rear
April 21, 2014

Page 30

Q   When? While you're looking at that, you had said that you met her in Eagle Butte. Do you mean Brooke Lebeau?

A   Yes.

Q   Okay.

A   I think it was in November. I'm just trying to get a --

Q   Because November would have been within two to three months following the accident itself, right?

A   Sure. And before that I met her in Pierre.

Q   At Marlin's Restaurant?

A   Yep.

MR. ARNDT: I think I could help.

THE DEPONENT: Is it the 10th?

MR. ARNDT: I don't want to answer the questions for you.

MR. ZEPHIER: Yeah, I'd just as soon let her answer the questions.

MR. ARNDT: Yeah, I won't answer the questions.

MR. ZEPHIER: I appreciate that.

A   So it looks like I must have met her on the 12th maybe.

Q   (By Mr. Zephier) Of November?

A   Yep.

Q   Okay. At that time did you meet with anybody else

Page 31

other than Brooke Lebeau?

A   On this claim?

Q   Yes.

A   No.

Q   Did you take photographs at that time, or was that done at the meeting in Pierre?

A   That was done at the meeting in Pierre. And this time I don't remember if I -- she'd hit a pheasant so I think I looked at her pheasant hit, too. I might have taken some photos. I don't recall if it was this time or -- she needed help setting up a pheasant claim.

Q   So this is part of the reason why I'm going down this road with you is that I want to kind of clarify that, if I could. Your meeting with her in Eagle Butte was not totally related to her bodily injury claim from the September '09 accident, was it?

A   No, that was the only -- I mean, she had asked me if I would look at her pheasant hit, too, so I did that also.

Q   Okay. Now, did you speak at all, whether it was at that meeting in Eagle Butte in November of '09 or at any point in time, did you ever speak at all with her employer?

A   I don't recall.

Page 32

Q   I know that you sent inquiries in writing for records from the employer, right?

A   Was it for wages? Yes.

Q   Okay. To your recollection, did you ever speak with anybody from her office that would have been the housing authority?

A   Not that I recall.

Q   She did have a wage loss claim, right?

A   Yes.

Q   And that was actually discovered by Progressive, yourself and Mr. Kurle, early on in the claim, right?

A   I believe when I talked to her she had indicated she had lost some time going to the chiropractor.

Q   Okay. So you knew as a representative of Progressive that she actually had a wage loss?

A   Yes.

Q   And, to your knowledge, has that wage loss ever been paid?

A   Not if she hasn't settled the claim.

Q   And why is that?

A   She hasn't settled the claim.

Q   No, why is it not paid absent the settlement of the claim?

A   Because she hasn't settled the claim in order to pay

Page 33

for that.

Q   Please explain what you mean, though.

A   She hasn't resolved the claim with Progressive.

Q   Does a Progressive insured have to settle a claim before they have their damages paid under their Progressive policy?

MR. ARNDT: Object to the form of the question and to the extent if it calls for a legal conclusion.

You can answer if you understand the question.

A   It's under the uninsured motorist bodily injury part of the claim which she would need to resolve that claim in order to be -- and at that time would be compensated for her wages.

Q   (By Mr. Zephier) So if she was not willing to settle her entire uninsured motorist claim with Progressive, she couldn't be paid for her wage loss separately; is that what you're saying?

A   Yes.

Q   Now, would you agree with me that over all of the years that you've handled claims, that there are various elements of damage that are covered under the uninsured motor coverage of Progressive's policies?

A   Can you restate that, please?

9 (Pages 30 to 33)

Lorie Rear
April 21, 2014

Page 34

Q    Would you agree with me that there are various elements of damages that are covered under Progressive's uninsured motorist coverage under their policies?

A    You're saying damages -- I want to clarify because there's not uninsured motorist property damage. You're meaning damages meaning wages, is that what --

Q    I'll clarify it. Bodily injury I'm speaking of, not property damage. I'm talking about bodily injury, there are various elements of damages that are intended to be covered under the underinsured motorist coverage of Progressive's policy, correct?

A    Yes.

Q    And that would include wage loss, wouldn't it?

A    Yes.

Q    And it would include medical expenses, wouldn't it?

A    Yes.

Q    Past, present and future?

A    Yep, that's for, yep, related to the accident.

Q    Right. And wouldn't it include mileage going to and from a medical visit?

A    Yes.

Q    And wouldn't it include pain and suffering?

A    Yes.

Page 35

Q    Loss of enjoyment of life?

A    Yes.

Q    Future pain and suffering?

A    Yes -- if it qualified, yes.

Q    Disfigurement?

A    Yes.

Q    Scarring?

A    Yes.

Q    Disability?

A    Yes.

Q    So with these various elements of damages that are intended to be covered under uninsured motorist coverage with Progressive's policies, what you're saying is that Progressive takes the approach where they will not pay any of those damages until a person settles the entire uninsured motorist claim; is that right?

A    Yes.

Q    So even if a person was in dire financial need of assistance to pay for those damages, Progressive would still demand that they settle their entire UM claim before any of that would be paid?

A    I would believe so, yes.

Q    Okay. Do you think that's right?

A    I believe that's the policy.

Page 36

Q    Is that a Progressive policy, or is that the way insurance is supposed to work?

A    To my knowledge, I believe that's how insurance works.

Q    Okay. Do you understand that there are other people in the insurance industry that would disagree with you on that?

A    There could be.

Q    Do you consider yourself, with all of the years that you've worked in the insurance industry, an expert in the field of insurance claim handling?

    MR. ARNDT: I'll object to the form of the question. The term "expert" is relative. She's called as a lay witness here today.

    You can answer if you understand.

A    I think that I handle the claims that I handle, and I've been with Progressive for a while. I don't know what (sic) anybody would consider me an expert. That would be up to whomever was looking at my -- looking at me if they felt I was an expert.

Q    (By Mr. Zephier) Have you ever been called as a witness as an expert in the insurance field?

A    No.

Q    I can tell you that I have not called you as an expert witness in this case. We're just asking

Page 37

questions as a witness.

    (Exhibit 2 marked for identification.)

Q    (By Mr. Zephier) I'm going to show you what we've marked as Exhibit 2 here. Would you take a look at that? Have you seen that before?

A    No.

Q    Do you know what a jury instruction is?

A    What a jury instruction is?

Q    Yeah.

A    I don't know if I know a hundred -- I would say it's what the jury is instructed to do when they hear a court case.

Q    Okay. Do you have any other understanding other than that?

A    No.

Q    Do you know how it works?

A    How --

Q    How a jury instruction works?

A    No.

Q    Have you ever heard the term "eggshell plaintiff"?

A    Yes -- well, not "eggshell plaintiff," no, I've never heard that term.

Q    But in the environment of the insurance industry, have you heard the term "eggshell"?

A    Yes.

10 (Pages 34 to 37)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 38

Q    And it often comes up, doesn't it, in consideration of injury claims?

A    I don't know if I would say it often comes up, but it does come up.

Q    It does come up?

A    (Deponent moves head up and down.)

Q    What's your understanding of what that means, an "eggshell claimant"?

A    My understanding of someone who may be an eggshell would be maybe somebody who has some prior conditions or some prior issues that maybe this -- an accident may have exacerbated that or made -- made those symptoms worse; that they had some other prior health conditions.

Q    And can you speak for Progressive as to how Progressive treats eggshell claimants on their bodily injury claims?

     MR. ARNDT: I'm going to object to the form of the question to the extent that it calls for this witness to speak for Progressive policy or corporate policy. She's called as a lay witness as a claims handler for this particular claim.

     You can answer if you understand.

A    I don't know how Progressive -- there's no ...

Q    (By Mr. Zephier) Well, you've handled bodily injury

Page 39

claims, right? You've run across an eggshell claimant?

A    (Deponent moves head up and down.)

Q    How did you treat it?

A    I guess you look at each situation differently and review the facts of the claim.

Q    And?

     MR. ARNDT: Object to the form. And what?

     MR. ZEPHIER: Exactly. That's my question: And what?

A    Look at the documentation from the claim, look at their prior history.

Q    (By Mr. Zephier) Well, what -- what do you think an eggshell claimant, in your claim handling experience, presents on a given claim?

     MR. ARNDT: Object to the form. It's vague and ambiguous. It's also been asked and answered.

     You can answer it if you understand.

A    Ask me the question again. I'm sorry.

Q    (By Mr. Zephier) Let's break this down. You've said that you've encountered yourself an eggshell claimant on claims you've handled in the bodily injury sense, right?

A    Yes.

Q    How did you treat those type of claims? What did

Page 40

you look at specifically in dealing with an eggshell claimant?

A    Look at their prior history, the type of damage on their vehicle, look at the kind of treatment they're getting currently.

Q    Do you believe an eggshell claimant that has a prior injury or condition of some sort is not entitled to make a claim?

A    No.

Q    Explain then how you would treat a claim -- or eggshell claimant, for purposes of separating out how you would treat them, versus a person that was not an eggshell claimant.

     MR. ARNDT: Objection, asked and answered.

A    I guess if I had a young athlete that has never been injured before, in his 20s, and was in an accident, and then somebody who was older, just went through chemotherapy or something, I would consider them differently.

Q    (By Mr. Zephier) Okay. An eggshell claimant is entitled to be compensated just as much as a person that didn't have any prior history, aren't they?

     MR. ARNDT: Objection, calls for a legal conclusion.

     You can answer.

Page 41

A    Yes.

Q    (By Mr. Zephier) And, in fact, Exhibit 2 that I put in front of you, there's a jury instruction, but you've never seen that particular jury instruction before?

A    No.

Q    And yet you're handling claims for Progressive dealing with eggshell claimants, right?

A    Yes.

Q    And that is actually the eggshell jury instruction, were you aware of that?

A    No.

     MR. ARNDT: Objection, asked and answered.

Q    (By Mr. Zephier) No? Okay.

     (Exhibit 3 marked for identification.)

Q    (By Mr. Zephier) Take a look at Exhibit 3. Have you seen that before?

A    No.

     MR. ARNDT: I'm going to ask for a standing objection to further questions about jury instructions to the extent that they call for legal conclusions and that it's unfair -- or misleading to this particular lay witness who's already testified that she's handling bodily injury claims that are non-attorney repped and that she has not previously

11 (Pages 38 to 41)

Lorie Rear
April 21, 2014

Page 42

seen either of the exhibits.

Q (By Mr. Zephier) You understand, ma'am -- I believe your answer was no, right, that you haven't seen this before, right?

A No, I have not seen this before.

Q Were you ever curious to look up what the South Dakota civil pattern jury instructions were concerning bodily injury claims in South Dakota?

A No.

Q Not at all?

A No.

Q And yet your job is to determine the extent and nature of bodily injury claims for real human claimants, right?

A Sure, that are not attorney repped.

Q What's the big distinction in your mind between attorney rep and non-attorney rep?

A That they don't have an attorney.

Q I mean, what's the big distinction in how you handle a claim when you're dealing with somebody who doesn't have an attorney?

MR. ARNDT: Objection to the form and the term "big distinction".

A I think the distinction is they don't have an attorney so you're dealing with that person one on

Page 43

one with their concerns to resolve the claim.

Q (By Mr. Zephier) So you may be dealing with a person that's totally naive about what their legal rights are; is that possible?

A Sure, they may not know what their legal rights are.

Q Because actually if they have an attorney, wouldn't you assume that they maybe have a better understanding of what their legal rights are in the claim?

A I guess that depends on a case by case. Some people may know their legal rights before -- with not having an attorney.

Q Right. But the fact that somebody doesn't have an attorney is important in Progressive's mind where they actually assign an adjuster to handle those claims and then a different adjuster once an attorney gets involved? I mean, isn't that what Progressive is doing is they're separating those type of claims?

A I think they're -- yes, they're separating them, but I don't know that -- it's just a distinction then that person just handles attorney rep claims, and I handle claims that are not attorney repped.

Q Do you see that as an appropriate distinction for Progressive to utilize?

Page 44

A Yes.

Q Well, you're an example here. I mean, your job basically is at an end, isn't it, once a person gets a lawyer and they're represented by an attorney?

MR. ARNDT: Object to the form and "your job". You mean that the claim is transferred?

Q (By Mr. Zephier) Your involvement in the claim.

A Yes. It comes to an end, yes.

Q So in your world it's a fairly critical distinction whether somebody has a lawyer or not as far as if you're going to remain the claims adjuster?

A Yes.

Q So once a person has an attorney, then you basically just hand everything off to the other adjuster, right?

A Yes.

Q And that would be Loren Sedevie?

A Or whomever the claim is assigned to.

Q That happened in this claim, didn't it?

A Yes.

Q Who is Robert Hupp?

A An adjuster in Nebraska, I believe.

Q Okay. And has he ever been in Rapid City handling claims?

A Not that I'm aware of.

Page 45

Q Have you spoken with Robert Hupp recently?

A No.

Q Have you spoken with him in the last year?

A No.

Q Have you ever met him personally?

A I believe I may have. Yes, I've met him.

Q Yes, you have?

A (Deponent moves head up and down.)

Q And has he ever been in any of the South Dakota claims offices, to your knowledge?

MR. ARNDT: Do you mean "been" from the standpoint of worked there, Robin?

MR. ZEPHIER: No, actually physically present.

A Like working out of a South Dakota --

Q (By Mr. Zephier) No. Just, he was in Rapid City and --

A I don't know his schedule. I mean, I don't know, so he could have gone to like a Sioux Falls claim office and worked or did something. I don't know his schedule or know if he's ever been in a South Dakota claims office. I don't know.

Q You two worked on the Brooke Lebeau claim for Progressive, right?

A Together, is that what you're asking?

Q Well, no, I mean at one point.

12 (Pages 42 to 45)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 46

A  Yes.
Q  So you handled it before he came in, correct?
A  That is correct.
Q  Because John Kurle actually was involved early on before you came on, correct?
A  That is correct.
Q  And John was involved on basically the property damage part, right?
A  When the claim was first turned in.
Q  Okay. So it went from John Kurle to you and then to Robert Hupp, right?
A  Yes.
Q  And it went to Robert Hupp because all of a sudden Brooke Lebeau got legal counsel; is that right?
A  That is correct.
Q  So did you have anything to do with the claim handling once Rebecca Kidder made an appearance on the claim?
A  No.
Q  You know who Rebecca Kidder is, right?
A  I assume Ms. Lebeau's attorney. I don't know her.
Q  Okay. But you recognize the name?
A  Yes.
Q  Because that's actually what triggered your non-involvement in the claim, correct?

Page 47

A  When the claim was transferred?
Q  (Counsel moves head up and down._
A  Yes.
Q  Okay. All right.
    So getting back to Robert Hupp, you said that he was -- what -- did he have an office in Omaha or something?
A  I don't know where his office -- I don't think it's in Omaha.
Q  Was it out of his home?
A  I don't know. I think he was in a -- I don't -- I don't remember the town he was in.
Q  Okay. Did you and he ever have any conversations about Brooke Lebeau's claim?
A  No.
Q  None?
A  Well, not that I recall.
Q  Even when a transition was occurring where Rebecca Kidder comes into the claim so therefore it's a, it's an attorney repped claim, according to Progressive, and then you handed it off to somebody else, was there ever any closeout meeting that you had with Robert Hupp about --
A  No.
Q  -- Hey, this is going on here and --

Page 48

A  Not that I recall did he ever call me and ask me anything on the claim.
Q  Okay. Is that standard operating procedure for Progressive in that situation?
A  If he had any questions he would probably call and ask me.
Q  So the fact that he didn't call and ask you, are we to assume he didn't have any questions?
A  I would assume so.
Q  Okay. Did you ever deal with him at all on any other bodily injury claims other than this one where you handed it off, handed a claim off to him?
A  He may have called me in the past and may have asked me some questions on a claim. I don't know the initial claim or I couldn't give you a certain claim number.
Q  Nothing sticks out in your mind?
A  No.
Q  Okay. If you -- if he walked through this door today, would you recognize him?
A  I don't know that I would. It's been awhile since I've seen him, so I don't know that I would.
Q  Do you know whether he's somebody who's under 40 years of age?
A  I believe he's probably close to my age. He's

Page 49

probably in his early 40s.
Q  Okay.
A  Again, I don't know. I don't know.
Q  All right. Do you know if he still works for Progressive?
A  I don't believe he does.
Q  And how do you know that? Again, I'm not asking you to repeat something from your attorney, but do you have any information company-wide through claims management or something like that that --
A  Not from claims -- I just heard that he had left.
Q  Do you know why?
A  No.
Q  Getting back to jury instructions, have you ever had a situation come up where somebody has actually asked you from the standpoint of a claimant, I'm talking about a Progressive claimant where somebody has asked you, Well, doesn't Progressive pay for my injuries regardless of the fact that I was injured previously?
A  I don't know if someone has asked me that in that term. We would pay for their injuries that are related to the accident.
Q  Is there some -- is there some way that Progressive looks at an eggshell claimant and diminishes the

13 (Pages 46 to 49)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 50

value of their claim based upon the fact that they have a prior condition?

A   No. Sometimes -- I don't know that I would use that word "diminish". I think "eggshell" sometimes can add value to the claim.

Q   And why is that?

A   Like I said, if someone had a prior medical condition, maybe they were in a little more pain than somebody else if they were seeking cancer treatment or something like that, so I think it's a broad term of the word. I don't think --

Q   I think I understand what you're saying. So from your standpoint in viewing an eggshell claimant, you, yourself, have seen where individuals that may be vulnerable to being harmed more actually may have greater damages, is that what you're saying?

A   They may have a prior history that may affect and make the value of their claim greater, yes.

Q   Okay. Now, in Brooke Lebeau's situation she was actually an eggshell claimant, wasn't she?

    MR. ARNDT: I'm going to object to the form of the question to the extent that it calls for a legal conclusion.

    You can answer if you understand.

A   She had some prior injuries.

Page 51

Q   (By Mr. Zephier) But didn't you guys actually refer to her as an "eggshell"?

A   Yes, we were waiting for her prior medical records to see exactly what her prior injuries were.

Q   Dee Hoime actually referred to her as an eggshell claimant, didn't she?

A   I believe she did in one of the notes.

Q   Well, Dee actually reviewed this claim several times over the time you were handling it, didn't she?

A   Yes.

Q   Did you feel that was appropriate?

A   That Dee reviewed the claim?

Q   Yeah.

A   Yes. She's my supervisor.

Q   Was Dee the one that was responsible for giving you your performance evaluations every six months?

A   I think -- like the end of the year, yes.

Q   Okay. What about John Lemon? I know that for a while there he was your supervisor, right?

A   He was.

Q   Didn't he give you some performance evaluations?

A   Yes.

Q   And have you seen your personnel file lately?

A   No.

Q   We had your personnel file four years ago when we

Page 52

took your deposition on that other case.

A   Okay. Yes.

Q   And do you remember I was asking you some questions about some of the things in your personnel file? Do you remember any of that?

A   You might have to jog my memory. I don't know exactly what you asked me. I don't recall.

Q   I'll try.

A   Okay.

Q   Well, anyway, we were discussing performance evaluations, and you acknowledged to me that actually you had gone through performance evaluations periodically. That's correct, right?

A   Yes.

    MR. ARNDT: I'm going to object to the question and ask for a standing objection to questions related to the witness's personnel file. I believe the file that was previously produced in the prior litigation was subject to a protective order and it would be inappropriate, without complying with that protective order, to ask this witness questions about that confidential -- or that personnel file in this case.

    MR. ZEPHIER: I'll take exception to that. We're asking questions here. I don't have the

Page 53

document. You haven't turned it over. So I'm asking questions about items. I'm cognizant of the protective order in that case. And those documents have been destroyed. I don't think protective orders go to the extent where they are intended to wipe my memory from my memory banks. I think that would withstand any judicial scrutiny.

    MR. ARNDT: Just to further the record on this issue then, Robin, the personnel file has not been requested in this case that I'm aware of, nor has any confidentiality or protective order been complied with as discovery with this witness in this particular case.

    (Exhibit 10 marked for identification.)

    MR. ZEPHIER: Number 12 of Exhibit 10, Defendant's Responses to Plaintiff's Third Set of Requests for Production of Documents, there is no protective order in this case, but the personnel files were clearly requested back then.

    MR. ARNDT: That's correct. And I think part of our response to that discovery request was that we'd consider the request if a protective order were entered. And, again, of course none has been entered in this case.

    MR. ZEPHIER: Right. So I just wanted to

14 (Pages 50 to 53)

Lorie Rear
April 21, 2014

Page 54

correct that because you were insinuating that they'd never been requested.

MR. ARNDT: No, I think I said properly requested. And I will regard that --

MR. ZEPHIER: No, you said "requested".

MR. ARNDT: Okay. Well, then I mean properly requested. And they haven't been produced because you have not sought a protective order.

MR. ZEPHIER: I don't want a protective order, so there is none.

MR. ARNDT: And that's why they haven't been produced.

Q (By Mr. Zephier) We'll continue on, okay?

A Okay.

Q Performance evaluations are done every six months at Progressive, aren't they?

A They're done at the end of the year.

Q Did that change at all over the last four years?

A No.

Q Okay. But to your knowledge they're only done once a year?

A You have like a mid-year where -- so you know where you're at, and then at the end of the year is your final.

Q So is it possible that they're done twice a year?

Page 55

A Yes.

Q Okay. You participate in gainsharing, right?

A Yes.

Q And to your knowledge you have no other choice, do you?

A To participate?

Q Right.

A No.

Q You must participate as a --

A Yes, as an employee.

Q You're basically forced to, aren't you?

MR. ARNDT: I'm going to object to the form of that question.

A I don't know that I would use the word "force". I guess it's something that's offered at Progressive.

Q (By Mr. Zephier) Aren't you required to participate in gainsharing?

MR. ARNDT: Object to the form. Required by who?

MR. ZEPHIER: Anybody.

Q (By Mr. Zephier) Are you required by anybody to participate in gainshare at Progressive?

A I guess. I -- if you receive a check or not, I guess you're employed by Progressive.

Q Do you understand that gainsharing is an incentive

Page 56

compensation program designed for Progressive personnel?

A It is designed for Progressive personnel. I don't know that it's an incentive. I don't exactly know how it's calculated or how it's put together.

Q But you have actually received payments through the gainshare program at Progressive, right?

A Yes.

Q And have you ever sat down and looked at the formula as to how your gainshare would be figured out?

A No.

Q Do you have any knowledge of where the numbers come from in the formula for how Progressive applies the gainsharing formula for its employees?

A No.

Q Are you aware that management and the Compensation Committee come up with figures for the formula to be applied?

A No.

Q Would that surprise you or shock you that it was coming down from management?

A I don't know that it would shock me, I guess. Somebody has to come up with it. I don't know who comes up with it.

Q You don't come up with it, right?

Page 57

A No.

Q To your knowledge, none of the claims handlers at Progressive come up with those figures, do they?

A No.

Q Do you know what the term "claim severity" means?

A The severity of a claim?

Q No, claim severity.

A No. So can you explain it to me?

Q I'm just -- I'm throwing that term out there because it is a term, and I'm just wondering if you're familiar with that.

A I've never heard that. I mean, I understand if you're asking me the severity of a claim, but if you're using the term "claim severity," I don't know. I don't know where -- in the terms you're using it.

Q Well, using your term, the severity of a claim, what does that mean to you?

A Meaning that the injury or how -- I don't want to use the word "severe," but how severe maybe a person is injured or that -- the impact of the claim.

Q So would it be fair to say that your understanding of the severity of a claim is more in line with the extent and nature of the damages on a claim? Is that what you're saying?

15 (Pages 54 to 57)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 58

A   Or the treatment, yeah.

Q   Okay.

MR. ARNDT:  Robin, if we could take a quick break.  I think we've been at it for a little over an hour.

MR. ZEPHIER:  Yeah.  Keep in mind, though, I do have very limited time.  I think I told you that coming in.

MR. ARNDT:  Sure.  Yeah.  We won't take a lengthy break.  We'll just take a short one.

(Recess taken from 1:48 p.m. to 1:55 p.m.)

(Exhibit 4 marked for identification.)

Q   (By Mr. Zephier)  I'm going to show you what we've marked as Exhibit 4.  Have you seen that before?

A   No.

Q   Again, this is another jury instruction.  This one has to deal with the "Damages - Aggravation of Preexisting Injury or Condition".  Do you see that?

A   Yes.

Q   We talked earlier about eggshell consideration, especially in the sense of Brooke Lebeau.  Did you, when you were investigating this claim, see any evidence that she was, in fact, an eggshell claimant?

A   She had indicated that she had a slip-and-fall

Page 59

accident prior to this accident.

Q   So that would indicate so?

A   We are waiting -- I was waiting -- I don't know if we got all of the records -- to review what kind of injury she had prior to this accident.

Q   Okay.  And do you know whether you were still involved by the time those records arrived, or was that something that Mr. Hupp handled once it got to him?

A   I don't believe I had all of those records.  I think we were still waiting for some of them.

Q   Did you make any type of monetary offers to Ms. Lebeau while you were handling the claim?

A   Yes.

Q   And yet that was still during a time when you were actually not in receipt of the total of her medical records from the past; is that right?

A   Yes.

Q   Would it be fair to say that you were trying to settle the entirety of the UM claim with Brooke Lebeau before having all of the information at hand?

A   I was trying to settle the claim fairly.

Q   But you didn't have all of the information at hand, did you?

A   I don't know that we had all of her ten-year prior

Page 60

medical history.

Q   Right.  And so that's information you didn't have at hand and yet you were making settlement proposals to finalize her UM claim, right?

A   I believe that part of the time of my offer to -- I don't know that she was still continually treating.  I think she had ended or maybe went back to the chiropractor.  And so the chiropractor had released her, so then I had made her an offer.

Q   But she was still indicating that she felt in her own mind that she needed ongoing treatment, right?

A   Yes, she felt she needed ongoing treatment.

Q   Now Jury Instruction No. 4 talks about aggravation of a preexisting injury or condition.  Do you see that as meaning anything different than what we were discussing about the eggshell claimant?

MR. ARNDT:  Same objection to -- standing objection to continued questions about -- to this witness regarding interpretation of jury instructions.

You can answer.

A   We were looking to see, or I was investigating to see if she was an eggshell or if she had -- what were her prior conditions prior to this accident.

Q   (By Mr. Zephier)  Okay.  So she could actually fit

Page 61

under that category of having an aggravation of a preexisting condition; is that what you're saying?

A   She could fit, yes.

(Exhibit 5 marked for identification.)

Q   (By Mr. Zephier)  Okay.  I'm going to show you what we marked as Exhibit 5 here which is Jury Instruction 50-10-70 concerning pain and suffering.  Have you seen that before?

A   No.

Q   In all of the years that you've handled claims for Progressive, was it your understanding as a claims adjuster with that company that bodily injury claims were supposed to include compensation for pain and suffering?

A   Yes.

Q   Do you recognize that pain and suffering is actually an element of damages under the uninsured motorist coverage of Progressive's policies?

A   Yes.

Q   And so would you expect if a person was injured enough to receive medical care at a hospital or clinic or a doctor's clinic, that they would also suffer pain and suffering?

A   Yes.

Q   And have you paid claims in the past where you've

16 (Pages 58 to 61)

APEX COURT REPORTING
(605) 877-1806

**Lorie Rear**
**April 21, 2014**

---

Page 62

actually compensated claimants for pain and suffering?

A   Yes.

Q   And did you calculate at all in this claim while you were involved a value attached to pain and suffering for Brooke Lebeau?

A   Yes.

Q   Was it your understanding in seeking a settlement from Brooke Lebeau for the UM claim that she was in any way required to sign some type of a written release to receive money from Progressive?

A   Can you ask that question again?

Q   Yeah. Was it your understanding that there was any requirement that Brooke Lebeau was to sign some sort of a written release to Progressive for her to actually receive benefits and payment from Progressive?

A   Yes.

Q   And why do you say that?

A   That is how -- once you sign the release, we're able to compensate you for the accident and pay for the medical treatment related to the accident.

Q   So what if somebody refuses to sign?

A   Then I guess we keep going until they want to sign the release.

---

Page 63

Q   So Progressive would withhold payment of that claim because of that failure to sign; is that right?

MR. ARNDT: Objection to the form of the question and the term "withhold".

You can answer if you understand.

A   Progressive would pay for compensation once they settle the claim --

Q   (By Mr. Zephier) But --

A   -- and signed a release.

Q   What you're saying is they will not pay until there's a written release, correct?

MR. ARNDT: Objection to the form of the question. That's what you're saying. I don't think the witness said that at all.

A   No, we will not -- we are unable to pay for, to compensate somebody or for their medical bills until they settle the claim with Progressive.

Q   When you say "settle," you mean?

A   Sign a release.

Q   Sign a written release of all of her future rights to any benefits, correct?

A   Yes.

MR. ARNDT: Objection to the form of the question to the term "any".

Q   (By Mr. Zephier) And so if that's the requirement of

---

Page 64

Progressive that there be a written release in order to receive UM benefits, do you agree with me that if a claimant having a Progressive policy refused to sign such a written release, that they will never get their benefits?

MR. ARNDT: Objection to the form of the question and the term "never".

A   So the "claimant" meaning a third-party person, or are you asking about our insured, a first party?

Q   (By Mr. Zephier) Your insured.

A   Once they sign the release --

Q   That's not my question. I'm saying: You have said that it's Progressive's policy that they will not pay UM benefits until there's a written release signed by the claimant, right?

A   That is correct.

Q   So if a Progressive insured refuses to sign such a written release for UM benefits, Progressive will never pay that claim, will they?

MR. ARNDT: Objection to the form of the question and the term "never".

A   I suppose when they sign the release and settle the claim they would receive payment. I --

Q   (By Mr. Zephier) Well, I understand your lawyer is interrupting here, but the thing about this is that

---

Page 65

you're saying that the whole triggering mechanism to a Progressive insured receiving UM benefit claims is that they have to sign a written release, correct?

MR. ARNDT: Objection to the form of the question. She did not say that. That's what you said.

You can answer the question.

MR. ZEPHIER: You're interrupting with these objections, and I'm just trying to quantify with her what she's actually saying.

MR. ARNDT: Well, then I would --

MR. ZEPHIER: Give me a little leeway here.

MR. ARNDT: I can give you as much leeway as is fair, Robin, but it's unfair for you to put words in the witness's mouth with your question, so I would ask that you not do that. I'm going to object when you do that.

A   When somebody signs a release, we would pay them for their medical bills and their treatment. I don't know what else -- I'm sorry if you feel like I'm not answering your question.

Q   (By Mr. Zephier) You're not. You're absolutely not answering the question. You've said that the requirement by Progressive is that they will not pay UM benefits until there is a signed written release,

---

17 (Pages 62 to 65)

Lorie Rear
April 21, 2014

Page 66

correct?

A   I don't know that that's a requirement. I know in my job that we do not --

Q   So it's not a requirement?

A   I don't know that.

Q   Who knows that?

A   I can tell you that I'm not going to pay a claim until I receive a signed release.

Q   You, yourself, will not do that?

A   Yes.

Q   And why do you do that?

A   Because that's what I was told not to do.

Q   By who?

A   By corporate, by my boss.

Q   You mean Progressive, right?

A   I guess, yes.

Q   Would you get fired if you paid a UM claim without getting a written release from a claimant?

A   I don't know.

Q   You've never tested it, have you?

A   No, because I know I need to get a release.

Q   Right. But you've never tested it, have you?

    MR. ARNDT: Objection, asked and answered.

A   No.

Q   (By Mr. Zephier) You're scared to, aren't you?

Page 67

    MR. ARNDT: Objection, form of the question.

A   No, I know that I need to get a written release in order to pay on the claim.

Q   (By Mr. Zephier) Do you think it's right to withhold paying a UM benefit claim to somebody if they refuse to provide a written release to receive those claims or payments?

    MR. ARNDT: Objection to the form of the question and to the extent that it calls for a legal conclusion.

A   I think once someone provides us with a written release, we are able to pay those benefits.

Q   (By Mr. Zephier) Do you think that's right?

A   Well, then they're saying they're settling the claim.

Q   Do you think that's right?

A   Yes, because then they're saying they're settling the claim and they're at the point where they would like to resolve the claim. Up and to that point --

Q   So any Progressive insured that has an uninsured motorist claim with Progressive that refuses to sign a written release to receive the uninsured motorist benefits, they could go years without getting paid and you're okay with that because they just refused to sign that release; is that right? You're okay

Page 68

with that?

A   Well, I don't know why they -- I guess it's a case-by-case issue. I don't know why they're refusing to sign the release if they're ready to resolve their claim.

Q   Do you believe there's any legal requirement they do such a thing?

    MR. ARNDT: Objection to the form of the question in that it requests a legal conclusion.

Q   (By Mr. Zephier) Can you answer that?

A   I don't know.

Q   Is it in the policy, in the Progressive policy anywhere specifically that says that as a Progressive insured if you're going to receive uninsured motorist benefits you must sign a written release to receive those benefits? Is that written anywhere within the Progressive policy?

A   I don't know.

Q   It's not, is it?

    MR. ARNDT: Objection to the form of the question. Are you testifying now? I mean --

    MR. ZEPHIER: No, I'm not.

    MR. ARNDT: -- she already answered the question that it wasn't in the policy. Are you asking a new question?

Page 69

    MR. ZEPHIER: No, she said "I don't know".

    MR. ARNDT: Well then she's answered the question.

    MR. ZEPHIER: Are you testifying?

    MR. ARNDT: I'm not. I'm making an objection so you don't create an unfair record. I think the question has been asked and answered.

    You can answer it if you understand.

A   I don't know that it's in the policy that they --

Q   (By Mr. Zephier) So you don't know?

A   I don't know.

Q   Okay. Have you read the policy recently?

A   I've read the policy.

Q   Okay. Do you remember anything close to that language being in there?

A   There could be. Like, I -- without seeing a policy, I don't --

Q   Well, there's one in here, actually. Let's find it. Well, actually I'm not talking about Exhibit 1. It's in the other stack here. Here we go. And I'll just -- I'll mark this in case we need to refer back to it.

    (Exhibit 19 marked for identification.)

    MR. ZEPHIER: Let the record reflect that Exhibit 19 has been handed to the witness, and she

18 (Pages 66 to 69)

Lorie Rear
April 21, 2014

Page 70

is paging through the Progressive policy.

MR. ARNDT: And is there a question pending?

A    What was your question again? So I can see if I can find your question.

Q    (By Mr. Zephier) Yeah, I think what you said is that you've read the policy recently. And I said, Well, do you recall seeing any language in there that's even close to that? And you said, Well, if I had the policy I could check. And so at that point I grabbed the policy.

MR. ARNDT: And what's the "that"?

Q    (By Mr. Zephier) So you're checking --

MR. ARNDT: Close to what? What are you asking her to check for, Robin?

A    It says, "We will pay under this Part III only after the limits of liability under all applicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements."

Q    (By Mr. Zephier) Where does it say that they must sign a release in order to get payment for those?

MR. ARNDT: I'll object to the form of the question. The document speaks for itself.

A    I don't know that it says -- it does not say that someone has to sign something. It's saying "settlement".

Page 71

Q    (By Mr. Zephier) Let's be quite frank here. You've never seen that language in the policy, have you?

A    That they have to sign a release?

Q    Right.

A    No.

Q    In fact, it's not in the policy, is it?

A    No.

Q    And actually the policy, isn't that the contract that -- where all the rights and remedies and the obligations come from between your relationship with Brooke Lebeau?

A    Yes.

Q    And so if it's not in the policy -- if it's not in the policy, how is the policyholder supposed to know what they're supposed to do about getting their benefits? Are they supposed to guess?

A    I think what -- when I met with her, I advised her when she settled the claim with Progressive and signed a release she would receive payment for her medical treatment related to the accident, as well as compensation.

Q    But, Lorie, that's you advising her. That's not coming out of the policy, is it?

A    I guess that was me advising her.

Q    Right. And that's not language coming out of the

Page 72

policy, is it?

A    No.

Q    Okay. Let's move on.

All right. Now, when we were -- I showed you these jury instructions. The reason I was showing those to you is that: Do you feel it is your responsibility as a claims adjuster to help the insured?

A    Yes.

Q    And to fully advise the insured as to what their coverages are?

A    Yes.

Q    And to basically disclose to the insured benefits that are owed to them?

A    Yes.

Q    Because you wouldn't want to withhold those benefits from the insured, would you?

A    No.

Q    In fact, that would be wrong, wouldn't it?

A    To withhold benefits?

Q    Yeah.

A    I guess not paying for something they were owed?

Q    Right.

A    Yes.

Q    Because that would actually -- could harm the

Page 73

insured, couldn't it?

A    I guess there are situations.

Q    Could create more financial stress on them, wouldn't it?

A    It could.

Q    Could actually create mental distress, couldn't it?

A    I suppose it could.

Q    It could make the problem worse, couldn't it?

MR. ARNDT: Objection to the form of the question and the term "problem".

You can answer if you understand.

A    I suppose it could.

Q    (By Mr. Zephier) Do you know why people carry insurance?

MR. ARNDT: Objection to the form, and it calls for speculation.

A    Because it's the law.

Q    (By Mr. Zephier) Do you recognize that people also carry insurance for peace of mind?

A    Yes.

Q    To protect against losses that they cannot bear themselves?

A    Yes.

Q    To help when they're feeling the need of -- under financial stress and mental stress of having a loss?

19 (Pages 70 to 73)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 74

A    Yes.

Q    Insurance companies are supposed to step in there and actually alleviate that stress, aren't they?

A    Yes.

Q    And insurance is a bought-and-paid-for product, would you agree?

A    Yes.

Q    In fact, Progressive has quite a marketing campaign trying to lure more consumers and policyholders, don't they?

MR. ARNDT:  Objection to the form and the term "lure".

A    I guess we have some good commercials, if that's what you're asking.

Q    (By Mr. Zephier)  Well, it's designed to drum up more business, isn't it?

A    I would suppose.

Q    And actually Progressive does better the more business they have, isn't that true?

A    I suppose I would still have a job.  Yes, that would be good.

Q    And gainsharing is actually tied into Progressive's profitability, isn't it?

A    I don't know.

Q    Well, does the term "combined ratio" mean anything

Page 75

to you?

A    I've heard the term before, and I know that it's maybe policies in force versus -- I don't exactly -- couldn't give you a great definition of the term.

Q    Okay.  You don't have a real good understanding of it then?

A    I know it has something to do with policies and maybe premium but, again, I don't --

Q    Okay.  Were you aware at all that combined ratio was part of the analysis that goes into the gainsharing formula?

A    No.  I know there's a lot of different factors.

Q    Okay.  Have you ever seen any of the gainsharing documents?  Have you?

MR. ARNDT:  I'll object to the form.  I don't know what you mean by "the gainsharing documents".

A    There was a document you showed me in our last deposition.

Q    (By Mr. Zephier)  You remember that?

A    Yes.

Q    Okay.

(Exhibit 20 marked for identification.)

Q    (By Mr. Zephier)  Ms. Rear, that's Exhibit 20.  Is this the one that you recall?

A    That you had showed me?

Page 76

Q    Yes.

A    I believe so, yes.

Q    Do you remember the tree?

A    Yes.

Q    The money tree?

A    Yes.

MR. ARNDT:  I'm going to object to the, this line of questioning regarding Exhibit No. 20, particularly as it relates to the date on the document, and I guess based upon Ms. Rear's prior answers in the prior deposition about her knowledge or lack of knowledge regarding this document.

Q    (By Mr. Zephier)  Gainsharing, the program itself still exists at Progressive, correct?

A    Yes.

Q    And it did back in 1997, didn't it?

A    Yes.

Q    If I recall right, didn't you go to work for Progressive back in '96?

A    No, November of '98.

Q    '98, okay.  But you were on gainsharing from the very beginning, right?

A    Yes.

Q    Looking at Exhibit 20 there, other than seeing that document during your deposition on the Hautala case

Page 77

four years ago, have you seen that since that time?

A    No.

Q    Have you seen other drawings depicting gainsharing there at Progressive other than this one?

A    No.

Q    I'd be interested to see any more drawings because apparently they stopped drawing these type of things after this one.  But you're not aware of any?

A    I wasn't even aware of this drawing until you showed it to me.

Q    Okay.  All right.  When you handle a claim for a Progressive insured, do you ever disclose to that claimant that you participate in a program called Gainsharing?

A    No.

Q    Do you ever disclose to Progressive insureds when you're handling their first-party claims that part of your salary for handling those claims comes from being compensated through a bonus program like gainsharing?

A    Part of my bonus comes from gainsharing, but I don't know that it comes indirectly from handling a first-party claim.  I don't know how the claims tie into gainsharing, if they do at all.

Q    Well, actually in your performance evaluations

20  (Pages 74 to 77)

Lorie Rear
April 21, 2014

Page 78

you're being judged on certain targets of performance, right?

A   Yes.

Q   Like number of claims closed, keeping the expenses down?

A   I don't know that I'm -- I don't know that that's on my PE about keeping expenses -- I don't believe that's on my PE, but ...

Q   Do you know that the reserves were set on this case at 25,000 back in 2011?

A   That would be after I handled the claim.

Q   Were you aware that the reserves were set at 25,000?

A   No.

Q   Were the reserves ever set above 10,000 during the time that you were handling the claim?

A   I don't know without looking through the claim to see when the reserves were set.

Q   Okay. Do you know what COA is?

A   Yes.

Q   Do you use COA on handling claims now?

A   Yes.

Q   And during the time dating back to your involvement with the Brooke Lebeau claim, was Progressive still using COA?

A   Yes.

Page 79

Q   And so it's -- to your knowledge, has that use, the COA, been happening uninterrupted since that time? I'm talking about '09 through the present time.

A   Yes.

Q   And COA actually is a computer -- a software program, isn't it?

A   Yes.

Q   Claim evaluation program?

A   Yes.

Q   And information is input into the program, and there's a range -- a settlement range that comes out in the end, correct?

A   Yes.

Q   And there's a low range and a high range, correct?

A   Yes.

Q   And as a Progressive adjuster, you're supposed to abide by that range in trying to get claims settled, correct?

A   I don't know that we abide by that range. I think we use that range as a tool.

Q   And if you deviate from COA's settlement range, what happens?

A   I guess you just put a note in for the reason why you did so.

Q   Is COA measured at all in your performance

Page 80

evaluations, the use of COA?

A   I don't believe so, no.

Q   Don't the claims managers encourage the use of COA on all the claims?

A   Not on all the claims.

Q   But it's clear that management actually encourages the use of COA on claims, correct?

A   On third-party claims?

Q   On claims.

A   On third-party claims, so not on first-party claims.

Q   Where is it written that COA is not used on first-party claims?

A   I don't know that it's written anywhere.

Q   I asked you that question four years ago, if you remember.

A   Okay. I don't remember.

Q   Okay. You don't know where that would be written anywhere?

A   I don't know, yeah.

Q   Standard operating procedures at Progressive are written, aren't they?

A   Yes.

Q   So there are things that are written down as to how claim handlers are supposed to do their jobs, right?

A   Yes.

Page 81

Q   Why wouldn't it be written down that, Hey, we're not supposed to use COA on first-party claims such as UM?

A   I don't know. You would have to maybe ask management or somebody else. I was just told not to use it.

Q   By whom?

A   By Dee Hoime.

Q   After she testified in litigation?

A   I don't know.

Q   Do you know that it's wrong for COA to be used on first-party claims?

MR. ARNDT: Object to the form of the question and the term "wrong".

You can answer if you understand.

A   I don't know that it's wrong. I just know that we are not using COA on first-party claims.

Q   (By Mr. Zephier) Do you know what the reason is of why that is the case?

A   I don't.

Q   Were you ever curious?

A   No.

Q   They just tell you what to do so you do it?

A   Yes.

Q   You want to obviously keep your job, right?

21 (Pages 78 to 81)

Lorie Rear
April 21, 2014

Page 82

A   Yes. I like working at Progressive.

Q   Management comes down with a lot of rules for the claim handlers to follow, don't they?

A   Yes, we have rules.

Q   And they expect you to follow them, right?

A   Yes.

Q   And so there are consequences to pay if you don't, would you agree?

A   Yes.

Q   Up to and including no bonuses?

A   No. I don't --

Q   You think you'd still get a bonus if you didn't follow the rules?

A   Are you asking about gainshare? I mean, I don't -- if you're asking about gainshare, there's a year that I didn't get gainshare and I followed all of the rules. So it was -- however it was factored that year, I didn't receive a gainshare check, and I followed the rules. So I don't ...

Q   Have you ever seen the newsletter for Progressive called The Pen?

A   Yes.

Q   Have you seen the stories in there periodically where they interview people about, Geez, how are you guys spending your gainsharing this year?

Page 83

A   To be honest, I don't read The Pen a lot. So if there was a story done on that --

Q   I'll try not to tell any. It's too bad he's here (indicating).

A   I don't know.

Q   You don't remember seeing any of those stories?

A   No.

(Exhibit 6 marked for identification.)

Q   (By Mr. Zephier) Okay. Take a look at Exhibit 6 here. It's quite an extensive document. But the cover calls it "The Progressive Way". Are you familiar with what that is?

A   Yes.

Q   And what is your understanding of what "The Progressive Way" is?

A   The way we should handle ourselves.

Q   Is it in the form of the document that, more or less in writing, tells you how to handle things?

A   Like handle a claim? I think it's an overall scope of Progressive, how they want their employees at Progressive to act.

Q   Right.

A   So it only gets claims --

Q   Don't rock the boat?

A   No, I think I was saying -- no, I think I meant it's

Page 84

not -- it goes to -- all over. So everybody that works at Progressive has the same copy of this.

Q   Okay. And it's called "The Progressive Way". Do you know why it's referred to like that?

A   No.

Q   Are there things such as core values that you're aware of at Progressive?

A   Yes.

Q   Could you recite me one or two of those?

A   Yes. Integrity, profitability, the Golden Rule.

Q   What's the Golden Rule?

A   Treat one as you would want to be treated.

Q   Do you know if that's applied to Progressive's insureds, or is that applied across the board to any person?

A   I think it's applied to any person.

Q   Have you seen "The Progressive Way" within the last year or so?

A   I haven't seen it like in complete, but I just read something on The Progressive Way maybe last month.

Q   What did you read?

A   About, um, I think it was like sexual harassment or something.

Q   Okay. Isn't that something that you would have access to as a Progressive employee that you could

Page 85

just bring it up on your computer screen?

A   Yes.

Q   Have you seen the standard operating procedures for North and South Dakota recently?

A   Yes -- I don't know if I've seen them recently.

Q   We went through those four years ago when you were deposed. Have you looked at them since then?

A   Maybe a couple years ago. I couldn't tell you an exact date.

Q   Okay. Do you refer to the standard operating procedures when you run into a question as to how to deal with a certain problem in claim handling?

A   I probably refer to my manager, and then we'd probably refer to our guidelines.

Q   Okay. Is your manager your first line of authority in dealing with questions rather than trying to look it up yourself?

A   I think if I have a question I'm not quite sure of what I need to do, that would be my first line would be my team leader.

Q   Do you know that in gainsharing the progression up the scale as to who gets greater percentages of gainsharing increases the higher level you are in the company?

A   Yes.

22 (Pages 82 to 85)

Lorie Rear
April 21, 2014

Page 86

Q    And so as a claims handler, you're basically down on the entry level rung of gainshare, aren't you?

A    Yes.

Q    In order to start getting more money through gainsharing, you've got to get into management, right?

A    I would suppose so, or take a different role.

Q    Okay. Where is your Human Resources Office for you guys here in Rapid City? Where is that? Is that in Sioux Falls?

A    No. Our Human Resources, Darren Devine, and he is in Omaha, Nebraska.

Q    And his name is Devine?

A    Yes.

Q    Do you know what Requests for Admissions are?

A    No.

Q    Okay. You've never had to answer Requests for Admissions on your own then?

A    No.

(Exhibit 9 marked for identification.)

Q    (By Mr. Zephier) Okay. I'm just going to show you what we've marked as Exhibit 9. It's fair to say you've never seen that before?

A    No.

(Exhibit 11 marked for identification.)

Page 87

Q    (By Mr. Zephier) Okay. I'm going to show you what we've marked as Exhibit 11. That's the formal answer filed by Progressive in this case. Have you seen that at all?

A    I believe it was in an e-mail that maybe was sent to me.

Q    Okay. Did you pay very close attention to it?

A    No. I opened it up and read it down, and I knew that I was being deposed.

(Exhibit 12 marked for identification.)

Q    (By Mr. Zephier) I'll show you Exhibit 12 here. Have you seen that before? It's called a "Corporate Disclosure Statement".

A    I don't know if I've seen this before.

(Exhibit 13 marked for identification.)

Q    (By Mr. Zephier) Okay. I'm going to show you what we've marked as Exhibit 13. Have you seen that before?

A    I don't know if I have or not.

Q    Do you know what that is? It's an offer of judgment. Do you know what that is?

A    Not entirely.

Q    Okay. You've never had any personal dealings with an offer of judgment; is that fair?

A    I have not.

Page 88

Q    Okay. All right. Now, I think I'm just about done here, but we -- we need to revisit something. When we were talking about uninsured motorist coverage, that's what this claim is all about, isn't it?

A    Yes.

Q    Because actually she had no medical payments coverage, right?

A    Yes.

Q    And so would it be fair to say, Lorie, that there were never any medical bills incurred by Brooke Lebeau that were ever paid by Progressive?

A    Yes, that would be fair to say.

Q    And would it be fair to say that Progressive has never paid one cent toward Brooke Lebeau's bodily injury?

A    Yes.

Q    And yet this accident happened back in September of '09, right?

A    Yes.

Q    Now, at one point Progressive had offered to pay -- well, how much had Progressive offered to pay for Brooke Lebeau's UM damages during your involvement? Can you recall?

A    Do you want me to look it up?

Q    Sure. Go ahead and go back to Exhibit 1 and -- the

Page 89

claim file.

A    I think I've got these all messed up.

Q    You might have.

A    I apologize for that.

Q    Well, no problem. It would be toward the end.

A    It looks like I made her an offer of $4,709, and that was, I believe, with her wages and her medical bills and her compensation.

Q    When you say "compensation," what do you mean?

A    Her compensation for going through the accident.

Q    What do you mean by that?

A    Her compensation for going through the accident.

Q    You mean pain and suffering?

A    Yes.

Q    Okay. There's a term that's used to include that called general damages. Have you ever heard of that?

A    Yes.

Q    Okay. So when you say compensation for her going through the accident, you're talking about general damages?

A    Yes.

Q    General damages, doesn't it also include loss of enjoyment of life?

A    Yes.

23 (Pages 86 to 89)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

## Page 90

Q Were you aware she was a single mother?

A I knew she was a single mom, yes.

Q And she had to take care of kids?

A (Deponent moves head up and down.)

Q It was difficult for her to get to the chiropractor because it was like 90 miles away one way?

A Yes.

Q Those are inconveniences of life, aren't they?

A Yes.

Q So she was losing work?

A Yes.

Q She complained about pain and suffering to you almost every time you talked, didn't she?

A I don't know without reading through each note that that --

Q Sure. But, I mean, it was quite frequent, wasn't it, that she said she was still having pain?

A Yes.

Q Mr. Hupp at one time -- have you read the notes where he was involved?

A No.

Q You haven't?

A No.

Q Okay. Were you aware that there was a wage claim loss as early as October of '09?

## Page 91

A I think in my evaluation here in January I considered some wages.

Q Okay. Do you think it was fair to not pay those wage claim losses to Brooke Lebeau even though you were aware of them?

A We would pay them once she settled the claim with us.

Q Right. So if she didn't sign off on a written release, she wouldn't -- wasn't going to get compensated for wage loss; is that right?

A That's correct.

Q And Mr. Hupp actually -- were you aware he made the statement in the claim file where he said, Well, the attorney never asked to have her wages paid so we never offered to pay them? Were you aware of that?

A No. I --

Q Would you ever do -- would you handle a claim that way?

A I considered some wages for her.

Q Right. But if you knew that a Progressive insured wasn't fully aware of the benefits that they could be paid under a policy, wouldn't you feel that it's just and reasonable to tell them?

A I think I did because I considered wages for her.

Q Right. So you feel that that's -- it's only fair

## Page 92

and just to do that, right?

A To let them know if they could have lost wages?

Q Yes.

A Yes.

Q Conversely, would it be unfair and unreasonable not to tell them that they're owed that if they are, in fact, owed?

A Yes.

Q It would be wrong to conceal the benefits to an insured, wouldn't it?

A Yes.

Q Okay. Now, I don't know if you remember last time, but we asked you a series of questions concerning claim handling principles in the insurance industry. Do you remember that?

A I do remember.

Q Okay. Well, it's come down to that time again where you are -- where we're going to actually go through some of those, if you don't mind. I didn't want to rehash a lot of our foundational stuff because you and I both went through your prior testimony, so --

A Okay.

Q But do you feel as a claims adjuster over all of these years that you're in a position where you know what good claim handling principles are?

## Page 93

A Yes.

Q And do you understand, from your background, you know, your education, your experience, especially your experience with Progressive, that you're familiar with how Progressive handles claims?

A Yes.

Q And you've already indicated that you, yourself, have handled first-party claims, right?

A Yes.

Q And many uninsured motorist claims such as this?

A Yes.

Q And Progressive has recognized they're supposed to comply with certain standards, would you agree?

A Yes.

Q So I'm going to be asking a series of these statements concerning claim handling principles, and I'm just going to ask you whether or not you agree or disagree with these statements, okay?

A Okay.

Q The insurer must treat the insured's interest with equal regard as it does its own interest?

A Can you repeat that for me?

Q Sure. The insurer must treat the insured's interest with equal regard as it does its own interest?

A I would agree that we need to treat our insured's

24 (Pages 90 to 93)

Lorie Rear
April 21, 2014

## Page 94

interests. And I guess I don't know by Progressive's interests. I mean, equal regard. They're our policyholders. We want to treat them fairly.

Q   Okay. The business of insurance is highly specialized, with policyholders particularly vulnerable and dependent on the insurance company, do you agree or disagree?

A   I agree that I -- I agree.

Q   Okay. Part of the claim handler's job is to assist the insured with the first-party claim?

A   I agree.

Q   The company must create and implement reasonable standards for the prompt investigation of claims?

A   I agree.

Q   Standards must be in writing?

A   I don't know if I agree with that.

Q   Okay. The insurer must act in good faith when investigating and evaluating a first-party claim?

A   Can you repeat that? I'm sorry.

Q   Insurers must act in good faith when investigating and evaluating a first-party claim?

A   I agree.

Q   The company must objectively investigate the claim?

A   I agree.

## Page 95

Q   The failure to fully and fairly investigate a first-party claim does not permit the company to deny or devalue a claim due to lack of information?

A   I agree.

Q   Insurers must fairly, reasonably and promptly pay the first-party claim if payment is warranted? You want me to repeat that?

A   Yes. Because you're in the context of once the claim is settled, is that what you're saying, that we will promptly pay the claim?

Q   Settlement is not in there.

A   Okay. So then I would disagree.

Q   Okay. The company should pay the first-party claim unless there is a good reason not to?

A   I dis- -- well, I don't know what the good reason could be. I don't -- every situation is different. So there could be a situation where maybe we were unable to pay the claim at that time.

Q   I think the statement -- let me read it again.

A   Okay.

Q   The company should pay the first-party claim unless there is a good reason not to.

A   I agree.

Q   The company cannot attempt to settle a first-party claim for an unreasonably low amount as calculated

## Page 96

by the claims adjuster?

A   I disagree.

Q   You disagree with that?

A   Because depending on what you feel is an unfair amount or -- if I was making an offer, I would feel it was a fair and just amount.

Q   Okay. And you may have a disagreement with the policyholder on that; is that what you're saying?

A   Yes.

Q   Okay. Denial or diminishment of the first-party claims should not be based upon speculation?

A   I agree.

Q   The company cannot misrepresent the important facts or policy provisions?

A   I agree.

Q   The insurance company must disclose to its insured all benefits, coverages and time limits that may apply to the first-party claim?

A   I agree.

Q   The company may not conceal or fail to disclose how it interprets its policy or how it handles similarly situated claims?

A   I don't know if I can agree or disagree. That's not something that I handled, so I don't know what our policies are and how they would be detailed to

## Page 97

people.

Q   Well, what are you saying you don't handle?

A   Well, read the question again.

Q   The company may not conceal or fail to disclose how it interprets its policy or how it handles similarly situated claims.

A   I guess I don't understand the question fully. I don't understand what policies that we're discussing or if it's this claim we're talking about. I feel -- can you give me a -- rephrase the question.

Q   Well, let's break it down into two parts.

A   Okay.

Q   The company may not conceal or fail to disclose how it interprets its policy.

A   I would probably agree then probably.

Q   The company may not conceal or fail to disclose how it handles similarly situated claims with the insured.

A   I don't know. I --

Q   Okay, that's the part you're having trouble with?

A   Yeah.

Q   The company must fully comply with the Unfair Claims Practices Act and applicable regulations?

A   I agree.

Q   The Claims Department is not a profit center?

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 98

A    I agree.

Q    The company must promptly pay all legitimate first-party claims?

A    I think I disagree with that claim because you're saying "legitimate". I mean, we would pay all first-party claims. I don't like that word "legitimate". I would assume that they would all be legitimate claims.

Q    Well, this is a statement -- this is a statement. It's not assuming an illegitimate claim.

A    So I would agree we would pay.

Q    The statement is merely: The company must pay, promptly pay all legitimate first-party claims.

A    I agree.

Q    Okay. The insurance process involved in the relationship between the insurance company and the policyholder is not an adversarial process?

A    Can you read that to me one more time?

Q    The insurance process involved in the relationship between the insurance company and the policyholder is not an adversarial process?

A    I agree.

Q    If there is an uncertainty about the facts, the company must conduct a full and fair investigation of the facts before making any decision to deny a

Page 99

first-party claim?

A    I agree.

Q    A fair investigation conducted with equal consideration of the insured person's interests means the company must look for the reasons that support payment of the claim and not just look for reasons to deny or diminish the claim?

A    I agree.

Q    The company must look for reasons that support the payment of the claim?

A    I agree.

Q    If a claim supervisor reviews a claim file, it is a supervisor's job to look for and to correct mistakes made by a claim handler?

A    I agree.

Q    The company's activities in investigating and handling the first-party claim must be documented in the file so that if there is any question later the activities undertaken by the claim handler can be reconstructed?

A    I agree.

Q    The company must never force a claimant to file unnecessary litigation in order to get the claim paid?

A    I don't agree that we should force somebody, but I

Page 100

think it comes to a situation where the statute is going to run so you have to file suit in order to preserve the statute.

Q    Do you see that as an exception?

A    Yes.

Q    Otherwise you would agree with that statement?

A    Yes.

Q    It is improper for an insurer to tie, in any manner, claim personnel compensation to claim decisions or payments to its insureds?

A    I agree.

Q    An insurer has an obligation to recognize and promptly retain independent and qualified experts to assist in the fair, reasonable, objective and prompt investigation of the claim?

A    I agree.

Q    Now, there is -- thank you for going through those. Those are the only statements I have. But there was something I want to revisit where we had discussed -- we had discussed the involvement of wage loss as it concerned contacting her employer. If you remember, you know, we were going through something like that.

A    Yes.

Q    Now, when you were handling the claim during that

Page 101

period, and you got information from her employer, were you satisfied that that information justified or were -- documented her income loss?

A    The information I received at that time?

Q    Yeah.

A    I believe so, yes.

Q    Okay. So in that respect, she cooperated and complied and did what was expected of her in order to meet your demands; would that be fair?

A    Yes.

Q    Was there anything that Brooke Lebeau did during the time that you were handling her claim that you would have considered her to be either uncooperative or noncompliant or, you know, fraudulently pursuing a claim, anything of that nature?

A    Not that I recall.

Q    If you had to do it all over again as far as your involvement in this claim, would you -- would you change it at all? Would you change anything?

A    I don't think so.

Q    Do you believe that Progressive did anything wrong in this situation, this case, in handling the Brooke Lebeau claim?

A    No.

Q    Are you aware of anybody that was ever reprimanded

26  (Pages 98 to 101)

APEX COURT REPORTING
(605) 877-1806

Lorie Rear
April 21, 2014

Page 102

or fired or suspended, anything of that nature, as a result of their handling of the Brooke Lebeau claim?

A   No.

Q   Were you aware whether any claims adjuster that was involved in this case ended up not getting a bonus as a result of their handling of this claim?

A   No.

Q   All right. Those are the only questions I had.

A   Thank you.

EXAMINATION

BY MR. ARNDT:

Q   Lorie, I have just a few follow-up questions for you. Did the Progressive Gainshare Program ever affect, in any way, the claim or your work on this claim of Ms. Lebeau?

A   No.

Q   Did you ever propose a settlement release to Ms. Lebeau? Did you ever give her a settlement release for her to review?

A   No, I don't believe I did. Without looking through my notes I'm not sure. I made her an offer. I'm not sure if she actually received a release.

Q   Did she ever accept any offer that you had made to her?

A   Not that I recall.

Page 103

Q   In any event, you don't recall any discussions with Ms. Lebeau about whether she needed to sign a release or not sign a release? Did you ever get that far with her?

A   Probably the first time I met her I probably went over the claim, got a -- medical authorizations and explained to her once she signed the release at the conclusion of her claim, we would pay for her treatment, her wages and her compensation.

Q   You don't ever recall her objecting to signing a release?

A   No.

Q   Or that you ever recall that the signing of the release was the obstacle to get the claim settled?

A   No.

Q   Did you ever use COA, Claims Outcome Adviser, on the Brooke Lebeau claim?

A   No.

Q   And were you using COA on any first-party claims that you were handling around this same period of time in 2009?

A   No.

Q   Or since then?

A   No.

Q   Okay. I think that's all the questions I have for

Page 104

you. Thank you.

FURTHER EXAMINATION

BY MR. ZEPHIER:

Q   I did think of something else when he was asking those questions.

A   Okay.

Q   In the claim notes when you were handling this -- and you took Brooke's statement, right?

A   I took a statement from her. John Kurle may have taken a statement from her also. I did take a statement from her when I took over the claim.

Q   Okay. Yeah, actually I think John took it on September 21st, and you took it on September 30th. When you took a statement of her, though, you were evaluating her as a witness also, weren't you?

A   The first time I took a statement from her?

Q   Yeah.

A   Over the phone?

Q   Uh-huh.

A   I guess I asked her some questions, and I probably did evaluate her a little bit as a witness.

Q   Actually, you're taught to do that, aren't you?

A   Yes. We want to know what kind of witness somebody would be.

Q   Because in case you have to end up -- or they end up

Page 105

testifying, it would be good to know that, wouldn't it?

A   Yes.

Q   Progressive also teaches you to classify strengths and weaknesses of the claim, right?

A   Yes.

Q   And that is something that you're required to do, right?

A   I don't know if it's a requirement. I know that we do do that.

Q   Have you ever not done that?

A   Yes.

Q   You have?

A   Yes.

Q   What kind of claims do you not use the evaluation of strengths and weaknesses?

A   At the very beginning of a claim maybe if it's not -- like I haven't reviewed the records fully, I don't make a list of strengths and weaknesses and they may resolve a claim within a month or so.

Q   So it's one that -- where you might actually end up settling real quick with somebody?

A   Yes.

Q   Okay. Strengths and weaknesses, though, when you evaluate -- well, in her case, I'll just throw this

27 (Pages 102 to 105)

## Lorie Rear
## April 21, 2014

### Page 106

out: Your claim notes from November 10th of '09 indicate that the strengths of the case are lower impact, soft tissue injury, chiro noted, believe four to six weeks. Doesn't know why wouldn't fully resolve?

A   Yes.

Q   Are those -- in the concept of those being strengths, whose strengths are those?

A   Those are a strength meaning this is maybe where the claim is valued a little lower because it was --

Q   So that's Progressive's strengths, isn't it?

A   I don't know if it's Progressive's. It's just what I reviewed, the claim -- the facts of the claim.

Q   Why is it called "strengths"?

A   I don't know. I --

Q   And -- okay. Well, in this case the strengths, as recorded in your claim notes, is: Lower impact, soft tissue injury, chiro noted, believe four to six weeks. Doesn't know why wouldn't fully resolve. Now, if those are strengths and that would help you lower the value of the claim, isn't that really seeing from the perspective of Progressive and wanting -- having a stronger case to pay less?

A   Yes.

Q   Okay. So when we speak of strengths and weaknesses,

### Page 107

we're talking the strengths for Progressive, right?

A   Yes.

Q   And then the weaknesses, as noted in this claim, note, was: It's a UM claim; prior history, an eggshell; had to turn her head to the right; ER and follow-up care. Now, those are weaknesses. So as designated, wouldn't those aspects favor increasing the value of the claimant's claim?

A   Yes.

Q   So as Progressive views things when you're dealing with your own insured here -- I mean, you're talking about your own insured here. You're actually classifying factors as strengths and paying less, and factors that weigh in favor of paying more are construed as weaknesses, right?

A   I think I'm just running down what my -- if I were to speak a list to Ms. Lebeau and explain how I evaluate her claim, the things that I would be looking at and the factors of what I would look at: That she's a first-party person; that she possibly has prior issues with her slip-and-fall accident that could affect the value of her claim.

Q   But it's just -- isn't it -- I mean, this is Progressive's use of these words, right, "strengths" and "weaknesses" as it pertains --

### Page 108

A   I don't know that it's Progressive's.

Q   Well, where did you come up with this then? Was this something that you were told, or did you see it in some claim manual? Was it in The Progressive Way? Where did it come from?

A   No. I think I just had maybe a template from somebody and used that to help me when I'm putting an evaluation together.

Q   And so Brooke Lebeau's weaknesses in this case actually could favor her getting a better claim payment, right?

A   Yes.

Q   Okay. Do you guys develop a theme for every claim that you handle?

A   No.

Q   Aren't you encouraged to have a theme and stick with it?

A   I think we use what we know about the case and about the claim. So I think we use the materials that are -- have been provided to us, the impact, the kind of treatment that they received, what their injuries were.

Q   Okay. All right.

MR. ARNDT: I don't have anything further.

MR. ZEPHIER: Thank you, Lorie.

### Page 109

THE DEPONENT: Thank you.

MR. ARNDT: Lorie, as we've discussed, you've got a right to review your deposition transcript before it becomes certified. I would recommend that you take advantage of that right and you do so. And the court reporter will send you an errata sheet for you to review the transcript and for you to sign; is that okay?

THE DEPONENT: Yes.

THE COURT REPORTER: Would you like to order the transcript?

MR. ZEPHIER: A mini, copy of the exhibits.

MR. ARNDT: Yeah, I suppose I will need those exhibits with mine. An E-tran is fine, scanned exhibits.

* * * * *

(The deposition concluded at 3:05 p.m., April 21, 2014.)

28 (Pages 106 to 109)