UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

BROOKE LEBEAU,                          )
                                        )
            Plaintiff,                  )
                                        )   NO. Civ. 12-5044
    vs.                                 )
                                        )
PROGRESSIVE NORTHERN                    )
INSURANCE COMPANY                       )
                                        )
            Defendant.                  )

VIDEO DEPOSITION UPON ORAL EXAMINATION OF

STEPHEN STRZELEC

July 21, 2014
12:00 p.m.
1420 Fifth Avenue, Suite 525
Seattle, Washington

TAKEN AT THE INSTANCE OF THE DEFENDANT



PLAINTIFF'S
EXHIBIT
9

REPORTED BY:
PHYLLIS CRAVER LYKKEN, RPR, CCR NO. 2423

APPEARANCES:

FOR THE PLAINTIFF:

MR. ROBIN L. ZEPHIER (Via videoconference)
Abourezk & Zephier
Attorneys at Law
PO Box 9460
Rapid City, South Dakota  57709
605.342.0097    605.342.5170 FAX
rzephier@azlaw.pro

FOR THE DEFENDANT:

MR. MARK J. ARNDT (Via videoconference)
May & Johnson
Attorneys at Law
PO Box 88738
Sioux Falls, South Dakota  57109
605.336.2565    605.336.2604 FAX
marndt@mayjohnson.com

ALSO PRESENT:

MR. JIM JEFFRIES (Via videoconference)
MR. MARC LYKKEN, VIDEOGRAPHER

Environment several times in it, and also I believe I cited once or twice the Aggressive Good Faith Book, so that would be e) and h), probably, were the two I cited in my report, as I recall now.

Q.   Okay.   There is two Claims Environment citations there, h) and i).  You think you relied on h) more than i), 1st and 2nd Edition?

A.   I believe I relied on h).  I may have -- I'd have to go through the report.  I also occasionally use Principles of Insurance, which is a real nice intro to insurance in general.  The -- and I use that on a pretty regular basis, too, but I don't believe I did in this report, but it would primarily be those three, as I --

Q.   And we could actually look at your report for the specific citations.  I mean, the documents speak for themselves, I guess is my point.  I don't want to waste unnecessary time here.  I could look at those citations in your report and then look at those documents to check those citations as to what you were relying on?

A.   Yes, you sure could.

Q.   I'm moving through your report, Steve, so if you want to try to follow along a little bit, I'll try to give you a heads up.

A.  Okay.

Q.  I'm looking at page 6 now regarding the terms of the auto policy at issue in this case.  I'm going to start with what may seem like an obvious question, but is it, do you agree or is it true that Ms. LeBeau was not actually the policyholder in this case, she was simply a permitted driver and/or driving an insured vehicle?

A.  I believe that is correct, yes.  She was not a named insured, she was an insured by definition with the policy.

Q.  And do you know if she was actually paying any insurance premiums for this policy?

A.  I don't know.

Q.  Does that make a difference as far as any of your opinions are concerned, whether or not she would be paying premiums versus someone else?

A.  No.

Q.  The uninsured motorist limits in this case include a limit of $25,000 per person, correct?

A.  That's correct.  Yes.

Q.  And that's really the limit that we're dealing with here as far as Ms. LeBeau's claim?

A.  As far -- as far as I know.  I have not seen any, any language that would allow stacking in any way

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 32

involving this case, so I assume that that would be the limit for this case.

Q. Okay. And you agree that -- it's not listed here in your report, but you agree that Ms. LeBeau did not have any medical payment provision as a benefit to this policy?

A. That is correct. This policy did not have medical payments coverage.

Q. And therefore, neither Ms. LeBeau or whoever the policyholder was was not paying premiums for medical benefits?

A. I would assume they weren't, since there was not coverage on the policy. I haven't looked at, you know, the documentation to show that, but that would be an assumption that I think would be safe to make under normal circumstances. And I did make that assumption.

Q. Okay. You didn't see, then, the document where they specifically waived the medical pay portion of the policy?

A. I don't recall seeing that document.

Q. Have you reviewed the Complaint, Ms. LeBeau's Complaint in this case?

A. I believe at some point in time I read the Complaint.

Q. Yeah, and I think that was listed. I just looked

back at the nine documents that you've reviewed.  Do you recall if there was an allegation about failure to pay medical pay benefits in this case?

A.  You know, I, I would have to review the Complaint, but I recall -- I do recall -- I recall seeing something about that at some point in time and double checked the declaration page, I recall that, but I don't recall specifically what it was.

Q.  Well, okay.  Make an assumption for me, if you would, please, for this next set of questions, let's assume Ms. LeBeau did make a claim in her Complaint that Progressive failed to pay medical pay benefits.  Do you have any reason to believe that that's accurate or there is some support for that, based on your review of this information?

A.  No, and I don't recall making any comments about them not paying medical payments coverage for the policy provisions, so I, I have no --

Q.  I didn't find that allegation in your report, I am -- I did see it in the Complaint, however, and that's why I'm asking.  If Ms. LeBeau made an allegation that the MedPay -- that Progressive failed to pay MedPay benefits and that that was an act of bad faith and it turns out that Ms. LeBeau did not, in fact, have MedPay benefits, would that be an accident of

Q. bad faith on her behalf?

A. I don't comment as to whether or not anything is bad faith or not if I can possibly avoid it.  Bad faith is, you know, is a definition and it's to the prerogative of the Court and the jury to make that determination.  Did they fail to meet industry standards or did they fail to meet their good faith obligations by not providing MedPay coverage when there was no MedPay coverage on the policy?  My answer to that would be no, they did not fail to meet their good faith obligations by failing to provide coverage that was not included under the policy based on the information I have.  Does that answer your question?

Q. Okay.  Well, no, I asked a different question.  You're asking your own questions.  But let me see if I can clarify this.  You started that answer with a response that you were not planning on -- or you try not to offer opinions about what was or was not bad faith.  Is that the case in this case?  You don't plan on offering an opinion to the jury that Progressive acted in bad faith in this case?

A. I never, I -- I try to never offer an opinion as to whether or not anybody acted in bad faith.  I will talk about whether or not they met specific industry

standards.  If during the course of trial I'm read the definition of bad faith and it involves my, my opinions regarding meeting industry standards and meeting good faith corresponds with that definition, I will say -- I will say that that definition meets my definition of industry standards and I have said that they have failed to meet those industry standards.  It's still up to the jury to determine whether or not they met that definition of bad faith.

Q.  All right.  I'm moving on to page 7 of your report, Steve.  Towards the bottom of page 7 you have an entry from Progressive's claim notes, or I think you referred to them as "log notes," October 6, 2009, and towards the middle of that entry there is a reference to Ms. LeBeau having her waitress job and that she slipped and fell and was just recovering from a back and neck injury from falling.  Do you see that portion?

A.  I see that, yes.

Q.  You agree with me that it was fair for Progressive in this case to investigate that injury, that prior injury of Ms. LeBeau when they were evaluating her uninsured motorist claim?

A.  Yes, I believe that that was appropriate.

Q.  And do you recognize, I guess in general, that a

person's pre-accident injury could have an effect on the value of their post-accident personal injury claim?

A. It can have -- it can have an effect on value of both up and down, and it could also explain why an injury occurred when you wouldn't think it would, where it doesn't meet, you know, what you would see normally. It can explain a lot of things and it's part -- it's proper to be part of the investigation.

Q. And any insurance carrier is not going to be responsible for paying for personal injury damages that weren't caused by the subsequent motor vehicle accident.  Would you agree with that?

A. I would agree that if a person has -- already has an injury at the time of the accident and the accident doesn't aggravate the injury or make it worse or cause it a longer period of time for it to heal, the injury is just the injury and it stays, stays separate in spite of the accident, the event, then they don't owe for that.  But if it aggravates, if it's aggravated, made worse by the accident, or it's nonsymptomatic and gets, you know, and then comes back again from the accident, then it would be included as part -- as caused by the accident.

Q. Sure.  I think I understand that.  Let me ask a

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 37

follow-up.  Really, I think part of what your answer included was there can be issues of causation when we're dealing with both a pre-accident injury and a claimed post-accident injury, right?

A.   Yeah, I believe --

Q.   Causation can be the issue?

A.   Causation would be an issue that needs investigating, sure.

Q.   And sometimes even medical folks are going to disagree about issues such as causation under those circumstances?

A.   I, I agree, sure.

Q.   It may be hard or difficult for someone to tell if the injury was caused by the car accident or something that preexisted the car accident?

A.   Well, typically, in the vast majority of the cases, that sorts itself out regarding if you look at treatment and the doctors' reports, what they have to say regarding the prior injury versus the current injury, the prior symptoms, the prior condition of the patient versus the current, current, most -- the vast majority of it gets sorted out, but on occasion it remains or it can remain a question.

Q.   That's not an issue that you looked at in particular to this claim, because I think you told me earlier

Page 38

you didn't look in detail at her medical records and try to resolve that causation issue.

A.   No.   I looked at how the claim reps addressed that issue and made their determination for that issue in their evaluation.

Q.   I've flipped to page 10 of your report, Steve.   If you could flip there and try to follow me.   About a third of the way down the page, again, you're referencing a claims note entry of, it looks like from the page before, November 10, 2009, and on page 10 of your report, under the term "Strengths," the last factor listed is "Chiro noted believe four to six weeks and doesn't know why it wouldn't fully resolve."   Do you see that entry?

A.   I do, yes.

Q.   Do you know, did Ms. LeBeau's chiropractor actually form that opinion or list that opinion in one of his medical records?

A.   I looked at -- back in November, I, I recall going back through and thumbing through some records.   I believe he did.   I'm not a hundred percent certain, but, but I recall going back and looking through his notes to see if, in fact, that was noted, and I believe it was, but I'm not a hundred percent certain.

Q. Sure. Perhaps more importantly, is there any reason that the Progressive claims rep that was evaluating the claim at that point couldn't rely on that? If that was, in fact, in the chiropractor's record, Ms. LeBeau's chiropractor's record, would Progressive's claims handler be entitled to rely upon that?

A. I believe so, yes. But keep in mind that that record is an indication that there is something medically going on here that the chiropractor is not, is not capable of addressing. He thinks it should resolve based on his knowledge and based on his treatment and it's not resolving. So that tells me that perhaps there is, you know, something else going on there besides, you know, soft tissue that a chiropractor would normally, normally address. And that's probably what I think the average claim rep would look at that note and go there's something else going on here. This is not the typical injury that you would expect it to resolve itself. And I think that is a theme that kind of runs through the claim notes.

Q. So you believe the reference by the chiropractor of four to six weeks resolution is at that four to six weeks resolution time, or after she'd been treating for four to six weeks post-accident?

A. Yeah, I don't recall. There is other comments in

there where they're talking to the chiropractor. This could be early on and he thinks that this treatment is going to resolve it. I don't recall specifically where, where it was when that was, that was done.

Q. I'm going to jump off topic just a little bit here, Steve. Tell me what your understanding is of the purposes of an insurance carrier setting reserves in any given claim.

A. We're taught and we teach people in the industry that reserves are your best estimate as to the ultimate payout on the claim. They set reserves to meet regulatory requirements, they have to -- an insurer needs to be properly reserved. They have to set aside enough money for known claims to pay those claims, and that -- and that deals with the solvency issue from the regulatory standpoint. But the purpose in setting a reserve is to give your best, your best estimate as to the ultimate payout of that claim.

Q. Did you occasionally set reserves or have input into setting reserves on claims when you were working at State Farm?

A. Yeah. Many, many, many times.

Q. I assumed that to be the case. Would you typically

LeBeau v. Progressive Northern Insurance Company          Stephen Strzelec 7/21/2014

Page 41

err on the higher side, or I guess on what I would think would be the cautious side as far as setting reserves? I guess given the definition that you just gave me to make sure that there is enough money reserved to pay claims that are pending, is the tendency for an insurance carrier to err on the side of making sure there is enough money or even more than enough money than the actual value of the claim?

A. Setting reserves is a challenge. The idea is to set the exact right amount each time. Over-reserving claims can be just as deadly to an insurance company as under-reserving claims. And so we've always stressed the importance of being accurate in your reserves, of making your very best guess and if the information changes, you adjust, adjust reserves accordingly.

But I can also tell you that an average claim rep setting reserves always feels, I believe, typically would feel more comfortable being more conservative and over-reserving a little bit versus under-reserving a little bit. I think that's the tendency by an average claim rep, anyway.

Q. And again, sometimes setting reserves is difficult, particularly early in the claim when the carrier is still gathering information.

A.   It is.  That's why you don't -- you don't just set a reserve once, you -- on a regular basis you look at the reserves and you make changes based on where are you in the claim file and what information you have received since then.

Q.   And it's not necessarily an indication of bad faith if an insurance carrier doesn't offer to pay a settlement amount that is less than the reserve amount.  Do you agree with that?

A.   Do you want to restate that question?  You kind of went around in circles, I think, a little bit.

Q.   Okay.  Sure.  Would you agree that it is not necessarily evidence of bad faith if an insurance carrier offers a settlement amount that is less than the amount in which the claim has been reserved?

A.   Okay.  Again, you're asking me to give an opinion regarding bad faith.  And I, I won't do that.  I also -- but to answer your question without saying bad -- without making a determination of bad faith, I think that the reserve amount is a claims person's best guess as to the ultimate, the ultimate payout based on information that they have, information they think is coming.  There is a lot of things into it.  And just setting the reserves for X amount and not offering that amount -- what you offer

is based on something different than what you set the reserves on.  Because when you set the reserves, you're also anticipating things that you think are coming and the way things are headed.  So your -- really it's your best guess.  But things may change between the time you set reserves and the time you actually make an offer or pay the claim.

So I don't correlate the two directly very often, and I think it's, I think it's -- it might be a little -- I don't know that it's appropriate to correlate the two directly.  I think it's an indication, but there's, really it shouldn't be a direct correlation.

Q. Thank you.  Continuing, I'm on page 11 now of your report.  I want you to look at another entry of the claims notes.  In the middle of page 11, there is a January 4, 2010, entry.  This would be approximately three months post-accident.  And in this claim entry, according to the claim entry, there is a chiro note indicating "ID," which I think means insured driver, "has reached preinjury status adjustment."  Do you see that?

A. Yes.

Q. Do you have any reason to disagree with the chiropractor who was treating Ms. LeBeau at that time

that she'd reached preinjury status on January 4, 2010?

A.   I think, I think the chiropractor's notes speak for themselves.  I think that at that examination, she was apparently doing -- was doing good and was where she needs to be.  So yeah.  I, I don't have any reason to doubt what the chiropractor said at that point in time.

Q.   Would it be appropriate for Progressive to be skeptical of additional medical expenses caused by the September 2009 car accident after reviewing that note from Ms. LeBeau's own chiropractor on January 4, 2010?

A.   I think it would be proper for the claim rep to conduct some additional investigation and find out, talk to the chiropractor, find out what's going on. I think the log, or the claim note, you know, the very next day, we're talking to the insured, discusses a little bit about what's going on.  But clearly, you know, as I said earlier, it appears the chiropractor feels that he's done what he can do.  So I, I would --

Q.   Well, and not only --

A.   I'm sorry, go ahead.

Q.   I'm sorry, go ahead.

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 45

A.   I was just going to say --

Q.   I'll let you finish your answer.

A.   I was going to say, you see a note like that from the chiropractor and the insured is still treating, you know, the prudent thing to do from a claims-handling standpoint is to talk to the chiropractor or send the chiropractor a letter and say, you said this, but she said she's still in pain, can you explain what's going on and find out what it is the chiropractor is thinking.  Because the typical chiropractor is involved with a lot of patients, and sometimes they're notes are abbreviated, sometimes they make mistakes in their notes,and sometimes they put down what they're thinking and realize that it doesn't read exactly what it said.  So it's all prudent to talk to the chiropractor and find out what's going on.

Q.   And of course the chiropractor would have to receive permission from Ms. LeBeau before he could speak to someone at Progressive on that issue.

A.   That's -- yeah, I would assume that would be correct.  You know, or you could just ask Ms. LeBeau, you know, we have these questions, we're going to send you a letter, would you please have your chiropractor address these questions and send them back to us or

ask for permission.  Yeah, you could do -- there is a lot of things you could do, but yeah, because of the of the privilege there, you would have to ask Ms. LeBeau for her permission, I would think, to talk to her.

Q.  Sure.  And I guess I just wanted to be clear.  It's not as simple as a Progressive adjuster picking up the phone and calling the chiropractor and asking, Hey, can you explain this?  I mean, that's not going to work.

A.  No.  But it would be as simple as calling the insured or the conversation with the insured, saying -- talking to the insured on the next day saying, Hey, this is what your chiropractor says.  Can we -- we would like to ask him some questions regarding what he meant.  Can we send you a letter for you to drop off to your chiropractor with some questions and ask him to answer it and send it back to us, or can we call the chiropractor?  You would expect to see something like that if it was -- if it was an issue or a concern.

Q.  I don't doubt that any claims adjuster would be entitled to rely upon the face value of the record.

A.  I don't know.  We've always taught our claim reps not to rely a hundred percent on the face value of

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 47

anything.  If something doesn't make sense -- you know, an investigation is putting together a jig-saw puzzle.  If you're putting together a jig-saw puzzle and everything is green and you pull out a piece and it's purple, I mean, you have to ask some questions.  If it doesn't fit into all of the other information, you don't just rely on it blindly, you investigate, you ask some questions.

Q. Well, let me see if we can either move on with this topic or we need to explore it further.  Are you offering any opinions that Progressive did not properly follow up with Ms. LeBeau's treating chiropractor, particularly this treating chiropractor, I believe his name is Dr. Kuehl, regarding her post-accident treatment?

A. No.  I think that they, they recognized that.  But in talking to her the next day, they recognized the fact that she still hurt, she isn't -- she isn't well, and, and they continued on with it.  They didn't lock that in stone without investigating it.  I think they recognized the fact that there is other things going on and continued on with it, so.

Q. And would you agree part of their evaluation of the claim at that point would include the nature of the impact of the accident?

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 48

A. That would be a consideration, yes.

Q. Also the fact that she had a preexisting condition in a similar location in her body with the same chiropractor that she had been treating with just prior to the low-impact car accident?

A. Yeah, I think they recognized the fact that that injury was resolved and they referred to her as a potential eggshell because of the prior injury, so I think they recognized it appropriately.

Q. I've moved on to page 13 of your report, Steve. If you would move there with me, please, and look at a November 18, 2011, entry that references a demand letter from Ms. LeBeau's attorney.

A. Yes, I see that.

Q. And then a demand that was made to Progressive for $85,304. Do you see that?

A. I do, yes.

Q. Then that obviously well exceeds the contractual policy limits in this case. Was it inappropriate for Ms. LeBeau to make that kind of a demand, given what her policy limits were?

A. No, not at all.

Q. Why not?

A. Well, I think that injuries typically are evaluated without regard to policy limits by both a plaintiff

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 49

attorney and by a claim handler.  You need to determine what the injury is and then you apply policy limits.  So I have no problem with a claim handler making the same evaluation then asking for the 25 policy limits, because it states their belief regarding what the true value of the injury is.

So it's, you know, regardless of policy limits, the injury is what the injury is, and then you apply the policy limits and then make your determination based on that.  So there are two separate events that take place, I think.

Q.  Sure.  I think I understand your answer, but in this instance, the November 18, 2011, letter was actually a demand letter, Ms. LeBeau demanding that Progressive pay the 85,000-plus dollars, not here's the evaluation of the injury, please forward your $25,000 policy limits.  It was a demand for $85,000.

A.  Sure.

Q.  Would you agree with that?

A.  Yeah, it was a demand for 85,000.

Q.  Is that appropriate?

A.  I, again, I don't see why not.  You know, an appropriate response would be we've received your demand, perhaps you aren't aware that policy limits are $25,000, and then if, if appropriate, offer the

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 50

25 or whatever.  But I don't see -- I don't think there's anything wrong with making that demand for that amount.

Q.  You agree with me that both parties have an obligation to treat each other fairly and with good faith?

A.  Absolutely.

Q.  And if the roles were reversed and there was a representation by Progressive as to what the insurance limits may have been that turned out to be inaccurate, that would be inappropriate, wouldn't it?

A.  Yeah.  If you're misrepresenting insurance limits. If it was an honest mistake and they corrected it the minute they found it, then, then that would be a mistake.  But yeah, but it's open to the insurance company to disclose the limits to an insured.

Q.  But you're right, I mean, honest mistakes can be made, correct?

A.  Sure.

Q.  By both of the parties?

A.  By both sides.  Yeah, that happens.

MR. ZEPHIER:  Excuse me.  I was just wondering, are you doing okay, Steve?  Would you like to take a break?

THE WITNESS:  If Mark is at a good time to take

Q. a break, I could run to the restroom real quick.

MR. ZEPHIER: We would like to take a break, too, Mark; is that all right?

MR. ARNDT: Sure.

THE VIDEOGRAPHER: Okay. We're going off the record at 1:25.

(A SHORT RECESS WAS HAD.)

THE VIDEOGRAPHER: All right. We're going back on the record. The time is 1:36.

Q. (By Mr. Arndt) Okay. Thank you. We just took a short break, Steve, and I want to pick up close to where we left off. I'm on page 15 of your report in this case and you begin your Analysis and Summary, and the first topic on your Analysis and Summary I want to address, I think it actually starts at the top of page 16, where you address the September 21, 2009, recorded interview between Progressive adjuster John Kurle, K-U-R-L-E, and you indicate that he "misrepresents the claim process as well as the Progressive policy." And then there is a question and answer segment, I think that you've cut and pasted from the recorded statement taken by Mr. Kurle of Ms. LeBeau. Are you with me? Do you see what I'm talking about?

A. I am, yes.

Q.   I can obviously read the question and answer and your analysis below it, but I do want to ask you some follow-ups about this.  And maybe I'll just start with having you summarize.  What was inappropriate about Mr. Kurle's statement in that segment of questions and answers that you've cut and pasted for your report?

A.   Well, it's -- this is the section where they talk specifically about medical bills, but I reviewed the statement, you know.  And first of all, Kurle was under the obligation to explain the coverages, the relevant benefits and coverages under the policy. And when somebody is injured in an accident, there is either the tort -- and it's somebody else's fault, which it kind of was determined they were rear-ended, and that was determined.  It's either the responsibility of the tortfeasor, you know, is going to pay it, or you're going -- and if they're not insured, it's going to be covered under your uninsured motorist coverage.

And I think the appropriate -- and this was misleading because there is U coverage available on the case, and absent, you know, exceeding policy limits on the U, there is going to be -- she's going to be compensated for her medical bills, either by

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 53

the at-fault driver or by the uninsured motorist, an uninsured motorist. And I think at this time they were told that, earlier on in the statement he was told that, you know, that the driver was not insured and he was going to look into it. But I would expect him to tell them that your med -- if you need treatment, you need to go get treatment. There's no med payment under this policy; however, there is uninsured motorist coverage, and we will reimburse you for those medical bills at some point in time.

So you need to do what, what's necessary and those bills will, in fact, get paid subject to the uninsured motorist limits. And he just said there is always the possibility, without having the MedPay coverage, you know, you're going to get stuck with it. Well, he didn't tell her the other half of that is the fact that, you know, the uninsured motorist coverage will pay the medical bills, it will be included in that portion of your claim.

Q. Okay. Let's start with just a few basics. I want to make sure we're on the same page. At the time the recorded statement was taken, September 21, 2009, that's about three days post-accident; is that right?

A. Right.

Q. And at that time a determination had not been made,

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Page 54

at least with any certainty, as to whether the tortfeasor had insurance coverage or did not?

A. That's correct. They hadn't decided with any certainty, they were three days post-accident, and they weren't certain. They thought the person was uninsured, it was reported being uninsured, but it hadn't been documented at that point.

Q. I think we established earlier the date that Progressive actually opened the UM claim was September 30, 2009?

A. That's, that's correct, yes.

Q. And that's after they had received confirmation that, in fact, the tortfeasor was uninsured?

A. Yes.

Q. There was some confusion there about whether or not the tortfeasor was insured or not insured. I don't know if you recall seeing that in the claims notes.

A. Yeah. I don't recall there being any real confusion. I think there was an issue with getting it documented, but I think they pretty much decided very early on that the person was uninsured.

Q. But in any event, at the time of the recorded statement, it was unknown if a UM claim would be made because we hadn't figured out if the tortfeasor was insured or not.

A.   Yeah, it had not been confirmed at that point. That's correct.

Q.   And I think we've already established, regardless, there was no MedPay benefits available to Ms. LeBeau.

A.   That's correct.

Q.   Because she had not -- or the policyholder had not paid a premium for medical payments.

A.   That's correct.

Q.   How did the representation by Mr. Kurle, and I think you specifically cited his statement, There is always a possibility without having that MedPay, medical payments coverage, and then he goes on to say, There is always the possibility it could be your responsibility.  That's what you take issue with, right?

A.   That's correct.  I expected him to explain the coverages under the policy and tell her that you can make claim against the tortfeasor if they have insurance, but it looks like, you know, based on what you've told us so far that he doesn't, in which case, if that turns out to be true, you know, your medical bills will be covered under your -- will be paid at some point in time under your uninsured motorist coverage.  You need to do what you need to do to get well.

Q. How did Ms. LeBeau, how was she adversely impacted by that statement by Mr. Kurle, if at all?

A. Well, I don't know that she was. She decided that, you know, even if she has to pay it herself, you know, she's hurt, she needs medical attention, and she -- so she elected to just go ahead, in spite of those comments, and go and seek treatment anyway. So I, I don't know that those, those statements did, in fact, impact what she did.

Q. And, in fact, in evaluating the claim, Progressive did ultimately as part of their evaluation place a value on the chiropractic treatment that she sought?

A. They did, yes.

Q. At least the initial chiropractic treatment?

A. They did. That's correct.

Q. I guess aside from that, when Mr. Kurle says there is always a possibility without having MedPay or medical payments coverage, then he goes on to say "it could be your responsibility." And then he goes on to say "But I can't you know, I just can't tell you one way or the other." I mean, isn't there at least some possibility that her medical payments would have been paid?

I mean, if the tortfeasor would have turned out to have insurance coverage and the tortfeasor's

insurance carrier saw her pre-accident condition and wanted to contest causation for her post-accident medical treatment, it is possible that she could have been responsible for making those payments.

A.   If, if it was determined that those injuries were -- that the treatment was not related to the accident, then she would be responsible for it.  But that would apply in any case, and that's probably what he should tell her, is if in fact it's determined your treatment isn't related to this accident or caused by this accident, then there wouldn't be, there is no -- there would be no coverage under any form for the Ford.  That would an appropriate thing to tell her.

Q.   Sure.  I guess without maybe putting it that way specifically, isn't that what he says when he says it's possible, I can't tell you one way or another, without MedPay, that you could be responsible for that payment?

A.   But he had a lot of additional knowledge he could have and should have shared with her.  As to going after the tortfeasor, they would pay for it if it turns out they're insured, but we don't think it is, and we would pay for it.  It would be covered under our, under our U coverage.  Just like with me, if she had MedPay and the treatment wasn't related to the

accident, MedPay wouldn't be paying for it either, so.

Q. No. I understand that. But what's the purpose of the medical payments coverage, as you would understand it?

A. To pay reasonable and necessary medical costs associated with an injury that arose out of the use of the automobile, of an insured vehicle.

Q. Yeah. Without regards to liability?

A. That's correct, sure.

Q. And there's a purpose of having the MedPay coverage that she did not elect to have, right?

A. Well, that somebody elected not to have, that's correct.

Q. And if she would have elected to have that MedPay coverage, it would have been simple and the insurance adjuster, Mr. Kurle, who was talking to her, could have assured her that, at least up to her MedPay limits, her initial medical payments would have been taken care of?

A. That's right. Mr. Kurle's obligation would be to explain the relative benefits and coverages under the policy, and that would include the MedPay if MedPay applied to this policy.

Q. You just think his explanation was too short, too

brief, he should have explained it more in depth about all of the potential scenarios that could play out regarding whether she would have to pay for her medical payments or someone else would?

A. Yeah.  I think he should have explained the benefits and, you know, spent ten seconds and told her that if it turns out the responsible party has insurance, you know, you would be able to make a claim against them.  If he's uninsured, the medical bills will end up being paid, you know, under the uninsured motorist coverage.  Most people don't know any of this and that's why the obligation to explain the relevant coverages and benefits under a policy are so important.

Q. And including if she would have had private health insurance, that's another potential responsible party for her medical expenses?

A. It may be, if that was the only coverage available.

Q. Okay.  To the next page of your report, please, Steve, page 17.

A. Yes.

Q. I think, although it doesn't have a separate topic, you address this issue of Ms. Rear, R-E-A-R, and whether or not she represented or misrepresented whether or not Ms. LeBeau's mileage to her

chiropractor was going to be paid for.  Are you following me?  Do you see where I'm at?

A.  Yes.  Yes.

Q.  And again, I can obviously read the opinion in your report, but can you explain it to me basically?  How would you explain to the jury that this was a -- well, was it -- you said you're not going to opine on the issue of bad faith.  Was it a misrepresentation, was it an error or something more than that that Ms. Rear created regarding this issue of mileage?

A.  I think it was more than an error.  She was well aware of the fact that the insured was driving 90 miles each way to seek medical treatment.  She's well aware of the fact that it's compensable under the policy and covered under the insuring agreement.  And she makes a note that, you know, that the insured is incurring this cost and the insured may actually request for it.  You know, it should be offered; if you owe it, you offer it.

And she gets caught later on where the insured says, What about my mileage, when they made the offer?  You know, You told me I was going to get mileage.  So apparently she did tell her about it, which was appropriate, and then didn't include it.  And then she, she does -- she realizes that she told

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Page 61

the insured she would pay for it, then she has to. But she's under the obligation to pay it anyway. It's damages that are compensable under the U coverage, and that should have been included in her evaluation and her offer right from the start.

Q. Why do you use the term "caught"? Is it possible that Ms. Rear made an honest mistake by not encompassing the mileage in whatever offer she was making on that date?

A. Well, I don't know. She makes a note in her log that the insured driver may request payment for milage, and since she didn't and she's aware of it -- you're correct, it might have been a mistake. It might have been her intent to include mileage and then she flat out forgot. But then in her -- later on in her log note, she was -- when she was asked why she hadn't had mileage already, when she stated she promised she would, she explained, I don't recall her asking for mileage. So again, she's saying you didn't ask for it, so I didn't offer it. And that's what's not appropriate. It should have been offered because it was owed.

Q. You think it was two separate occasions and the fact that it was two separate occasions shows intent?

A. No. I think she -- no. What I'm saying is in her

own note she states, "She asked why I haven't add mileage already and stated I promised would add when we met. Explained I don't recall her asking for mileage. Insured driver stated I promised and she can't believe didn't do this." Explained to her I'm sorry, I don't remember discussing milage. It was a simple mistake.

Q. All right. Well, would you agree with me that in claims in which the insured doesn't have to travel a long distance for treatment, mileage may not be part of an uninsured motorist claim?

A. It might not be. But in this case, she was well aware of the fact that the insured was traveling 90 miles each way. It was recorded months before that in her log.

Q. I mean, what are we talking about? What's the degree of inexcusability here that it wasn't offered by Ms. Rear on this, at least one occasion, I don't know if you were saying it's more than once, but how excusable is that, how inexcusable is that? You're not going to opine regarding bad faith, how big of a mistake is this?

A. You know, in and by itself, I would say that it was just a mistake. But as other events transpired, we talked about in my report, it becomes -- I think it

becomes pretty clear that there's kind of a don't ask, don't tell mentality.  It's like later on when they ask about, you know, loss of earnings, oh, you know Mr. Zephier didn't include it in his $85,000 demand and so I'm not going to include it in my evaluation, you know, didn't ask for it, not going to offer it.

You know, you're under the obligation to determine what is owed.  That's what the insuring agreement says.  We will pay damages the insured is legally entitled to collect.  So you have to investigate and evaluate and make an offer based on what the insured's legally entitled to collect in damages and that would include milage and loss of earnings.

Q.  So when the insured's attorney makes a demand, the insurance carrier is not entitled to rely upon that to encompass the damages?

A.  If they're willing, if they're accepting his evaluation of $85,000 in damages and paying policy limits, they don't need to include it.  But that's not what happened in this case.  What they looked at is the $85,000 demand and said, We're going to do our own evaluation to determine what's owed.  And it ended up being 7,000 or 6,000 or whatever it was.  In

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Page 64

that case, they needed to include it.  They needed to include everything that was compensable to get up to a true value.

If they're going to rely on Robin's evaluation, then rely on the whole thing.  Just because he forgot something, he's at $85,000 and the policy limits are 25.  He could have left a lot of things out because he felt the value of the claim was so high in his evaluation.  He didn't have to include everything to come up with a true value.  He was already above, way above policy limits, more than three times.

Q.  Is that not a double standard that the attorney -- the plaintiff's attorney doesn't have to consider something but the insurance adjuster does?  I mean, how do we get to the appropriate standard to show evidence of intent or evidence of wrongdoing beyond mistakes?

A.  I -- the problem is with, with your question is you're assuming that both parties have equal standards and equal responsibilities, and that's not the case.  The insured has an obligation to be fair and truthful to the insurance company and to assist in the claim.  All of the other good faith, all of the vast majority of good faith obligations in industry standards apply to the insurer.  The

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 65

insuring agreement says we will pay these damages, so whether the insured is represented or not, the insured has the obligation, but the vast majority of obligations belong to the insurer.  It's not an equal field.

Q.   Do you agree with me that the insured and the insurer are adverse parties when the insured makes a first party claim such as a UM claim?

A.   No, not at all.

Q.   And if South Dakota law establishes that, you disagree with that?

A.   I think the industry standard is that the insurer is entitled to stand in the shoes of the tortfeasor in determining what is owed under the claim.  There is still many other good faith obligations where -- and that's where the adverse position comes in, is standing in the shoes in that.  There's still good faith obligations that exist in the handling that don't exist in a true adverse situation.  And I don't -- I, again, I'm not going to speak as to South Dakota law, but I know the way the industry interprets it is it's only adverse in that the insurer stand in the shoes of the tortfeasor regarding, you know, liability and determining liability and damages, that portion of the claim.

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Q.   Have you reviewed Mr. Quinley's report?

A.   I don't recall if I reviewed Mr. Quinley's report in this case or not.  Was it -- I've reviewed a couple of Quinley's reports.

Q.   That's fine.

A.   Yeah.

Q.   I'll be as specific as I can, because I'm looking at it and I want to read you one short portion regarding this topic of failing to offer expenses for mileage that's listed in Mr. Quinley's report.  And for the record, I'm looking at page 8 of Mr. Quinley's report, and the short one-line paragraph concludes with, At worst, comma, this was an oversight which was acknowledged and quickly rectified by Progressive's adjuster, period.  It does not reflect malevolent intent, comma, a standard business practice or bad faith.  Do you agree with that?

A.   Would you read the first half of the first sentence to me again, how he started off?

Q.   Sure.  It does not reflect malevolent --

A.   No.  No.  The very first part you read, Mark.  I'm sorry.

Q.   You bet.  I'll read the entire thing again.  At worst, comma, this was an oversight which was acknowledged and quickly rectified by Progressive's

adjuster, period.  It does not reflect a malevolent intent, comma, a standard business practice or bad faith.  Would you agree with that?

A.  I would agree in and of itself this one thing.  I would agree with that statement regarding this one thing all by itself.

Q.  Okay.  You referenced loss of earnings claim.  I do want to touch on that topic.  Are you aware at some point that Progressive attempted to collect information from Ms. LeBeau regarding a loss of earnings claim?

A.  I don't recall.  I don't recall that specifically.  I knew that -- I know that they had information regarding where she worked and what her hourly wage is and the time and were able to calculate it, but I don't recall -- I don't recall them sending out and asking for additional information.

Q.  If Progressive had done that, if Progressive had forwarded a form to Ms. LeBeau to complete regarding the lost wage claim and through that form or that process attempted to gather information from her employer to document that claim, would it be Ms. LeBeau's obligation to complete that and return it, if possible?

A.  I think, I believe that would, that would certainly

assist Progressive in determining the entire loss of earnings claim.

Q. I mean, it's fair for the insurance carrier to request some documentation for a loss of wage claim, correct?

A. I believe, I believe so. I believe they at least need to know, you know, where you work, what your hours were. And, I mean, a lot of times you can calculate out a small loss of earnings claim just based on, you know, you know how long they went, you know when the doctor appointments were, how long they were gone from work to go to those doctors' appointments, how much they're making an hour. You're able to calculate it without that, but a large loss of earnings claim would require additional documentation.

Q. Well, regardless of the amount, I mean, if you have an employer and you're not working for that employer, you should be able to gather some kind of documentation from that employer regarding your inability to work, shouldn't you?

A. Yeah. If your injury is preventing you from working and you're having to take time off work for that, yeah, I would assume you would get the medical information and the information from the employer to

determine how long they were off work.

Q. And is it fair for an insurance carrier to deny a wage claim, whether it was done in this case or not, and I'm not suggesting that it was, but would it be fair for an insurance carrier to deny a lost wage claim if the insured making the claim couldn't provide any documentation or didn't follow up with providing any documentation?

A. You're using the term deny the claim. I think it would be appropriate for the insurance company to tell the insured that we can't -- we can't complete our investigation regarding the loss of earnings because we need this documentation, and at this point in time, we can't make payment because we don't have -- just because we can't complete our investigation. And if that's what you're referring to when you say deny a claim, then I think that would be appropriate.

Q. Page 18 of your report, I'm looking at the second full sentence, which says "The file contains evidence that there was a possibility of significant impact, but the area is never investigated."

A. Yes.

Q. First of all, do you have -- what evidence are you referring to that there may have been a significant

impact?

A.    Mark, by significant impact, I'm referring to how the injury has impacted the insured's life, not the impact -- not the vehicle impact.  You got that?

Q.    Okay.  Yep.  Thank you.  I appreciate that.  So same question, although I appreciate the clarification, what significant impact on Ms. LeBeau's life occurred as a result of this claim?  What evidence in the file was there to reflect that?

A.    I think there is notes in the file that discussed her having two small children at home and she continued to work while she was going to the doctor and take care of her small children and she, you know, and she was in continued pain while she was trying to do these duties under duress.  I think there is comments in the file, or in recorded statements, in the file that kind of hit on that that don't really ask any real questions, it's just kind of there, as you read the file.

Q.    Okay.  And then the follow-up to that is the area is never investigated.  What specifically should the claims adjuster have done?

A.    Well, I would have talked -- I would have counseled my claim rep to talk to her to find out how this injury specifically is, how it's impacted her life,

what sort of things is she doing, what sort of things, you know, based on this injury, can she no longer do.  You know, she's got two children, are they, you know, small infants, is she still able to hold them and take care of them or does she need assistance doing that?  You know, has she stopped doing some things because of this injury?  You know, I would -- that's part of the injury investigation that you would typically see, especially with a mother with small children that was still working and treating that you would ask about.  That's what impacts the value of a claim.  And I didn't see where that was really any detail included in the evaluation.

Q. Did you recall in reviewing the claim or the claims notes or even Ms. LeBeau's testimony at her deposition that she felt she was being contacted too often by Progressive personnel?

A. I, I don't specifically recall that, no.  But I do know that she was being contacted and she wasn't, she was still treating and not ready to settle, so that could have been, the comment might have been made during that period of time where she was being recontacted over and over again and she kept saying she wasn't ready to settle, she was still treating.

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 72

Q.  Okay.  On to page 19, Steve.  You reference GainShare on page 19.  Again, I can read your report.  I don't want to rehash what you have listed there necessarily, but I do want to ask some follow-up questions regarding starting with your knowledge of GainShare.  But overall, I guess, being as efficient as I can, your opinion in this case is that the Progressive GainShare program had an improper effect upon the way the claim was handled by Progressive employees?

A.  Yeah.  I think that, that any incentive-based program, and GainShare is a perfect example of it, where a company's profitability impacts the compensation that an employee receives can have an impact, whether it's conscious or subconscious impact, on an employee regarding how they handle claims and how they evaluate claims and whether or not they're paying a full amount owed or if they're being overly conservative to save the company money to help, you know, to assist in the profitability.  I think all those things are possibilities with GainSharing.

Q.  What's your basis for your opinions regarding GainShare?  I mean, what's your knowledge of GainShare and how it works?

LeBeau v. Progressive Northern Insurance Company          Stephen Strzelec 7/21/2014

Page 73

A.  You know, boy, I was really strong in GainSharing in cases in the past.  I haven't looked at it in -- any GainSharing documents in about six months.  But, you know, in reading depositions of Progressive management and upper management and people responsible for GainSharing, GainSharing exists at Progressive, profit sharing based on profitability exists at Progressive, even though it's a very expensive program.  It costs Progressive an awful lot of money.  It exists there because it works.  It has a significant impact in Progressive's bottom line -- bottom line.  And so if you have a GainSharing program, a program for -- an incentive program that rewards employees for company's profitability, and based on profitability, that program, you know, when you say that program works, it's because it's impacting the profitability of the company, whether it's doing it consciously or subconsciously.  I think GainSharing works.  And that's, and that's the testimony I've read simply states that.

Q.  GainSharing works perhaps also because it encourages or accomplishes customer retention; would you agree with that?

A.  I would have to take a look and see how -- what has happened with customer retention based on

GainSharing. I'm not sure how GainSharing, the program in and of itself, would increase customer retention. Especially when you're --

Q. If there were --

A. I was going to say especially when you're dealing with the claims department. So go ahead.

Q. Okay. If you -- if there were testimony from Progressive corporate employees with intimate knowledge of the GainShare program who testified that customer retention was a major, if not the major component of the GainShare program, would you have some reason to disagree with that?

A. I would love to read that testimony and find out how GainSharing within a claims department impacts customer retention. It could be GainSharing in other departments. I would have to take a look at that. I would have to take a look at the total testimony to see what it is they're exactly talking about.

Q. Sure. I don't want to beat the GainShare horse to death, Steve, and I want to be as professional as I can when asking these questions, but I have to ask some follow-ups because if you plan on offering opinions about GainSharing in this case, I want to know some specifics about your knowledge of it, including whose testimony you've read and how you

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Page 75

know how GainShare operates.  Can you give me any specifics or are you just doing this from past memory in a general sense of how it works?

A.  I -- I'm having a hard time coming up with specifics right now.  I have reviewed Progressive GainSharing information numerous times, compared it myself to other incentive programs with other insurers, seen the results with GainSharing versus other -- with other carriers.  I've read testimony of Progressive employees discussing GainSharing in different cases. I've read trial testimony from various people regarding GainSharing at different times.  Right now my information is based on all of that, that collective knowledge and the fact that, you know, this is an incentive-based program that works.  It's having a positive impact.  So it's a very successful program, and it's held up as a successful program.

Q.  But you can't give me any specifics about that GainSharing information that you reviewed or whose testimony you reviewed or what the specific results are that makes the program successful?  You're not able to give me any specific sources of information that forms the basis of your opinion?

A.  No.  I, I didn't bring any of that information with, with me today.  I've got a -- I mean, there is a set

of, you know, basic documents that Progressive has produced in the past, you know, from early on from the 1992 or 1993, that initial brochure that went out to employees, you know, with the GainSharing tree, and further, and further things, but I don't have anything -- I don't have any specific information that I can, that I can quote right today.

THE VIDEOGRAPHER:  This is the videographer.  I have about eight minutes left before I have to make a disk change.

MR. ARNDT:  Okay.  Thank you.  Just let me know.  I'm going to keep going here.

THE VIDEOGRAPHER:  All right.

MR. ARNDT:  Feel free to interrupt when you need to.

THE VIDEOGRAPHER:  Okay.

Q. (By Mr. Arndt)  Steve, you don't have any -- well, first of all, the Progressive claims handlers that would have handled this claim would have been doing so in 2009 and 2010, correct?

A. That's correct, yes.

Q. And you don't have any -- you're talking about documents that were issued in the early '90s or mid '90s.  Do you have knowledge of how the GainShare program has evolved or may have changed since then

and what may have been in place in 2009-2010?

A.   I have -- I'm aware of testimony that while the GainShare program between 1992 and current has been -- has minor tweaks done to it, it's the same basic program now that it was back then, that it was then.

Q.   What testimony are you referring to that says that it's the same program?

A.   Again, I don't recall specifically right now where I read that, but I recall -- I do recall reading that.

Q.   Are there any acts or specific circumstances or details that you can point to in this case in which the Progressive claims handlers were affected by GainShare, improperly affected by GainShare?

A.   I don't think there were any -- I don't think you can point to any act and say they consciously did this because of GainSharing.  I think, in this case, you'll see -- I refer to it in my report as don't ask, don't tell, where things in the evaluation are just not included unless asked for, or -- and that's happened with both the mileage and the loss of earnings.  It's, you know, I refer to it, I think, in my report as kind of a don't ask, don't tell kind of attitude.  That's not appropriate in a first-party claim, and I think that's what -- how you see the

GainSharing manifesting itself.  But to overtly point to something and say this is the result of GainShare, specifically the result of GainSharing, I don't think -- I can't do that.  I don't know.  I can't read people's minds, so.

Q.  Sure.  Fair enough.  If the Progressive claims handlers who handled this claim in 2009 and 2010 were to testify that whether I give someone mileage or whether I seek to pay someone's lost wages in a UM claim has nothing to do with the GainShare I receive or how I'm evaluated or how my GainShare payment may be evaluated, would you have any reason to disagree with that?

A.  I, I would probably agree that consciously they aren't seeing a connection between the two.  It doesn't mean the connection doesn't exist.  I just don't think they either don't see it or don't acknowledge it.  And so I wouldn't, I wouldn't -- I would not say they were not being truthful.  I think that's their perspective.

Q.  And if they don't see it and they don't know it, then it's not adversely affecting the way they're handling the claim, right?

A.  Wrong.

Q.  Why?

LeBeau v. Progressive Northern Insurance Company                Stephen Strzelec 7/21/2014

Page 79

A.    I think a program, a, an incentive-based compensation program is one that becomes just part of the culture and part of the way things are being done and I don't think you consciously say, Oh, I need to do this because of GainShare.  I think it just happens because that's the culture now and that's just how claims are handled and you cut back wherever you can and that's just kind of the mentality and the culture.  I don't think they're making any conscious decisions regarding I've got to do this to improve my GainShare.  I don't think the program would work if that were the case.

Q.    And what if the program, again, were focused on customer retention, where that was a major component of GainShare, would that change your opinion?

A.    If you can show me the documents where the claims department impact is on customer retention and that's what the focus is on and somehow they do that by, you know, if that's the focus.  But again, profitability, you know, retention might be a small part of profitability, but from a claims standpoint, paying less on claims is how a claims department can really impact profitability.  So I would have to see those statistics and see those surveys that were done that show that the claims department is impacting customer

retention.

THE VIDEOGRAPHER:  This is the videographer. I'm going to have to make a disk change here.  I'm going to end Disk No. 1, and we're going off the record at 2:18.

(A SHORT RECESS WAS HAD.)

THE VIDEOGRAPHER:  Okay.  This will begin Disk No. 2 in the deposition of Stephen Strzelec.  We're back on the record at 2:21.

Q.  (By Mr. Arndt)  Thank you.  Steve, I was just telling Robin, I don't think I've got a whole lot more, so bear with me and I'll try to get through this.

A.  Okay.

Q.  You made a comment in your last answer that I want to follow up on, and if I'm mischaracterizing, let me know, but I think I heard you say you thought customer retention may be less significant in the profits of an insurance carrier than paying smaller amounts on claims.  Am I paraphrasing you correctly?

A.  No.  I think what I said, or at least was trying to say, is I think that a claims department or a claims person can have a much greater impact through indemnity payouts than they can through retention. Yeah, retention -- customer retention can add to profitability of a company.  And other departments --

I think there is a lot of departments involved with that.

Q. Well, so to follow up on that, a claims handler could have a significant impact on customer retention just by the way that they handle the claims and their attempts to satisfy their insureds, yes?

A. Well, a claim handler can have some impact on retention. I would have to look at the stats for overall retention versus retention with people that have had claims. And keep in mind the vast majority of people that buy insurance in any given year don't have a claim. I mean, it's probably a single digit or it's a small percentage of people, so when that renewal comes up, it's more important to renew the people that haven't had a claim, because they're such a huge majority versus the people that have had a claim. So if you're going to have an impact on retention, you know, the claims department deals with a small group of policyholders that deal with retention. But they can have some impact.

Q. Are you aware of an insurance carrier that has an appropriate bonus program for claims employees?

A. I think there is several insurers out there that don't have any incentive-based programs. I know that -- I can't think of anybody specifically right now

off, but I know that other insurers are moving their claims department away from a profit center mentality to being a completely separate unit that has no -- that is compensated separately than the rest of the company and controlled and managed separately than the rest of the company to keep that separate.  But, yeah, there is -- there is a lot of companies out there that don't have incentive-based pay programs. They just have it based on, you know, evaluations. So company profitability has no impact on salary.

Q. Based upon that answer, do you believe that Progressive operates its claims units as a profit center or as a profit mentality?

A. Yeah.  I, I really don't understand -- I guess I really don't understand that question.  Do I -- do I believe that Progressive operates it as a profit center?  I believe they operate their claims department as a claims department.  Whether they are -- whether -- because of their GainSharing program, I believe that the claims department has a profit under mo -- at least a profit under mode within their claims department.

Q. What insurance carrier doesn't operate as a -- doesn't have a bonus program for its claims department?  You said there were some.  Can you tell

them -- can you list them for me specifically that you're aware of?

A.   Well, it used to be State Farm, but State Farm started an Auto Growth Incentive Program in 2000, so they have an incentive program based on -- the Auto Growth Enterprise Program that started in 2000.

I just had a case, I think it was Fireman's Fund that I saw no incentive program on, but I, but I -- I'm really drawing a bit of a blank on which companies, companies don't right now.  I'm trying to remember all their compensation programs.  I've never -- I mean, I've handled claims, I've done this for other insurers where I've made no comment regarding any incentive-based program on it because I haven't seen any documents regarding that, so that's all I can tell you.

Q.   Well, would you agree with me that most national insurance carriers -- and I guess I would put Progressive in that category, I don't know if you would, I assume you would -- would you agree with me that most national-based insurance carriers have an incentive program of some sort for their employees and most of them include their claims department in that incentive-based program?

A.   I would agree with you that many, several of them do,

because they found out that it works, I think.  You know, like I said, State Farm just adopted it, adopted an incentive program in 2010.  So yeah, it's -- the incentive-based programs work.  They have a direct impact on the bottom line of the company and they work, and more and more companies are starting to head that direction.

Q. And to follow up on State Farm specifically, I know you're a former employee, so at one point they were doing it correctly by not having incentive-based compensation for their claims department and then they moved to a program in 2000, and now, in your opinion, they're doing it incorrectly?

A. I just became aware of State Farm's Enterprise Auto Growth Incentive Program, and I have not seen any of the documents or how it's set up.  Based on its title alone, Enterprise Auto Growth Incentive Plan, I, I'm not sure yet.  I haven't seen the documents to make that final -- make a determination.

Q. When you were working for State Farm prior to stopping working there in 2002, was there a incentive-based compensation program for the claims department?

A. No.

Q. You never worked under a program that was incentive-

based compensation?

A. No. There was -- there was an incentive-base compensation program for management, senior management, and the executive program, but not for the whole claims department when I worked for them.

Q. Okay. And you received bonuses, then, as part of the management team?

A. I did the last -- I think the last three years I was there, we received up to a -- my level up to a $2,000 a year bonus.

Q. Was that appropriate or inappropriate?

A. It -- I didn't -- I still don't feel it was inappropriate. I don't think the amount was significant enough to, in and of itself, to change anybody's attitude or their behaviors in any way.

Q. How is that different from the Progressive GainShare program?

A. Well, Progressive's GainShare Program can result in significant dollars. Again, you're talking about, you know, a senior, a manager at State Farm that's making $150,000 a year, a $2,000 a year bonus, I mean, how much incentive is that to, internally to change any philosophy? It really is -- it's not significant enough to, I think, change behavior consciously or subconsciously.

Progressive's program can result in significant dollars to an employee, and it can, I believe it can have a significant impact subconsciously over the long run with the -- since it's the entire company.

Q. You're not able to get any more specific with me than "significant"? I mean, you don't have examples of individual employees, including the employees that would have handled this claim?

A. I don't have any specific examples with me right now. I've seen some examples and I've seen testimony where it's -- where different employees have received different amounts, but I can't tell you what those are right now. I haven't looked at it in a long time.

Q. How did State Farm figure out what the compensation would be for you when you were a manager there? What was it based upon? Was it overall company profitability or --

A. They had just a pay --

Q. How was it determined?

A. Yeah, profitability ever -- are you talking about my compensation or that $2,000 -- the $2,000 bonus?

Q. The bonus.

A. Oh. You know, I don't know. One year they even awarded it when the company had an underwriting loss,

so I'm not sure how -- we were never told how that was calculated specifically.

Q. Okay. To kind of wrap this up, Steve, I want to make sure I'm being thorough regarding the opinions you intend or foresee you offering in this case, so I want to -- you've got four bullet points toward the end of your report that I'm going to ask you about. The first bullet point states that, Progressive "Misrepresented the policy and the available policy benefits to the insured," who would be Ms. LeBeau. Have we talked about all of the specifics regarding that opinion?

A. I, I believe we have. I think they're detailed in my report. Earlier on I think we've hit on -- we've hit on them during this conversation.

Q. Is it basically the MedPay, the mileage, and the loss of wage claim?

A. Yeah. It's that initial thing, not explaining that U coverage, you know, can compensate you for MedPay and the wage and the loss of mileage. I believe those are the main things that I detailed in my report.

Q. Okay. Second bullet point, Progressive "Failed to conduct an objective investigation, giving equal consideration to the insured's interests to determine what was owed." Can you be more specific in that

regard?  Maybe we've discussed it, but remind me if we have, is there -- can you tell me -- go ahead.

A.  I was going to say I think we have.  I talked a little bit about how this claim has impacted her life and what the value of the claim would be dollar-wise based on that, instead of just giving it a number based on the meds, to really investigate it and determine, you know, how much do we owe, what is this injury, and how has it impacted her life?  I think that was one of the key things with that.

Again, all of these, these bullet points just really are there trying to summarize the things that are discussed in detail in my Analysis and Summary.

Q.  I understand what the purpose of the summary is, but I want to make sure I've covered them all regarding the opinions you're going to offer to a jury, so that's why I'm asking.

A.  Oh.  Okay.

Q.  The third one states, "Failed to conduct an objective evaluation, giving consideration to the insured's interest."  First of all, how does that differ from the second bullet point?

A.  Well, the investigation is gathering the information, so that's asking the insured questions and gathering up all of the information.  The evaluation is taking

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 89

that information and placing a dollar value on the claim, determining what is owed. That's the evaluation part. Again, it involves not talking about how it impacted her life, it deals within the evaluation not including the -- not including the loss of earnings and then earlier on failing to include the mileage. It includes the additional 33 doctor visits where the mileage was only increased by $14, and that's not detailed or explained, explained correctly and within the claim file. I think those are really the key, the key things that I discussed in my report.

Q. Okay. So I want to make sure I've got it all, though. On the second bullet point where you opine that Progressive failed to conduct an objective investigation, the one specific you gave me that I recall is that they didn't follow up enough with Ms. LeBeau regarding how the accident was impacting her life, correct?

A. Well, not just follow up, but that's part of the investigation. You know, following up just means checking on her, you know, like they did, checking on her, Are you ready to settle? No. Okay. I'll call you later. You know, that's following up. What I'm talking about is calling the insured and saying,

Let's talk about the injury and how it's impacted your life and what's going on and what are you feeling and kind of going into real detail to determine what the value of the claim is. That's what I didn't see in this, in the investigation and evaluation portion.

Q. Any other specific step in the investigation that Progressive failed?

A. No. I believe that's, that covers it.

Q. Okay. And then let's move to the fourth bullet point. You conclude that Progressive "Failed to attempt to effectuate a prompt, fair, and equitable settlement of the claim when liability has become reasonably clear." First of all, no question, we've established that liability was clear from the outset and Progressive acknowledged that liability was clear from the outset, correct?

A. That's correct, yes.

Q. So how else specifically did Progressive fail to effectuate a prompt settlement? And I guess the claim is not settled, so I guess I can take from that that it's -- you think it's not prompt. Is there anything else?

A. No. I -- that was the key thing, is the fact that once they received that, towards the end once they

received that $85,000 demand.  And yeah, I was trying to find it.  Once they received that demand, you know, then they failed to include everything that was owed in it.  Oh.  It's, you know, then they turn around and they didn't include the loss of earnings and earlier on they didn't include mileage, and then later on she had 33 more treatments, they included the meds but they only gave her an additional, you know, $14 for travel for the additional.  I didn't see where the calculations are to see if that's appropriate or not.  I think that's, that's it.

Q.  Okay.

A.  You know --

Q.  The next word is fair.  Was there anything specific that Progressive did that wasn't fair that we haven't already covered?

A.  I think we've talked about all of those things.

One thing, Mark, that I would like to point out, is the log notes note that after receiving that $85,000 demand in November of 2011, in May of 2012, the claim rep notes that they called the attorney and advised that the policy limits were worth $25,000, six months later, so, and that was noted in the log. I thought I would just point that out.

Q.  Why are you pointing it out?

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

A. Well, because you had that conversation about that 85, you know, whether or not it was appropriate to offer that $85,000. And my response was, My response would have been back to them, well, the policy limits are $25,000, and I believe I said I didn't see that, but in the log they do make a point of contacting the attorney at some point and telling him that, and I wanted to make sure that I -- because I said I didn't see it but it's there.

Q. Thank you. Okay. Steve, would you agree with me that the value of Ms. LeBeau's claim at the time that Progressive was investigating the claim, and given, I guess, the speed and the impact of the injury and her pre-accident conditions and her chiropractor's post-accident records, was the value of Ms. LeBeau's claim fairly debatable?

A. Mark --

MR. ZEPHIER: I'm going to object to that. Calling for a legal conclusion. You can go ahead and answer, if you can.

A. Fairly debatable from a claims handling standpoint is kind of a term of art. I realize there's -- and Robin just objected. I realize there is a legal definition from it, but from a claim-handling standpoint, fairly debatable comes into play with

when you've conducted a reasonable, objective investigation, giving equal consideration to the insured's interest, then you can deduct that reasonable, objective evaluation, giving consideration to the insured's interest, and you determine what is owed.  There is going to be some gray area.  There is going to be areas that really, that are subjective in nature, or that really can't be -- that really, you really can't figure out.  And those are the areas where fairly debatable or reasonableness dan come into play, after you've taken those other steps.

In this case, they didn't take those other steps.  They didn't conduct that, that detailed investigation and evaluation including everything that was owed.  So to say that the injuries are fairly debatable, if you were talking strictly about the general damages and, you know, and somebody says it's 8,000, somebody says it's 50,000, well, yeah, I mean, objective minds can differ.  But that doesn't come into play until after you've conducted that investigation and evaluation giving equal consideration.  That's when the issue of fairly debatable, at least from an insurance standpoint, comes into play on those subjective things that still

remain gray.

Q. And in this case, it's your opinion that Progressive didn't conduct that investigation because it didn't ask Ms. LeBeau enough about how the injury had -- her injuries were impacting her life?

A. That's part of it.  And I think I talk -- I mean, my whole report is filled, my whole analysis talks about not conducting a proper investigation and evaluation giving equal consideration.  I mean, the whole report is based on that.  And because I feel they failed to meet those obligations, then I don't think you can get to fairly debatable.  I don't think fairly debatable becomes an issue.

Q. Mr. Quinley in his report addressed a topic about the balance between a claims department being weary of fraud, yet handling claims properly and evaluating claims properly.  Do you agree with me that there is a balance that a claims department is going to have to strike regarding those competing interests?

A. I believe there is a balance.  I mean, there has to be a concern, an awareness of the fraud issue all the time.  But typically, once you get involved in a claim, the -- that issue gets set aside in the handling of claims.  But yeah, I mean, you need to be aware of fraud early on in the claim, complete your

investigation, kind of make that determination, and then fraud becomes a very secondary back issue in claims handling.  You have to proceed forward and pay everything that's owed on a first-party claim.

MR. ARNDT:  Okay.  I think that's all of the questions I have for you, Steve.  Thanks.

THE WITNESS:  Thank you.

MR. ZEPHIER:  Steve, I just have a couple of questions to follow up.


EXAMINATION

BY MR. ZEPHIER:

Q.  One of those dealt with the issue of GainSharing. And do you -- do you understand what the term "plausible deniability" means?

A.  I, I've seen the term.  I understand the concept of plausible deniability.

Q.  Now, Mr. Arndt asked you a question phrased in the sense that some of these claims adjusters from Progressive have individually stated that their claim decisions have nothing to do with GainSharing.  In your experience in dealing with GainSharing and looking at documents and prior testimony, throughout your tenure as an expert in the insurance claims handling field, have you seen the influence of

plausible deniability in the connection between what GainSharing is intended to do versus the outcomes that it actually results in?

A. Well, yeah. I, I think that's, that's a great term to express why it's -- in my opinion, GainSharing is more of a subconscious, a covert, if you will, effect on the claim reps. They don't, you know, the claim reps aren't told you do this and you get this. I think there is plausible deniability with the claim handlers for the most part, and they don't even -- most of them probably don't even recognize they're doing things a certain way and GainSharing's having that impact.

Q. And also, to follow up, Mr. Arndt had asked you some questions regarding Brooke LeBeau at one point complaining that Progressive was contacting her too much. Do you remember that question?

A. Yes. Yes.

Q. Do you recall reading in her deposition testimony that she was objecting to the frequent contacts in an attempt by Progressive to get her to settle for a lowball amount?

MR. ARNDT: I'm going to object to the form of the question and that it's leading.

A. As I -- when I answered Mr. Arndt's question, I

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 97

believe I stated that it was my recollection that she said, They were contacting me too much when they were following up, calling her up saying, Are you ready to settle?  And at that point she was telling them, No.  Leave me alone.  I'm not ready to settle.  I thought that's what they were referring to about contacting her too much, and I believe that's kind of in line with what you're saying.

Q. Okay.  Now, there were a lot of questions that were raised during this deposition, and I know that your report has your information in here based upon your study of this particular claim, as well as all of the other industry standards and what have you, but have you been able to adequately address all opinions that you have held on this case as far as answering these questions, or are there additional opinions that are contained within your report that haven't specifically been addressed by question and answer today?

A. I'll try to answer that question.

Mr. Arndt, I believe, did an excellent job of going through the report quickly and hitting on the key areas he wanted to hit on.  For the brevity of time, as much as anything, we didn't discuss absolutely every word and everything in this report.

LeBeau v. Progressive Northern Insurance Company                    Stephen Strzelec 7/21/2014

Page 98

Obviously, my opinions, this report combined with the things we talked about, and I believe we really pretty much talked about the vast majority, almost everything was in my report that we talked about today, but there were kind of a few things we went astray on. I believe all of my opinions that I have come -- that I have so far are either detailed in my report or we've talked about during this deposition. So I think between the two of them, I think they cover everything that I, that -- all of my opinions that I plan on testifying to.

And for sake of Mr. Arndt, I know there's additional depositions, and if I form any new opinions I, I hope he allows me to either supplement my report or provide information to him that I have additional opinions based on whatever discovery takes place between now and the end of discovery as well.

MR. ZEPHIER: Okay. Thank you. Those are the only questions I had.

MR. ARNDT: Yeah, thanks, Robin. I don't have any follow-up, but I guess just to make the record clear, the discovery deadline in this case has passed. I don't anticipate any others, Steve, so I think you've got everything that the parties have.

THE WITNESS: Great. Good to know, Mark. I