UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| BROOKE LEBEAU,<br><br>            Plaintiff,<br><br>vs.<br><br>PROGRESSIVE NORTHERN<br>INSURANCE COMPANY,<br><br>            Defendant. | Civ. 12-5044<br><br>**DEFENDANT PROGRESSIVE<br>NORTHERN INSURANCE COMPANY'S<br>REPLY BRIEF IN SUPPORT OF<br>DEFENDANT'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT** |

Defendant Progressive Northern Insurance Company ("Progressive") submits this Reply Brief in Support of its Motion for Partial Summary Judgment.

Progressive's Motion for Partial Summary Judgment is relatively simple.  Progressive does not believe that any evidence exists, i.e., there are not issues of disputed **material** facts that support the two elements of a bad faith claim.  Those elements are:  (1) the insurer had no reasonable basis for denying an insurance benefit[1]; and (2) that the insurer knew or recklessly disregarded that it had no such basis. *Champion v. U.S. Fidelity & Guaranty Company*, 399 N.W.2d 320 (S.D. 1987), at 324.  *Dakota, Minnesota & E. R.R. Corp. v. Acuity*, 2009 SD 69, ¶ 17, 771 N.W.2d 623, 629.

More specifically, Progressive's Motion relies heavily upon *Anderson v. W. Nat. Mut. Ins. Co.*, 857 F. Supp. 2d 896. (D.S.D. 2012).  Progressive cites *Anderson* because the facts of that case are very analogous to Lebeau's claim, the issue addressed by the Court in *Anderson* is identical (insurance carrier's motion for partial summary judgment on the issue of bad faith), the

---

[1] As stated in Progressive's initial brief, this case is not a denial of insurance **coverage**.  Progressive has never denied that Lebeau has a UM claim. As soon as Progressive was able to confirm that the tortfeasor did not have insurance coverage, Progressive opened a UM claim file, worked at investigating that claim, and made settlement offers to Lebeau. For purposes of this Motion, a case involving a denial of insurance coverage, vs. a dispute of value of a claim, must be distinguished.

case is very recent (2012) and the case was issued by the Federal District Court of South Dakota. It is difficult to imagine how any single case could be more on point than *Anderson*. Lebeau could have attempted to distinguish the facts of *Anderson* from her own claim but chose not to. Lebeau's Response Brief does not even mention *Anderson*. However, Lebeau cannot escape the conclusion that the facts of her own UM/personal injury claim represent an even stronger motion for partial summary judgment than the *Anderson* case.

Instead of addressing *Anderson*, Lebeau attempts to save her bad faith claim with confusing theories (not evidence), repeated references to phrases not used by Progressive (e.g., "MIST," "undisputed amounts" and "lowball offers"), and misrepresentations of testimony of witnesses from other cases, which have nothing to do with this case. This Court should not be distracted by Lebeau's misdirection. In the end, Lebeau cites no **material facts** that support the two elements of bad faith. Lebeau's Response to Progressive's Motion is based upon arguments and conspiracy theories by her counsel. Those arguments are not evidence, and they do not save her bad faith claim.

### Fact Section of Lebeau's Brief

Much of the "Fact" section of Lebeau's Brief does not bother to cite to supporting evidence. Many of Lebeau's stated "Facts" are simply arguments and are not supported by the discovery of this case.[2]

---

[2] Beyond submitting a response to Progressive's Statement of Material Facts, Lebeau also filed her own "Statement of Disputed and Undisputed Facts," Doc. 30. However, Lebeau is not the moving party. Neither FRCP 56 nor the Local Rules of Practice appear to recognize a procedure in which the non-moving party submits its own Statement of Material Facts. In any event, any testimony by witnesses in this case may be referred to via the deposition transcripts, and such testimony speaks for itself. Absent different direction from the Court, Progressive is not inclined to follow a procedurally incorrect pleading (Doc. 30) with a formal responsive procedurally incorrect pleading. However, to be clear, testimony taken in other litigation, and orders issued other litigation, are not evidence in this case (although they could be used as impeachment) and are not applicable to the specific facts of this case. Doc. 30 is both procedurally and substantively incorrect, and does not save Lebeau's bad faith claim.

**Accident Report**

The accident report completed by law enforcement generally describes the facts of this car accident.  In her Response to Progressive's Statement of Undisputed Material Facts, Lebeau argues that the accident report is hearsay.  In certain circumstances, Lebeau's hearsay objection may be technically correct.  In this case, the hearsay objection is easily overcome by Lebeau's own acknowledgment that, other than the officer not finding the minor damage to Lebeau's bumper, the accident report is accurate.  (See Doc. 26-2, Progressive's SMF ¶ 2, Lebeau Depo. pp. 33 and 75.)  At a minimum, Lebeau's acknowledgement is an admission against interest.  Although the accident report is not dispositive of any single issue, for purposes of Progressive's Motion, and based upon Lebeau's acknowledgement that the accident report is generally accurate, the accident report can and should be considered by the Court.

**Medical Expenses**

The "Fact" section of Lebeau's Brief also states that Progressive "…made a purposeful decision to scrutinize, then deny, much of the medical expenses of the Plaintiff." (Lebeau Brief, Doc. 31, p. 2.)  This statement by Lebeau is argument, not fact.  Not only is the argument untrue, (Progressive offered, on multiple occasions, pre-litigation, to pay Lebeau for her medical expenses and additional general damages) it is not a disputed material fact that saves Lebeau's bad faith claim.  Lebeau's statement is not a fact at all because it is not supported by any evidence.  It is just an argument by Lebeau's counsel.  Lebeau's Brief ambiguously cites 20 pages of her own deposition transcript, and the entire 20 pages of her insurance expert's report as support for this "fact."  But neither Lebeau's deposition, nor her expert report, contains such a statement.  For purposes of this Motion, the statement should be disregarded as unfounded argument.  It does not create an issue of disputed material fact.

A party resisting summary judgment "cannot overcome a motion for summary judgment with mere general allegations and denials." *Toll v. Lev*, 804 N.W.2d 440, 446 (S.D. 2011), citing *Lawrence County v. Miller*, 786 N.W.2d 360, 367 (S.D. 2010).  "A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is generally disputed."  Fed.R.Civ.P. 56(c)(1); *Gacek v. Owens & Minor Distrib., Inc.,* 666 F.3d 1142, 1145 (8th Cir.2012); *Anderson v. W. Nat. Mut. Ins. Co.*, 857 F. Supp. 2d 896, at 904. (D.S.D. 2012).

**Settlement Negotiations**

The end of the first paragraph of Lebeau's Response Brief states, "None of the first party UM benefits owed to Plaintiff have been paid by Defendant to the present time." (Lebeau Brief, Doc. 31, p. 2.)  Of course, Lebeau fails to mention that Progressive did make repeated offers to pay UM benefits, including amounts that included all of Lebeau's medical/chiropractic treatment at the time those offers were made, in addition to some general damages.  Lebeau did not accept those offers because she did not want to settle her claim for those amounts.  Certainly that is her right.  Again, Progressive recognizes that personal injury claims are subjective and often fairly debatable.  (The *Anderson* Court, and the South Dakota Supreme Court, *Hein v. Acuity*, 2007 SD 40, ¶ 10, 731 N.W.2d 231, 235, have also recognized that proposition.)  A jury will determine the actual value of Lebeau's personal injury claim.  But the fact that the two parties have not been able to agree on that settlement amount is not evidence of bad faith.

"Anderson's claim, based on these facts not subject to genuine dispute, might be worth more than the $100,000 threshold of UIM coverage, or it might not.  In short, the question of whether the value of the claim exceeds $100,000 is fairly debatable." *Anderson v. W. Nat. Mut. Ins. Co.*, 857 F. Supp. 2d 896, at 905-906. (D.S.D. 2012).

4

**Payment of "Undisputed Amounts"**

Lebeau's counsel makes references to "undisputed amounts" of UM benefits that Progressive owes Lebeau. (Lebeau Brief, Doc. 31, p. 2.)  Lebeau does not cite to any authority that defines that term.  Reading between the lines, Lebeau is presumably arguing that once an insurance carrier makes a settlement offer to the first party claimant (which Progressive did on multiple occasions in this case), Progressive is then obligated to pay that amount, i.e., it becomes "undisputed" that Progressive owes that amount to Lebeau.  Not only is there a lack of authority in South Dakota to support such a concept, that concept is completely contrary to the notion that some claims are "fairly debatable," *Hein v. Acuity*, 2007 SD 40, ¶ 10, 731 N.W.2d 231, 235, and completely contrary to legal policies that encourage settlement discussions.[3]  Lebeau's "undisputed amount" theory lacks both facts and authority.  It is just argument by Lebeau's counsel, and it does not save her bad faith claim.

**Proposed "settlement release" by Progressive**

On page 3 of her Brief (still under the heading of "Facts," but again at p. 14 under the Brief's "Argument" section), Lebeau states "However, Progressive sought to have Brooke Lebeau sign <u>all rights and remedies</u> against Progressive and its entities forever and into the future, when Progressive referenced a blanket settlement release before Progressive would pay anything at all in first party UM benefits to its own insured Brooke Lebeau."  (Emphasis original.)  Lebeau again cites to 20 pages of her own deposition as ambiguous support for that statement of "fact."

---

[3] It is worth considering the chilling effect Lebeau's "undisputed amount" theory would have upon future settlement negotiations of first party insurance claims.  Although not acknowledged by Lebeau's counsel, the ability of an insured and insurer to compromise, thereby avoiding the time, stress and costs of litigation, has value.  Our rules of evidence recognize the value of settlement and seek to encourage settlement offers by prohibiting evidence of settlement offers to finders of fact.  (FRE 408.)  Further, if Lebeau's concept would be adopted by the Court, additional legitimate questions would arise.  Would all first party claimants be willing to play by the same rules?  Is Lebeau actually arguing that if she had made a settlement offer for something less than her $25,000 UM limits, she would be bound by that ceiling when making damage arguments at trial?  Presumably the answer to that question is no, but the point remains.  Settlement offers that are made, but not accepted, do not automatically convert into "undisputed amounts" required to be paid by that party, and are not evidence of bad faith.

5

However, Lebeau's testimony makes no such reference.  In fact, **Lebeau was never presented with a settlement release of any kind**, (Rear Depo., p. 102) which makes sense given the fact that the parties never agreed to a principal settlement amount.  This argument by Lebeau (titled "fact") appears to be another theory Lebeau's counsel has been used in other litigation, but it has no application to this case.  There is no evidence to support a claim that Lebeau was presented with a settlement release of any kind.  It is simply not a fact, let alone a disputed material fact.  It is just an unfounded, cut-and-paste argument that Lebeau's counsel has used in other cases.  A settlement release has nothing to do with this case because a settlement release was never presented to Lebeau, and prior to this Brief, Lebeau has never alleged and never testified that she was presented with a release.

Beginning at the bottom of page 3 of Lebeau's Brief, and continuing to page 9, Lebeau recites her **Request for Admissions and Progressive's Responses**.  It is not clear why Lebeau recites the entirety of that pleading in her Brief.  However, Progressive stands by its Responses. They are accurate.  More importantly, there are no facts or admissions by Progressive contained in that discovery document that supports either element of bad faith.

### <u>Argument Section of Lebeau's Brief</u>

Progressive does not understand all of the arguments made in Lebeau's Brief. Progressive will address all of the arguments that are understood.  In general, when considering any of Lebeau's arguments, Progressive again respectfully requests that the Court consider only arguments by Lebeau that are supported by both the facts of this case and some authority to support Lebeau's legal arguments.  Arguments without evidence or authority, and conspiracy theories by Lebeau's counsel, do not save Lebeau's bad faith claim.

On a couple of different occasions, Lebeau makes inferences that Progressive did not "…fairly disclose the fact that first party UM Bodily Injury policy benefits are available (and

should be paid) to cover unpaid/unreimbursed accident related medical expenses and/or lost wages incurred by its own insureds…" (Lebeau Brief, Doc. 31, pp. 9 and 12.)  The facts of this case demonstrate the opposite.  Progressive did, in fact, make multiple settlement offers to Lebeau following this accident and during the course of her treatment.  (In fact, Lebeau testified that too many offers were made by Progressive.  (Lebeau Depo. pp. 72-73.)  Lebeau simply chose not to accept those offers.  Again, that is her right, but there is no authority for an argument that Progressive acted in bad faith by not paying ongoing medical expenses on a piece-meal basis.  Insurance coverage exists for ongoing medical expense claims.  The term for such coverage is medical pay coverage (or "MPC" as referred to by Lebeau's counsel).  But Lebeau (or at least her boyfriend who purchased her policy) waived that coverage and did not pay a premium for that coverage.[4]  Lebeau cannot now turn that waiver of medical pay coverage into a bad faith claim.  Lebeau cites no authority for the proposition that Progressive was required, under the terms of UM coverage, to pay ongoing medical expenses on a piece-meal basis.

### "Deceit"

On page 13 of her Brief, Lebeau argues, "If you look at the potential of collecting up $20.00 to $40.00 per year from each and every policyholder on UM coverage 25/50 limit policies, with lower claims paid, over at least 20 to 30 years, you are looking at quite a bit of unpaid claim dollar money that Defendant pockets…"  It is hard to know for sure what Lebeau's argument is on this topic and how it is evidence of bad faith in Progressive's handling of Lebeau's UM claim.  Nevertheless, this is not a class-action lawsuit.  Lebeau cites no evidence

---

[4] Pre-litigation, and post-litigation, Progressive repeatedly attempted to communicate to Lebeau that her boyfriend had denied medical payments coverage.  Those efforts fell on deaf ears.  Via her Complaint and Request for Admissions, Lebeau continued to allege that Progressive acted in bad faith by denying her medical payment coverage.  Via her Response Brief, for the first time, Lebeau appears to acknowledge that medical payment coverage was not purchased and, thus, not available to her.  (It would be interesting to know how Lebeau would respond if the roles were reversed—if Progressive denied a specific type of coverage that Lebeau had actually purchased.  The point is rhetorical but represents the double standard that is present in bad faith litigation, particularly when considering both parties to a contract has an obligation to treat the other party in good faith.)

supporting the numbers used in her argument.  This topic is just another argument/theory offered by Lebeau's counsel.  It has no basis in evidence and has nothing to do with this claim.  It does not save Lebeau's bad faith claim.

Similarly, under the topic of "Breach of Contract," Lebeau alleges "...deceit has been alleged by Plaintiff for Defendant's known, willful and institutionalized decisions and motives to sell, market, deliver and profit from premiums collected for auto policies having UM BI at $25,000 per person per accident limits," and makes allegations about "…intentional sales motives…"  (Lebeau Brief, Doc. 31, pp. 13 and16.)  The marketing and selling of the insurance policy at issue has nothing to do with this litigation.

First, Lebeau's Complaint does not even make a deceptive marketing/sales allegation.  In paragraph 12, the "Venue" portion of Lebeau's Complaint, Lebeau alleges the selling and marketing of the policy took place in various South Dakota counties.  However, within the three causes of action contained within Lebeau's Complaint, nowhere does Lebeau allege improper marketing or selling of the Progressive policy.  Lebeau cannot now, for the first time, allege new theories of bad faith simply to keep her bad faith claim alive.

Secondly, Lebeau does not have standing to make deceptive marketing/selling claims against Progressive because she never purchased the policy from Progressive.  It is undisputed, and even clearly alleged in Lebeau's own Complaint, that the person who purchased the policy at issue was James Berndt, Lebeau's boyfriend.  (Complaint, ¶ 14.)  Lebeau cannot be "deceived" into purchasing a policy that she never purchased.  She has no standing to make such a claim.

Finally, even if Lebeau had purchased the policy and even if she made a proper allegation in her Complaint, Lebeau provides no evidence (just arguments of counsel) that supports this "deceit in purchasing" allegation.  The policy at issue sold by Progressive is permitted, if not encouraged, by South Dakota law.  It is designed to provide auto users with a minimum amount

8

of insurance in the event the tortfeasor is uninsured.  Further, this case is not a class-action

lawsuit.  Lebeau does not represent a class of people who have been sold similar policies for

similar UM limits.  The focus of Lebeau's claim has always been, and should continue to be,

**how Progressive handled Lebeau's individual UM claim**, not a referendum on insurance auto

policy law in South Dakota or even Progressive's overall business/marketing strategies.  The

District Court of South Dakota has previously reached the same conclusion.

> Before allowing discovery about broad corporate practices, plaintiff must first
> show the practice is connected to plaintiff's claim.
>
> > Limiting discovery to the practices applied to the individual
> > plaintiff is the preferable approach, as the issue in a bad faith case
> > is whether the insurer acted recklessly or with ill will towards the
> > plaintiff in a particular case, not whether the defendants' business
> > practices were generally reasonable. **What constitutes a**
> > **reasonable set of business practices for the investigation and**
> > **evaluation of claims is a question properly left to the**
> > **Pennsylvania Insurance Commissioner, not a judge or jury**…
> > By limiting discovery to those practices employed in handling
> > plaintiff's claim, the Court can ensure that the litigation remains
> > focused on the problems the bad faith statute intended to redress.

*DeKnikker v. General Casualty*, 2008 WL 1848144 (D.S.D. 2008) (citing *Santer v. Teacher's*

*Ins. and Annuity Assoc.*, 2008 WL 755774 (E.D.Pa.), (emphasis added).

**No Defense Medical Expert**

Lebeau also makes the argument that "Defendant has also failed to have Plaintiff's bodily

injury claim for UM benefits reviewed or evaluated by an independent medical review expert,

according to Rule 35."  (Lebeau Brief, Doc. 31, at p. 14.)  A classic bad faith catch 22.  If the

insurer hires an independent medical expert who issues an opinion that Plaintiff does not like, the

insurer is accused of acting in bad faith by retaining a "hired gun" who is paid to support the

insurer's position.  If the insurer elects to rely upon Plaintiff's own medical records in support of

its evaluation of the claim, then the insurer is alleged to have not done enough to investigate the

claim because it did not hire its own doctor.  The insurer will be accused of bad faith no matter

what position it takes.  In reality, and in this case, regardless of her theory, Progressive's decision to evaluate Lebeau's personal injuries based upon Lebeau's own treating medical providers is sufficient.  Given the low speed of the accident, Lebeau's prior back injury shortly before this accident, and her own chiropractic records in which Dr. Kuehl concluded—on two separate occasions (Progressive SMF ¶¶ 14 and 15, post-accident chiropractic record of Dr. Curt Kuehl, Bates Stamp ProgCL000066 and 67, Ex. D)—that Lebeau had recovered from this car accident and no longer needed treatment, Progressive had (and still has) legitimate reasons to fairly debate that Lebeau's UM claim does not exceed her $25,000 policy limits.  That is the essence of *Anderson*.

> Here, Western National did not contest that an accident occurred, that Anderson was injured in the accident, and that Anderson was blameless for the accident. Western National did an investigation. Western National did not interview Anderson, but Anderson was represented by counsel who requested that Western National direct all communications to Anderson through Anderson's counsel. As this Court has explained, whether the value of Anderson's claim exceeds $100,000 is fairly debatable under the undisputed material facts. Western National's investigation and handling of this case makes the case distinct from *Dakota, Minn. & E.R.R. Corp. Cf., See Merriam v. Nat'l Union Fire Ins. Co. of Pittsburgh. Pa.,* 572 F.3d 579, 586 (8th Cir.2009) (applying Iowa law and explaining that "an improper investigation cannot alone sustain a tort action for bad faith if the insurer had an objectively reasonable basis for denying the insured's claim."); *Reid v. Pekin Ins. Co.,* 436 F.Supp.2d 1002, 1012–13 (N.D.Iowa 2006) (plaintiff's contention that insurer's experts conducted imperfect investigation did not preclude a grant of summary judgment on plaintiff's bad faith claim where opinions from other experts made claim fairly debatable); *Lerette v. Am. Med. Sec., Inc.,* 270 Neb. 545, 705 N.W.2d 41, 49–50 (2005) (insured's bad faith claim failed as a matter of law because insurer had an arguable basis on which to deny insured's claim); *State Farm Mut. Auto. Ins. Co. v. Smith,* 956 So.2d 1164, 1167 (Ala.Civ.App.2006) (insurer did not commit bad faith by failing to investigate insured's UIM claim where insurer carefully considered insured's medical records and "had a legitimate reason to dispute the extent of [the insured's damages resulting from the accident].").

*Anderson*, 857 F. Supp. 2d 896, at 907.

**"COA"—Claims Outcome Advisor**

Lebeau goes on to make allegations that "Defendant has chosen to use its

institutionalized non-human bodily injury claim scrutiny under COA (Claims Outcome Advisor),

and to challenge the basis of Plaintiff's UM BI claimed damages under the MIST (minimal

impact, soft tissue theory.)"  (Lebeau Brief, Doc. 31, pp. 14 and 19.)  Lebeau then cites large

chunks of Progressive claims handler Lorie Rear's deposition testimony (Rear Depo. pp. 25-35,

78-84) in support of this theory.  But in reality, Rear's testimony very clearly established the

opposite—that COA was **not used** to evaluate Lebeau's claim because it is not used by

Progressive to evaluate first-party claims in South Dakota.  (Rear Depo., p. 80.)  Rear also

testified that MIST was not a category used by Progressive in which to funnel claims (Rear

Depo., p. 25), she is not/was not directed to treat minimal impact claims in a certain way and that

"minimal impact" was simply a generic term (Rear Depo., p. 26).

As expected, Lebeau herself has no knowledge what kind of computer software

Progressive employees used to evaluate her claim (Lebeau Depo., p. 75) and, therefore, cannot

support this "COA" theory.

Lebeau's counsel is not a witness.  His questions are not evidence.  The answers given by

the witnesses are evidence, and those answers establish that "COA" was not used to evaluate

Lebeau's UM claim.  Lebeau's theory (even if one were to accept that use of COA on first-party

claims is evidence of bad faith—which Lebeau has not established) does not create issues of

disputed material facts.

**"Deceit" of Lebeau Regarding Lost Wages or Mileage**

Lebeau's Brief goes on to state "…adjustor Hupp deceived Plaintiff on the issue of lost

wages and did not include them" and cites Rear's deposition, and Mr. Strezlec's deposition, in

support of that claim.  Lebeau did not depose Mr. Hupp.  It seems obvious that other witnesses,

including Mr. Strezlec, who have never spoken to Mr. Hupp, or reviewed testimony about Mr. Hupp's state of mind, would not be allowed to speculate about Mr. Hupp's state of mind to create an issue of material fact.  Again, this statement by Lebeau is just an argument.  It is not evidence.

Lebeau's Brief goes on to state, "Adjustor Kurle further deceived Plaintiff to allow her to believe that UM BI coverage would not or may not cover or be used to pay her medical expenses."  Lebeau cites large portions of Kurle's deposition transcript and Strezlec's report in support of an argument that a Progressive witness tried to deceive Lebeau.  The Court should be clear about the document supporting Lebeau's argument regarding this theory—Kurle's recorded statement taken of Lebeau three days post-accident.  (Recorded Statement by Kurle, Ex. L, Second Affidavit of Defense Counsel Mark Arndt.)

At that time of the recorded statement (three days post-accident), neither Lebeau nor Progressive knew with any certainty whether the tortfeasor had insurance coverage and, therefore, whether Lebeau would have a UM claim under the Progressive policy.  Realizing that the Progressive policy at issue did not have any medical pay benefits, Kurle prudently cautioned Lebeau that it was **possible** that her medical expenses **may** not be covered under the Progressive policy.

> Q: Okay in that case, Brooke that will end the formal part of the statement. Based on what you've told me so far umm sounds as though the other person would be found at fault for the accident.  As far as your vehicle, if you're not claiming any damages then you know we don't need to worry about anything there.  However, for the injury portion of it, I'm not showing that you have MedPay coverage on your policy which would be the coverage that would pay the medical bills as they come due.
>
> A: Unh huh
>
> Q: However, with the other insurance company would be able to pursue a bodily injury which…
>
> A: And what if…

Q:      What's that?

A:      What if he doesn't have any?

Q:      Well, that's… if he doesn't have any then there would be a potential for…
        you do have Uninsured Motorist coverage.

A:      Unh huh

Q:      So there would be potential there for you to pursue the same type of thing
        through your Uninsured Motorist coverage.  Okay, but it's going to be
        whether… we need to know for sure if he doesn't have any insurance.

A:      Okay

Q:      Before we can open that up.

A:      Okay

Q:      Okay so…

A:      And then…

Q:      So what I'll do is I'll try and get in touch with the officer and see if ugh if
        we can maybe try and speed up that process a little bit and see if there is
        insurance on the vehicle or not.  If there is, I'll get a claim filed with them
        and make sure that they are aware of it and have them get in touch with
        you regarding an injury and if there's not, we'll open up an Uninsured
        Motorist coverage on your claim with us and then that would get
        transferred to an injury representative for the rest of the handling.  Okay.

A:      Okay

Q:      So umm probably going to have to sit type (sic) until we can either get the
        police report or at least talk to the officer and see if we can get the
        insurance information if there is any.

A:      Okay

Q:      Okay, does that make sense?

A:      Yeah it does.  Umm so then like I can just keep going to the chiropractor
        cause he wants to see me back Wednesday or Thursday.

Q:      Well I mean you can, but the…

A:      I may get stuck

13

Q:      Yeah, it's possible.  You there is always a possibility without having that MedPay, medical payments coverage,

A:      Okay

Q:      So I mean you can do whatever you feel you need to do, but you know there is a chance it could possibly be your responsibility.

A:      Oh…

Q:      But I can't you know, I just can't tell you one way or the other.

A:      You don't know yet.

Q:      Yeah

A:      Okay, alrighty well I guess I'll just keep going; I got to get it done.

Q:      Alright.

A:      Thank you.

Q:      Yep and I'll give you a call as soon as I have any updates on that insurance info okay.

A:      Sounds good, thank you.

Q:      Yep thanks Brooke.

A:      Okay bye

Q:      Bye

End of tape

(Recorded Statement by Kurle, ProgCL000172-174, Ex. L, Second Affidavit of Defense Counsel Mark Arndt.)

The recorded statement demonstrates that not only was Kurle's statement to Lebeau not deceptive, it was correct.  Without medical pay coverage, it was/is at least possible that Lebeau would be responsible for payment of her own medical expenses.  Three days post-accident, Progressive certainly did not have information about Lebeau's current health status or any potential issues regarding causation.  Bear in mind, this was a very low-impact accident.  Kurle

14

took the prudent step of cautioning Lebeau that, without medpay coverage, there was no guarantee that her own policy would pay for her ongoing expenses.  Kurle even went as far as telling Lebeau that if the tortfeasor did not have insurance coverage, she could submit medical expenses under her own policy as part of a UM claim, similar to a personal injury claim against an insured tortfeasor.  At the conclusion of the conversation, Kurle went out of his way to make sure Lebeau understood what he was telling her, and Lebeau acknowledged that she understood.  The interview resulted in understanding, not deception.  The recorded statement is not evidence of bad faith because it does not establish deception by Progressive.

### Unfair Claims Practices Act, SDCL Title 58-33

As support for some of her arguments, Lebeau cites portions of the Unfair Claims Practices Act, SDCL Title 58-33.  Specifically, SDCL 58-33-67 (Lebeau Brief, Doc. 31, p. 16). However, SDCL 58-33-69 states that "[n]othing contained in §§ 58-33-66 to 58-33-69 grants a private right of action."  The *Anderson* Court also recognized the inapplicability of SDCL 58-33-67 as evidence of a bad faith claim.

> Anderson argues, however, that Western National's alleged violation of SDCL 58-33-67 is evidence of bad faith. Anderson has not directed this Court to any cases from the state of South Dakota or the Eighth Circuit holding that a violation of SDCL 58-33-67 is evidence of bad faith, although the *Dakota, Minn. & E.R.R.* case does consider the absence of investigation as possible evidence of bad faith. The tort of bad faith in South Dakota focuses on whether or not the insurer had a reasonable basis for denying benefits under the policy and whether the insurer knew or recklessly disregarded the lack of a reasonable basis in denying the claim. A violation of SDCL 58-33-67 (1)—a provision that is focused on the adoption of reasonable standards to provide for the *timely* investigation of claims—does not prove either prong of the South Dakota bad faith test. *See Arp,* 300 F.3d at 916 (applying South Dakota law and stating that "being dilatory or even slow doesn't in and of itself amount to bad faith."). This conclusion holds true even if South Dakota law allows a plaintiff, regardless of whether the insurer has a reasonable basis to deny the plaintiff's claim, to recover from an insurer on a bad faith "failure to investigate" claim. Section 58-33-67 is aimed at the timeliness, rather than the quality, of an insurer's investigation. Western National's alleged violation of SDCL 58-33-67(1) is not a material fact that prevents the court from granting summary judgment on Anderson's bad faith claim when the

question of Anderson's entitlement to more than the $100,000 UIM limit is fairly debatable as a matter of law.

*Anderson*, 857 F. Supp. 2d 896, at 908.

**"Gainsharing"**

One of Lebeau's counsel's consistent bad faith theories is that Progressive's employee incentive program— "Gainsharing"—constitutes evidence of bad faith.

Lebeau herself has no knowledge of what, or even if, Progressive's employees participate in an incentive compensation program. (Lebeau Depo., pp. 75-76.)  Lebeau's expert, Steve Strezlec, speculates that Progressive's incentive program is improper but can offer no specifics regarding why.  (Strezlec Depo., pp. 72-80.)  When pressed, Strezlec claims to have past knowledge of Gainshare but is unable to cite a single source of information that forms the basis of his opinions.  He also acknowledges that Gainshare did not likely have a conscious effect on the way Lebeau's claim was handled but likely had a "subconscious" effect on Progressive's employees.  Again, this Gainshare theory amounts to nothing more than speculation and does not create an issue of material fact.  If Strezlec, a purported expert, is not even familiar with the Gainshare program that was in effect at the time Lebeau's claim was handled, and does not know the specifics of the program's contents, his testimony cannot possibly create an issue of disputed material fact.

Lebeau's counsel deposed a total of two Progressive witnesses in this case.  Both were claims handlers—Lorie Rear and John Kurle.  Both Rear and Kurle repeatedly testified that they had no specific knowledge of how their Gainshare bonuses are calculated (Rear Depo., pp. 56 and 77) (Kurle Depo., p. 12), and both denied that Gainshare had any effect on their handling of Lebeau's claim.  (Rear Depo., p. 102) (Kurle Depo., p. 62.)

In the larger picture of things, the Gainsharing argument represents another catch 22 for a national insurance carrier.  Failing to provide bonuses for employees is deemed corporate greed.

16

Yet, providing a bonus program is bad faith because it "subconsciously" causes employees to unfairly reduce first-party claim payments.  However, that is theoretical.  For purposes of Progressive's Motion for Partial Summary Judgment, Gainsharing is simply one more theory proffered by Lebeau in a desperate effort to save her bad faith claim.  The theory is not supported by any evidence in this case and, therefore, is just an argument.

## CONCLUSION

"First-party bad faith is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured."  *Hein v. Acuity*, 2007 SD 40, ¶ 10, 731 N.W.2d 231, 235 (internal citations omitted).  In claims for first-party benefits, "**the parties are adversaries,** and therefore, an insurer is permitted to challenge claims that are fairly debatable."  *Id*.  (Emphasis added.)  Only a frivolous or unfounded refusal to comply with a duty under an insurance contract will qualify as bad faith.  *Id*.

The Wisconsin Supreme Court's 2011 decision in *Brethorst v. Allstate Property & Casualty Insurance Company*, 798 N.W.2d 467, (Wis. 2011), hits home when applied to Lebeau's bad faith claim.

> As intended, plaintiff's ability to bring a separate tort action [of bad faith] has helped to curb abuse and unfair practices. Unfortunately, as quickly as bad-faith law developed to come to the aid of the disadvantaged party in a contract or fiduciary relationship, it has **evolved into a litigation quandary that often misses its basic purpose** ... In some cases, **enterprising plaintiffs' attorneys seek out technical violations to bring a bad-faith action where there is no purposeful or malevolent will, or even a remotely unfair act. In legitimizing such claims, bad-faith law has lost its way.**

*Id*., at 482 n. 6.  (Emphasis added.)

The parties can agree to disagree about the value of Lebeau's personal injuries and whether those injuries are worth the $25,000 limits of the insurance policy Mr. Berndt purchased for Lebeau.  The value of Lebeau's uninsured motorist (UM) claim is, and always has been,

"fairly debatable."  *Hein v. Acuity*, 2007 SD 40, ¶ 10, 731 N.W.2d 231, 235.  Progressive is willing to submit that issue to a jury.  However, Lebeau should not be able to use the threat of additional damages for bad faith—simply as a means to leverage a higher settlement value for her personal injury claim—when no legitimate evidence of bad faith exists.

Per the evidence cited in Progressive's Statement of Material Facts, Progressive had a reasonable basis to disagree with Lebeau and her attorney regarding the causation of Lebeau's claimed injuries and the monetary value of her personal injury claim.  Similar to any personal injury claim (first or third party), only a jury will be able to determine the value of Lebeau's claim.  However, no facts exist to support Lebeau's bad faith allegation that:  1) Progressive had **no reasonable basis** for declining Lebeau's policy limit settlement demands; **and** 2) that Progressive **recklessly disregarded** the basis of Lebeau's demands.  Without a basic showing of those two elements, and as confirmed by the *Anderson* Court, Lebeau's bad faith claim fails as a matter of law.

Dated this 18th day of August, 2014.

MAY & JOHNSON, P.C.

By____/s/ Mark J. Arndt_____
        Mark J. Arndt
6805 South Minnesota Avenue
P.O. Box 88738
Sioux Falls, SD  57109-8738
(605) 336-2565; Fax:  (605) 336-2604
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 18th day of August, 2014, a true and correct copy of the foregoing **Defendant Progressive Northern Insurance Company's Reply Brief in Support of Defendant's Motion for Partial Summary Judgment** has been filed electronically with the Clerk of Court through ECF on the following:

Robin L. Zephier
Abourezk & Zephier, P.C.
P.O. Box 9460
Rapid City, SD  57709
rzephier@azlaw.pro
(605) 342-0097

Attorney for Plaintiff


        /s/ Mark J. Arndt
        Mark J. Arndt