UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BROOKE LeBEAU,<br><br>           Plaintiff,<br><br>    vs.<br><br>PROGRESSIVE NORTHERN<br>INSURANCE COMPANY,<br><br>       Defendant. | CIV. 12-5044-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiff Brooke LeBeau filed a three-count complaint against defendant Progressive Northern Insurance Company ("Progressive").   (Docket 1).   Count 1 alleges a breach of contract, count 2 alleges bad faith, and count 3 asserts a claim for punitive damages.   Id. at pp. 3-7.   Progressive filed a motion for partial summary judgment, supported by the defendant's statement of undisputed facts, seeking dismissal of counts 2 and 3.   (Dockets 23 & 25).   Plaintiff filed a response to defendant's statement of undisputed facts and her own statement of disputed facts.   (Dockets 29 & 30).   For the reasons stated below, Progressive's motion for partial summary judgment is granted.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show[] that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   Id. at 248.   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."   Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.   Id.   However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   "There can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Id.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

2

574, 587-88 (1986).   In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [her] allegations with 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993)).   "A mere scintilla of evidence is insufficient to avoid summary judgment." Moody, 23 F.3d at 1412.   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Id. at 256; see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (internal quotation marks

3

and citation omitted).   The non-moving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas, 483 F.3d at 527; Torgerson, 643 F.3d at 1042.

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts undisputed by the parties.   These facts are developed from the plaintiff's complaint (Docket 1), defendant's answer (Docket 7), defendant's statement of undisputed material facts (Docket 25), plaintiff's response to defendant's statement of undisputed material facts (Docket 29) and plaintiff's statement of disputed material facts (Docket 30).   Additional facts from the record are included where indicated. Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document.

Brook LeBeau is a resident of Eagle Butte, South Dakota.   (Docket 1 ¶ 1). Progressive is an Ohio corporation, licensed to sell and service insurance products in South Dakota.   Id. ¶ 4.   Progressive issued an insurance policy insuring Ms. LeBeau's vehicle which provided $25,000 in uninsured motorist ("UM") coverage.   (Docket 25 ¶ 23).   The policy did not provide medical payments coverage ("MPC").   Id. ¶ 24.   By the terms of the UM coverage, Progressive promised to pay Ms. LeBeau for "damages . . . which [she] is legally entitled to recover from the owner or operator of an . . . uninsured motor vehicle because of bodily injury."   Id. ¶ 26.

4

On September 18, 2009, a two vehicle collision occurred in Eagle Butte, South Dakota.  Id. ¶¶ 1 & 3.   Ms. LeBeau was stopped at the intersection of Highway 212 and D Street when a vehicle driven by Narcisse Bruguier bumped her vehicle from the rear.   Id. ¶ 3.   The airbags did not deploy in either vehicle and there was no broken glass on either vehicle.   Id. ¶ 4.   Ms. LeBeau does not recall her body striking anything inside her vehicle and she had no visible injuries such as cuts, bruises or protruding bones.   (Docket 29 ¶ 4).

Cheyenne River Sioux Tribal Officer Jody Charging Eagle was called to the scene and prepared an accident report.   (Docket 25 ¶¶ 2 & 6; see also Docket 26-1).   Ms. LeBeau acknowledges the report accurately describes the accident. (Docket 25 ¶ 2).   Officer Charging Eagle reported that he "closely examined both vehicles but [he] did not see any visible damage on [Ms. LeBeau's] S.U.V. . . ." (Docket 26-1 at p. 2).   Mr. Bruguier reported "he barely tapped the rear of LeBeau's vehicle."[1]   Id.

In response to the officer's inquiry, Ms. LeBeau stated "[m]y neck hurts real bad."   Id.   She was told an ambulance would be summoned, but "she declined their services."   Id.   The officer suggested she not drive herself to the hospital because "we didn't know the extent or severity of the injuries."   The

---

[1]At her deposition, Ms. LeBeau confirmed three post-accident photographs of her vehicle show indentations on her rear bumper from Mr. Bruguier's license plate.   (Docket 25 ¶ 7).   The indentations were highlighted in pink on the photographs.   Id.

officer concluded his summary with the statement that "[a] short time later a female arrived on location and transported Brooke to the ER."   Id.

At the emergency room, Ms. LeBeau's main complaints were neck and back muscle strain.   (Docket 25 ¶ 10).   The Indian Health Service ("IHS") treating physician noted Ms. LeBeau had past chiropractic treatment for neck pain following a slip and fall episode seven months prior to the automobile accident.   Id.   The physician noted Ms. LeBeau's neck was tender, but she had a full range of motion.   Id.   The diagnosis was acute neck strain and upper back muscle strain secondary to the motor vehicle accident.   Id.   Ms. LeBeau was given a cervical collar and pain medication.   Id.   Her condition was noted as stable on discharge.   Id.

Three days later Ms. LeBeau treated with Dr. Curt Kuehl, a chiropractor. Id. ¶ 11.   Dr. Kuehl had treated Ms. LeBeau seven months earlier for her slip and fall injury.   Id. ¶ 12.   Those earlier treatments were for back and neck pain.[2]   Id.   Concerning Ms. LeBeau's present physical condition, Dr. Kuehl

---

[2]Ms. LeBeau acknowledges this earlier treatment, but contends this made her an "eggshell Plaintiff under the law."   (Docket 29 ¶ 12).   The concept of an "eggshell plaintiff" was endorsed in Pollman v. Ahrens, 218 N.W.2d 475 (S.D. 1975) and Shippen v. Parrott, 553 N.W.2d 503 (S.D. 1996) and was incorporated in the South Dakota Pattern Civil Jury Instructions (2009 ed.) ("SDCivPJI") as 50-10-30 ("If you find that plaintiff had a prior [condition] . . . making . . . [her] more susceptible to injury than a person in normal health, then you may award damages for the injuries caused by defendant's conduct, even though those injuries may be greater than what might have been experienced by a person in normal health under the same circumstances.   Before awarding such damages, however, plaintiff must prove that the conduct of the defendant was a substantial factor in bringing about the harm alleged.").

noted she suffered from neck pain, upper back pain and a headache.   (Dockets 25 ¶13 & 29 ¶ 13).

On December 2, 2009, Dr. Kuehl concluded Ms. LeBeau had reached pre-injury status.[3]   (Docket 25 ¶ 14).   The doctor noted no follow-up care was recommended and discharged her from further treatment.   Id.   On December 15, Ms. LeBeau sought treatment with Dr. Kuehl.   Id. ¶ 15.   She reported her neck pain was gone and her mid-back pain was mild.   Id.   Dr. Kuehl again noted Ms. LeBeau had achieved pre-injury status and was maintaining.   Id.

On January 14, 2010, Ms. LeBeau asked Dr. Kuehl for an x-ray of her neck.   Id. ¶ 16.   Dr. Kuehl noted the x-ray was essentially normal.   Id.   The record of that visit concluded "[o]nce again no further care is recommended for

---

[3]Plaintiff acknowledges this was Dr. Kuehl's conclusion, but asserts she still suffered from neck, spine and headache issues.   (Docket 29 ¶ 14).   She claims to be frustrated by traveling from her home and work location in Eagle Butte to Dr. Kuehl's clinic in Pierre, South Dakota.   Id.   She also "surmise[es]" that Dr. Kuehl was "weary of [Ms. LeBeau's] inability to make every appointment (distance problems), . . . had an unpaid bill for treatment . . . and no insurance to cover it, . . . and Progressive was not ever willing to step up and fulfill its promises to pay for accident related bodily injury medical treatment despite the absence of MPC benefits."   Id.   Ms. LeBeau made the same response to all of defendant's undisputed material fact statements relating to her care. These arguments are not proper responses as required by D.S.D. Civ. LR 56.1(B) ("A party opposing a motion for summary judgment will respond to each numbered paragraph of the material facts with . . . appropriate citations to the record.").

her injuries received in Sept. 09." Id.   Between September 18, 2009, and January 14, 2010, Ms. LeBeau treated with Dr. Kuehl a total of nine times.[4] (Docket 26-7).

On June 3, 2010, Ms. LeBeau presented to Dr. Kuehl with what she described as "a new problem which was her mid-back, insidious onset." (Dockets 25 ¶ 18 & 26-7 at p. 5).   No further treatment by Dr. Kuehl is indicated in the record.

On July 15, 2010, Ms. LeBeau began treatment with Dr. Brandon Heck.[5] (Docket 25 ¶ 19).   The doctor's note indicates she presented with headaches and neck pain, as well as general soreness throughout her back.   (Docket 26-9). She described the rear-end collision of September 2009 and told Dr. Heck she had been dealing with intense headaches since then.   Id.   Ms. LeBeau was treated more than twenty times for soft tissue injuries over the next two years. (Docket 25 ¶ 20).   Her last treatment with Dr. Heck was on October 12, 2012.[6] Id.

---

[4]As of the date of defendant's motion for partial summary judgment, Dr. Kuehl had neither been designated as an expert witness by plaintiff nor deposed by defendant.   (Dockets 25 ¶ 17 & 29 ¶ 17).   The deadlines for designation of experts and completion of discovery have both passed.   (Docket 19 at p. 4).

[5]Ms. LeBeau admits defendant's statement of undisputed material facts. (Docket 29 ¶ 19).   She claims this change in doctors occurred because Dr. Kuehl was too concerned about getting paid to address her injuries.   Id.   This argument is not a proper response.   D.S.D. Civ. LR 56.1(B).

[6]Ms. LeBeau acknowledges these visits but claims they were not just for soft tissue injuries.   She does not provide any guidance as to the nature of any other treatment issues.   (Docket 29 ¶ 20).   This argument is not a proper response.   D.S.D. Civ. LR 56.1(B).

On June 6, 2013, Ms. LeBeau was treated at the IHS clinic for sinus pressure and pain.   (Docket 25 ¶ 21).   During the examination, Ms. LeBeau indicated she was involved in an accident in 2009 and since then had been experiencing neck problems.   Id.   She requested an MRI.   Id.   The cervical MRI report indicated "[t]he soft tissues and in pervertebral soft tissue space are normal.   The skeletal structures are well mineralized.   The vertebral body heights and disc spaces are well maintained.   The alignment of the cervical spine is normal."[7]   (Docket 26-10).

On September 21, 2009, upon receiving notice of the September 18 accident, John Kurle, a claims representative for Progressive, contacted Ms. LeBeau.   (Docket 25 ¶ 29).   She indicated to Mr. Kurle that there was some question as to whether Mr. Bruguier had valid insurance.   Id.   Mr. Kurle advised Ms. LeBeau that he would contact the investigating officer and if there was no insurance on Mr. Bruguier's vehicle, Progressive would open a UM file and transfer the case to an injury representative.[8]   Id. ¶ 30.   Ms. LeBeau agreed with this plan.   Id.

---

[7]Ms. LeBeau acknowledges the MRI findings, but asserts an MRI cannot adequately indicate or "diagnose 'soft tissue' or connective tissue/stretching or damage to the neck and spine."   (Docket 29 ¶ 21).   This argument is not a proper response.   D.S.D. Civ. LR 56.1(B).

[8]Ms. LeBeau claims at this point in time Progressive was obligated to advise her that if Mr. Bruguier was uninsured, Progressive's UM policy would pay her medical expenses.   (Docket 29 ¶ 30).

9

Between September 21 and 30, 2009, Mr. Kurle made nine calls trying to determine whether Mr. Bruguier's vehicle was insured.   (Docket 26-13 at pp. 1-2).   After visiting with an insurance agent at the State Bank in Eagle Butte on September 30, Mr. Kurle concluded the Bruguier vehicle was not insured and Progressive opened a UM claim file.[9]   (Dockets 25 ¶¶ 22 & 32 and 26-13 at p. 2).

Lorie Rear, a UM claims representative, called Ms. LeBeau on September 30 and obtained a recorded statement.   (Dockets 25 ¶ 33 & 26-13 at p. 3). Because Ms. LeBeau was going to be in Pierre the next week, Ms. Rear set up an appointment to meet in person.[10]   (Dockets 25 ¶ 33 & 26-13 at p. 4).   Ms. Rear commented in the claim notes that the reserve "range is little higher do [sic] to possible egg shell issue and UM claim."   (Docket 26-13 at p. 4) (capitalization omitted).

---

[9]Progressive never denied Mr. Bruguier was wholly at fault for causing the accident.   (Docket 25 ¶ 27).   As a result, the UM coverage in Progressive's policy provided up to $25,000 if a trier of fact concluded Ms. LeBeau incurred damages. Id. ¶ 28.

[10]Ms. LeBeau's objection suggests these were "not reasonable arrangements, in that Progressive made Plaintiff travel to Pierre for a meeting." (Docket 29 ¶ 33).   This assertion is contradicted by Ms. LeBeau's statement she was going to Pierre the next week to see her chiropractor and it was only then that Ms. Rear suggested meeting in Pierre.   (Docket 26-13 at p. 3).   When the parties assert "two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).   Ms. LeBeau's objection "is so utterly discredited by the record that no reasonable jury could have believed [her]."   Id.

Ms. Rear and Ms. LeBeau met in Pierre on October 7, 2009.   Id.   See also
Docket 33-2 at pp. 3(27:18) & 4(30:10-12).   Ms. LeBeau signed medical release
authorizations at their meeting.   (Dockets 25 ¶ 35 & 26-13 at p. 4).   This
permitted Progressive to obtain Ms. LeBeau's pre- and post-accident medical
records and bills.   (Docket 25 ¶ 35).   As part of their discussion, Ms. Rear
explained the claim process and that Progressive would make a settlement offer
in "30/60 days."   (Docket 26-13 at p. 5).   Ms. LeBeau indicated she would
prefer to wait, as she was afraid to settle too quickly and wanted to see how
physical therapy and her chiropractic visits went.   Id.   On February 1, 2010,
Progressive received notice that Attorney Rebecca Kidder of the Abourezk Law
Firm would be representing Ms. LeBeau.   Id. at p. 7.

Between the winter of 2009 and mid-2010 Progressive made a number of
offers to Ms. LeBeau to "cover her post-accident medical expenses and some
additional general damages."   (Docket 25 ¶ 37).   Ms. LeBeau rejected each of
these offers.[11]   Id.

---

[11]Ms. LeBeau's objection to these statements is that they are "entirely . . .
self-serving and an embellishment of Progressive's fictional 'diligent' concern for
its own insured."   (Docket 29 ¶ 37).   Defendant did not disclose the dates or
amounts of each offer nor the dates of Ms. LeBeau's rejections.   (Docket 26-13).
This information is not included in the submitted claim notes.   Id.   The report
of plaintiff's proposed expert witness, Mr. Strzelec, contains a chronological
summary of the entire claim file.   (Docket 33-1 at pp. 6-15).   Since neither
party makes specific reference to the amounts offered or the dates associated
with each offer, the court will not make individual references to this information.

On November 18, 2011, Attorney Robin Zephier of the Abourezk Law Firm tendered a settlement demand on Ms. LeBeau's behalf to Progressive.[12]   (Docket 25 ¶ 39).   The demand of $85,304 included $4,354.80 in past medical expenses. Id.   See also Docket 26-14 at pp. 3-4.   On December 1, Robert Hupp, a Progressive claims representative, called Mr. Zephier's office and orally conveyed an offer of $6,650.   (Docket 26-13 at p. 8).   This offer is the result of the following analysis in the claims notes: "totals 6648.00-8997.00 conceeding [sic] to meds will begin negs [negotiations] at low end of considered specials. – negotiation points[:] +lower impact +sti [soft tissue injury] + chiro release 3m [3 months] post loss. -1st party UM – prior hx [history], eggshell – long duration of care."   Id.

On December 14, Mr. Hupp called Attorney Zephier to see if there was a response to Progressive's offer.   Id.   Mr. Zephier asked that the offer be faxed to him and he would meet with his client, hopefully around Christmas, with a follow-up after the New Year.[13]   Id.   Mr. Zephier responded in May 2012, reducing Ms. LeBeau's settlement demand to the UM policy limits of $25,000. (Docket 25 ¶ 41).   On May 31, 2012, Progressive increased its settlement offer to

---

[12]The demand letter included a declaration that "Brooke has no prior medical history of problems with her back or with headaches . . . . Brooke has no pre-existing injuries of her back, or neck, nor [sic] any history of recurring headaches, dizziness, numbness, or tingling."   (Docket 26-14 at pp. 2-3).   This statement is contrary to Ms. LeBeau's medical history.

[13]Ms. LeBeau makes a number of arguments regarding Progressive's statement of undisputed facts.   See Docket 29 at ¶¶ 39-43.   The arguments are not proper responses.   D.S.D. Civ. LR 56.1(B).

$9,000.   Id. ¶ 42.   The claim notes say this offer was made "to spur

negotiations, but [attorney] felt they would have to file for anything less than

policy limits."   (Docket 26-13 at p. 9) (capitalization omitted).   The claim note

indicates an invitation was made to the attorney to call back when he decided the

route Ms. LeBeau intended to take.   Id.

On July 9, 2012, Ms. LeBeau filed her complaint in Federal District Court.

(Docket 1).   Plaintiff's statement of disputed material facts (Docket 30) asserts a

number of other disputed facts.   Those are not discussed because "[o]nly

disputes over facts that might affect the outcome of the [case] under the

governing substantive law will properly preclude summary judgment."

Anderson, 477 U.S. at 248.

## DISCUSSION

### A.   Applicable Law

The court has jurisdiction pursuant to 28 U.S.C. § 1332 because the case

is a diversity action.   (Dockets 1 ¶¶ 3 & 4 and 7 ¶ 4).   In diversity actions, the

court applies the substantive law of the forum state.   See Jordan v. NUCOR

Corp., 295 F.3d 828, 834 (8th Cir. 2002).   "[F]ederal courts sitting in diversity

cases, when deciding questions of 'substantive' law, are bound by state court

decisions as well as state statutes."   Hanna v. Plumer, 380 U.S. 460, 465 (1965)

(referencing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)).   See also In re Baycol

Products Litigation, 616 F.3d 778, 785 (8th Cir. 2010) ("in a suit based on

diversity of citizenship jurisdiction the federal courts apply federal law as to

13

matters of procedure but the substantive law of the relevant state.") (internal citations omitted).   Only then can the court determine whether summary judgment is appropriate.   United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994).   In this case, the forum state is South Dakota. Accordingly, the court will apply South Dakota law.

**B.     FIRST PARTY BAD FAITH**

"[B]ad faith litigation can be classified as either first- or third-party bad faith."   Hein v. Acuity, 731 N.W.2d 231, 235 (S.D. 2007).   "Third-party bad faith is traditionally based on principles of negligence and arises when an insurer wrongfully refuses to settle a case brought against its insured by a third-party . . . . Third-party bad faith exists when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case."   Id.   "First-party bad faith, on the other hand, is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured. . . . In these cases, the parties are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable."   Id.   "[A] frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith." Id.

"Insurers are entitled to challenge fairly debatable claims. . . . [R]esolution of a claimant's request for benefits will have a direct bearing on the viability of a bad faith claim."   Id. at 237.   The South Dakota Supreme Court held:

> [F]or proof of bad faith, there must be an absence of a
> reasonable basis for denial of policy benefits [or failure to
> comply with a duty under the insurance contract] and the
> knowledge or reckless disregard [of the lack] of a reasonable
> basis for denial, implicit in that test is our conclusion that the
> knowledge of the lack of a reasonable basis may be inferred
> and imputed to an insurance company where there is a
> reckless disregard of a lack of reasonable basis for denial or a
> reckless indifference to facts or to proofs submitted by the
> insured.
>
> Under these tests of the tort of bad faith, an insurance
> company, however, may challenge claims which are fairly
> debatable and will be found liable only where it has
> intentionally denied (or failed to process or pay) a claim
> without a reasonable basis.

Dakota, Minnesota & Eastern R.R. Corp. v. Acuity, 771 N.W.2d 623, 629 (S.D.

2009) (internal citation omitted).   The Court identified the ultimate parameter of

a bad faith claim:

> If an insured's claim is fairly debatable either in fact or law, an
> insurer cannot be said to have denied the claim in bad faith.
> The fact that the insurer's position is ultimately found to lack
> merit is not sufficient by itself to establish that the insurer
> had a reasonable basis to deny the claim.   The focus is on the
> existence of a debatable issue, not on which party was correct.

Id. at 630 (internal citation omitted).   "If the claim is fairly debatable, then the

insurer has a reasonable basis to deny the claim . . . ."   Id.

"Bad faith conduct may include the failure to conduct a reasonable

investigation concerning the claim. . . . The issue is determined based upon the

facts and law available to [the] [i]nsurer at the time it made the decision [as to the

claim]."   Id. at 629 (internal citations omitted).   "The question of whether an

insurer has acted in bad faith is generally a question of fact."   Id. at 629-30.

"In considering whether a claim was fairly debatable, courts may look to the adequacy of the insurer's investigation and consideration of the claim." Anderson v. Western National Mutual Ins. Co., 857 F. Supp. 2d 896, 904 (D.S.D. 2012).   "If an insurer conducted an inadequate investigation of a claim, and, by doing so, failed to locate information indicating that the plaintiff was entitled to benefits, then the claim may not be fairly debatable, and the insurer may be responsible under a bad faith claim.   The same would be true if the insurer's reasons for questioning the validity of the plaintiff's claim, or arguing that the claim was fairly debatable, stemmed from the insurer's failure to investigate the claim."   Id. at 904-05.   "[D]enial of a claim that is not fairly debatable is strong evidence of bad faith . . . ."   Bertelsen v. Allstate Ins. Co., 796 N.W.2d 685, 698 (S.D. 2011).

Ms. LeBeau claims Progressive must be held responsible for the following conduct in support of her bad faith claim:

1.   Progressive "has withheld and continues to withhold first party UM benefits from [its] own insured . . . even 5 years after the loss . . . ."  (Docket 31 at p. 9).

2.   Progressive failed to disclose "the fact that the UM bodily injury ("BI") benefits can and may be used to pay for unreimbursed accident related medical expenses . . . ."  Id. at pp. 9-10.

3.   Progressive "fail[ed] to . . . disclose the fact that first party UM [BI] policy   benefits are available . . . to cover . . . lost wages . . . ."  Id. at p. 12.

4.   Progressive "failed to have Plaintiff's . . . claim . . . reviewed or evaluated by an independent medical review expert . . . ."  Id. at p. 14 (referencing Fed. R. Civ. P. 35).

16

5.  Progressive "use[d] . . . COA (Claims Outcome Advisor), and . . . challenge[d] Plaintiffs UM BI claimed damages under the MIST (minimal impact, soft tissue) theory." Id.

6.  Progressive's adjuster, Ms. Rear, "had no knowledge of the types or elements of [BI] damages that Progressive <u>must</u> consider and pay to its insured . . . ." Id. (emphasis in original).

7.  Progressive's adjuster, Mr. Hupp, "deceived Plaintiff on the issue of lost wages . . . ." Id.

8.  Progressive's adjuster, Mr. Kurle, "deceived Plaintiff to allow her to believe that UM BI coverage would not or may not cover or be used to pay her medical expenses." Id.

9.  Progressive violated the South Dakota Unfair Claims Practices Act, SDCL § 58-33-67(7).  Id. at p. 16.

10. Progressive's use of GainSharing "create[d] a conflict of interest for [its] employees."  Id. at p. 20.

11. Progressive "failed to conduct a good faith investigation of the plaintiff's claim."  Id. at p. 23 (capitalization omitted).

The court will address each of these claims in three general categories: investigative claims, payment claims and other claims.

**INVESTIGATIVE CLAIMS**

As the initial issue in this section, Ms. LeBeau claims Progressive "failed to conduct a good faith investigation."  Id.  The essence of this claim is that Progressive "failed to locate information indicating that the plaintiff was entitled to benefits . . . ."  Anderson, 857 F. Supp. 2d at 904.  Plaintiff refers the court to

the report of Mr. Strzelec for the "proof of the breach of the standard of care . . . ." (Docket 31 at p. 23) (referencing Docket 33-1).

Mr. Strzelec's report includes a detailed summary of Progressive's claim notes, identifying both the investigation and thought processes articulated by Progressive's employees in handling Ms. LeBeau's claim.   Id. at pp. 6-15.   Mr. Strzelec observes the claim notes contain information Ms. LeBeau "was required to . . . stay employed and put in a full work week, take care of her small children and home, drive hundreds of miles to obtain medical treatment, all the while dealing with an ongoing injury."   Id. at pp. 18-19.   He concludes "[t]he file contains evidence that there was a possibility of a significant impact [as to how this accident and injury impacted Ms. LeBeau's life],[14]  but the area is never investigated.   The file is unclear as to how or why general damages are determined or changes during the handling."   Id. at p. 18.   Mr. Strzelec's conclusions are:

> Progressive's valuation of general damages (pain and suffering-past, present and future; loss of enjoyment of life-past, present and future; and other compensable articles) was not proper and did not meet minimum industry standards as this was never properly investigated or evaluated.   The evaluations that did take place failed to consider everything owed to the insured . . . . The evaluations did not appear to be objective and appear[] designed to minimize payout.   There was little to no adjustment as new information was received. . . . None of these issues were addressed by the . . . adjusters in completing their evaluations.

Id. at pp. 18-19.

---

[14]  See Docket 33-9 at p. 43(70:2-4) ("by significant impact, I'm referring to how the injury has impacted the insured life . . . not the vehicle impact.").

The evidence in the record discloses Progressive's claims adjusters spoke with Ms. LeBeau at least three times by telephone, spoke with her face-to-face twice and obtained two recorded statements.   Mr. Strzelec testified Progressive should have called Ms. LeBeau to discuss in more detail how her injuries may have impacted her life.   (Docket 33-9 at pp. 43-44 (70:20-71:14)).   However, he acknowledges that when a claims representative did call Ms. LeBeau, she was unhappy about being contacted so frequently and indicated she was not interested in speaking with Progressive because "she wasn't ready to settle, she was still treating."   Id. at p. 44 (70:15-25).   Mr. Strzelec suggests the follow-up telephone call should have, at a minimum, included:   "Are you ready to settle? No.   Okay.   I'll call you later.   You know, that's following up."   Id. at p. 62 (89:20-24).   Mr. Strzelec admits he was not criticizing Progressive for not following up with Dr. Kuehl, who was Ms. LeBeau's treating chiropractor during this portion of the investigative phase of the claim.   Id. at p. 20 (47:10-16).

The evidence in the record makes it clear that only four and one-half months after the accident Ms. LeBeau hired Attorney Kidder.   It would have been inappropriate for a claims adjuster to contact Ms. LeBeau directly to conduct the follow-up Mr. Strzelec suggests.

Ms. LeBeau argues Progressive should have invoked Rule 35 and sought an independent medical examination.   While Progressive may have been able to obtain a medical examination under the terms of the policy, it would not have been entitled to obtain an independent medical examination under Rule 35 until

litigation was initiated.   Mr. Strzelec does not conclude Progressive should have conducted an independent medical examination, as argued by plaintiff's counsel.

Mr. Strzelec's report focuses on the claim evaluation process used by Progressive and expresses his opinions as to the appropriateness of that process. The report does not state what further steps should have been taken or what information Progressive should have obtained during the course of its investigation.

A reasonable investigation is required, but a perfect one is not mandated. Dakota, Minnesota & Eastern R.R., 771 N.W.2d at 629-30.   Plaintiff failed to support her claim that Progressive conducted an inadequate investigation.

**PAYMENT CLAIMS**

Ms. LeBeau claims Progressive intentionally deceived her regarding coverage issues under the UM policy by failing to disclose that her medical expenses and mileage are subject to reimbursement.   (Docket 31 at pp. 9 & 12). Mr. Strzelec spoke to both issues.

The essence of the first claim is that the claims adjuster was deceptive by initially indicating "there is always the possibility" Ms. LeBeau's medical expenses were recoverable instead of declaring those expenses "will be included in . . . your claim."   (Docket 33-9 at p. 26 (53:13-19)).   This conversation occurred only three days post-accident and "it had not been confirmed [that UM coverage existed] at that point."   Id. at p. 28 (55:1-2).

20

Notwithstanding that the adjuster's statement was made so early in the claims process, Mr. Strzelec testified the statement "was misleading because there is [UM] coverage available . . . and absent . . . exceeding policy limits . . . she's going to be compensated for her medical bills, either by [Mr. Bruguier] or [the UM policy]."   Id. at pp. 25-26 (52:21-53:2)).   Mr. Strzelec admits that if Mr. Bruguier had insurance coverage and his carrier chose to contest causation for Ms. LeBeau's post-accident medical bills, "it is possible that she could have been responsible for making those payments.   Id. at pp. 29-30 (56:24-57:4).

Even though he believed the adjuster's statement was misleading, Mr. Strzelec concluded Ms. LeBeau was not adversely affected because she sought medical attention "in spite of those comments."   Id. at p. 29 (56:1-9).   Ms. LeBeau did not act adversely to her own interests in reliance on the statement made by the adjuster.   See Moore v. Kluthe & Lane Ins. Agency, Inc., 234 N.W.2d 260, 266 n.4 (S.D. 1975) (approving a jury instruction holding an insurance agency liable for negligent misrepresentation if the plaintiff can "prove a detrimental reliance on such representation . . . .").   The adjuster's statement—whether misleading, in fact, or just a cautionary explanation of the possibilities Ms. LeBeau may encounter—cannot constitute a basis for a bad faith claim if the plaintiff did not act in reliance on the statement.

The next issue is whether another adjuster misrepresented to Ms. LeBeau that her mileage expense incurred to attend chiropractic treatments would not be covered by the UM policy.   If there was such a statement made, Mr. Strzelec

21

testified "it might have been a mistake.   It might have been her intent to include mileage and then she flat out forgot. . . . [I]n and by itself, I would say that it was just a mistake." Id. at pp. 34-35 (61:13-15 & 62:23-24).   Mr. Strzelec agreed with the statement by Progressive's proposed expert witness that "[a]t worst . . . this was an oversight which was acknowledged and quickly rectified by Progressive's adjuster. . . . It does not reflect a malevolent intent, . . . a standard business practice or bad faith." Id. pp. 39-40 (66:23-67:6).

An oversight or innocent mistake cannot be grouped with other conduct or act as the foundation upon which a bad faith claim is made.   Plaintiff failed to present a bad faith claim based on this conduct.

Ms. Rear's participation in the file occurred between September 30, 2009, and February 1, 2010.   (Docket 26-13 at pp. 3-7).   Ms. LeBeau's file was turned over to another adjuster, Mr. Hupp, once Attorney Kidder entered the picture. (Docket 33-2 at p. 8 (46:10-19).   Ms. LeBeau argues Ms. Rear "had no knowledge of the types or elements of [BI] damages that Progressive must consider and pay to its insured . . . ."   (Docket 31 at p. 14) (emphasis in original). Plaintiff directs the court to Ms. Rear's deposition and Mr. Strzelec's report and deposition as the basis for this element of her bad faith claim.   Id. (referencing Ms. Rear's deposition at pp. 33-60 & 90-91; Mr. Strzelec's report at pp. 1-20; and Mr. Strzelec's deposition at pp. 47-61).

22

Ms. Rear testified a UM claim covered the following damages:

-bodily injury;
-past, present and future medical expenses;
-medical mileage;
-past, present and future pain and suffering;
-loss of enjoyment of life;
-disfigurement; and
-disability.

(Docket 33-2 at p. 5 (34:9-35:10)).   She acknowledged the general existence of "an eggshell claimant" and that it is necessary to "[l]ook at their prior history, the type of damage on their vehicle, look at the kind of treatment they're getting currently. . . . and consider them differently."   Id. at p. 6 (39:1-40:19).   She testified an eggshell claimant "may have a prior history that may affect and make the value of their claim greater . . . ."   Id. at p. 9 (50:17-18).   Ms. Rear testified Ms. LeBeau may be an eggshell claimant so they were "waiting for her prior medical records to see exactly what her prior injuries were."   Id. at p. 9 (51:1-4). It was not until Ms. LeBeau finished her treatment with Dr. Kuehl, who indicated Ms. LeBeau had returned to pre-accident status, that Ms. Rear made an offer to settle Ms. LeBeau's claim.   Id. at p. 11 (60:5-9).

Neither Mr. Strzelec's report nor his deposition specifically reference Ms. Rear's alleged lack of knowledge of what damages were recoverable under a UM policy.   Ms. Rear's explanation of the damages recoverable by Ms. LeBeau under the UM policy are consistent with South Dakota law.   See SDCivPJI 50-10-10 through 50-10-90.   Plaintiff failed to present a bad faith claim on this basis.

Ms. LeBeau claims Progressive's response to her $85,000 offer of settlement was made in bad faith because the response did not include lost wages.   (Docket 31 at p. 14).   Mr. Strzelec asserts this conduct was inappropriate because the parties were not on equal footing and the carrier had the obligation to act in good faith.   (Docket 33-9 at pp. 36-27).   This good faith obligation would apparently require Progressive to correct counsel's failure to include a lost wages calculation in Ms. LeBeau's demand for settlement and then have its own counteroffer expressly include lost wages.   (Docket 31 at p. 14).

Mr. Strzelec does not agree with the South Dakota Supreme Court declaration that in a first-party claim, such as a UM claim, the parties are adversaries.   (Docket 33-9 at p. 38 (65:6-9)).   Mr. Strzelec's opinion is simply wrong.   The Court made clear in <u>Hein</u> that in first-party claims the parties are adversaries.   <u>Hein</u>, 731 N.W.2d at 235.   This permits Progressive to fairly challenge Ms. LeBeau's representations and demand for settlement and conclude for itself what an appropriate response should be.   <u>Id.</u>   If Ms. LeBeau unwittingly mischaracterized her demand, Progressive has no obligation to correct her error.

The ultimate issue is whether Progressive had the right to refuse payment of Ms. LeBeau's claim, even after five years.   (Docket 31 at p. 9).   Ms. LeBeau's claim is very similar to that of the insured in <u>Anderson</u>, although that case involved an underinsured ("UIM") claim as opposed to a UM claim.

24

In the Anderson case, the insured's pickup was struck in the rear by a driver who "was completely at fault for causing the accident."   Anderson, 857 F. Supp. 2d at 898.   The collision caused Mr. Anderson's "head to strike and shatter the rear windshield."   Id.   An ambulance transported him to a hospital where a physician diagnosed "sprain and/or strain of the neck and back with cervical spondylosis without myelopathy."   Id.   Mr. Anderson participated in forty-eight chiropractic treatments, physical therapy sessions for six weeks, and continued physical therapy exercises at home.   Id.   He incurred over $20,000 in medical bills, struggled with "left arm strength and mobility, shoulder soreness, daily headaches, and pain in his upper middle back and the right side of his neck."   Id.   Mr. Anderson's injuries affected his work performance, he suffered a loss of earning capacity of at least $28,000 per year, and his hobbies were restricted.   Id.

Following settlement with the third-part tortfeasor, Mr. Anderson sought coverage under his UIM policy.   Id. at 899.   Western National Mutual Insurance conducted an investigation.   After a series of exchanges with Mr. Anderson's attorney, the file was reviewed by an attorney retained by the carrier.   Id. at 901. The attorney's report advised the carrier there were questions concerning the validity of the lost earnings claim and concluded the claim "likely did not have a value in excess of the tortfeasor's insurance limit . . . ."   Id.   The claims adjuster in Anderson went through an analysis very similar to that conducted in Ms. LeBeau's claim.   Id. at pp. 902-03.   While the claims adjuster was having

25

the case reviewed by the insurer's claim board, Mr. Anderson filed his lawsuit. Id. at p. 902.   After properly applying the summary judgment standard of viewing the evidence in the light most favorable to Mr. Anderson as the non-moving party, the Anderson court concluded it was "fairly debatable" whether Mr. Anderson's UIM claim exceeded the limits of that policy.   Id. at 905.

In Ms. LeBeau's case, whether Progressive's conduct was appropriate is fairly debatable.   Ms. LeBeau sought chiropractic treatment from Dr. Kuehl, who released her from further treatment after only a few months.   Progressive was prepared to make an offer at that time.   However, it was Ms. LeBeau who did not want to discuss settlement of her case, which was her right.   Once her attorney entered the process, the court finds that a large part of the delay was the result of Ms. LeBeau's attorney not promptly getting back in touch with Progressive.   Ms. LeBeau continued treatment with Dr. Heck.   Progressive adjusted its claim reserve upward and made a higher offer which included these medical expenses.   The fact Ms. LeBeau and her attorney do not like that offer does not make Progressive's conduct unreasonable.

Ms. LeBeau's claim may be worth more than $25,000 or it might not be worth that much.   Progressive articulated a "reasonable basis for denial of policy benefits" above its last offer.   Dakota, Minnesota & Eastern R.R. Corp., 771 N.W.2d at 629.   Ms. LeBeau has not presented evidence to show "a reckless disregard of a lack of reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured."   Id.   The value of Ms. LeBeau's

26

claim remains a debatable issue.    A jury will have to resolve the dispute between Ms. LeBeau and Progressive regarding the value of her claim.    Whether Progressive's decision is ultimately determined to be right or wrong is not material.    Viewing the evidence in the light most favorable to Ms. LeBeau for summary judgment purposes, the value of her claim is fairly debatable.    Hein, 731 N.W.2d at 235; Dakota, Minnesota & Eastern R.R. Corp., 771 N.W.2d at 630; Anderson, 857 F. Supp. 2d at 905.

Because Ms. LeBeau's claim is unresolved, Progressive, as her adversary in this first-party claim, has no obligation to make partial payments for medical expenses, lost wages or mileage.    Plaintiff does not direct the court to any South Dakota statute, regulation or case authority which mandates a contrary conclusion.    Until the entire claim is resolved and a settlement agreement and release is executed by Ms. LeBeau or a jury determines the value of her damages, Progressive is not required to do anything further.

### OTHER CLAIMS

Ms. LeBeau argues Progressive is liable under her bad faith claim because it violated South Dakota's Unfair Claims Practices Act, SDCL § 58-33-67(7). (Docket 31 at p. 16).    She asserts the "purposeful conduct in selling, marketing and delivering auto policies with UM/BI coverage, while failing to disclose the UM BI will not be . . . paid out . . . to cover unreimbursed/unpaid medical expenses, or UM BI will be withheld even when an undisputed amount is determined . . . is fraud, deceit, and a breach of contract."    Id. at pp. 16-17.

27

Under South Dakota law "unfair or deceptive acts or practices" include "refusing to settle a claim of an insured or claimant on the basis that the responsibility should be assumed by others."   SDCL § 58-33-67(7).   Ms. LeBeau argues because Progressive collected a premium for the UM policy, it must "pay out to cover unreimbursed/unpaid medical expenses <u>without</u> a formal and permanent UM BI <u>written release being signed</u> . . . ."   (Docket 31 at p. 16) (emphasis in original).

SDCL § 58-33-69 provides "[n]othing in §§ 58-33-66 to 58-33-67, inclusive, grants a private right of action."   As the court concluded in <u>Anderson</u>, "SDCL 55-33-67 does not create a private right of action."   <u>Anderson</u>, 857 F. Supp. 2d at 908.   <u>See also</u> <u>Lewison v. Western National Mutual Ins. Co.</u>, Civ. No. 13-4031-KES, 2014 WL 3573403 * 9 (D.S.D. 2014) (the carrier's "purported noncompliance with SDCL 58-33-67(1) is not a material fact that prevents summary judgment.").   "SDCL 58-33-67 is aimed at the timeliness, rather than the quality of an insurer's investigation.   Western National's alleged violation of SDCL 58–33–67(1) is not a material fact that prevents the court from granting summary judgment on Anderson's bad faith claim when the question of Anderson's entitlement to more than the . . . UIM limit is fairly debatable as a matter of law."   <u>Anderson</u>, 857 F. Supp. 2d at 908.

Progressive's alleged violation of SDCL § 58-33-67(7) "does not prove either prong of the South Dakota bad faith test."   <u>Id.</u>   Plaintiff failed to present a bad faith claim on this issue.

Ms. LeBeau argues Progressive improperly used a Claims Outcome Advisor ("COA") software program to establish plaintiff's compensatory damages. (Docket 31 at p. 14) (referencing Ms. Rear's deposition at pp. 25-35 and 78-84 and the COA protocol (Docket 33-5)).

Ms. Rear testified Progressive uses COA as part of the claim evaluation process.   (Docket 33-2 at p. 16 (79:1-9).   She indicated that COA provides a low range and high range for settlement.   Id. at p. 16 (79:14-15).   Claims adjusters are not required to use the COA figures but rather it is a tool to consider.   Id. at p. 16 (79:19-20).   Ms. Rear testified Progressive claims adjusters do not use COA on first-party claims.   Id. at p. 16 (81:11-17) (emphasis added).   Ms. LeBeau offers no evidence to contradict Ms. Rear's testimony.   Plaintiff failed to present a bad faith claim on this issue.

Finally, Ms. LeBeau asserts Progressive committed bad faith by permitting its claims adjusters to participate in GainShare, a profit sharing program. (Docket 31 at p. 20).   She alleges "the use of such incentive pay programs creates a conflict of interest for the employees."   Id.   Ms. LeBeau poses the following questions:   "Do they serve their management and corporate goals for lower loss severity and increased profit, or do they seek out and honor the best interests, including the financial interests, of their own policy holders?"   Id. (referencing Mr. Strzelec's deposition at pp. 70-98).

When asked how GainShare works, Mr. Strzelec had "a hard time coming up with specifics . . . . [and he was] . . . not able to give [counsel] any specific

sources of information that forms the basis of [Mr. Strzelec's] opinion . . . ."
(Docket 33-9 at p. 48 (75:1-5 & 18-24)).   When asked specifically how
GainShare would affect Progressive claims adjusters, Mr. Strzelec stated "I don't
think you can point to any act and say they consciously did this because of
GainSharing . . . . [it is more] a don't ask, don't tell kind of attitude."   Id. at p. 50
(77:11-24).   Mr. Strzelec was unable to articulate what yearly bonus would
"change behavior consciously or subconsciously . . . [as he had no] specific
examples" available to him.   Id. at pp. 58-59 (85:18-86:9).

 In order to withstand a motion for summary judgment, Ms. LeBeau "must
substantiate [her] allegations with sufficient probative evidence [that] would
permit a finding in [her] favor on more than mere speculation, conjecture, or
fantasy."   Moody, 23 F.3d at 1412 (internal quotation marks omitted).   Ms.
LeBeau's argument and Mr. Strzelec's testimony concerning the impact of
GainShare on the handling of Ms. LeBeau's claim are nothing more than
speculation and conjecture.   Id.   They are insufficient to withstand defendant's
motion for summary judgment on this issue.

## CONCLUSION

 The court finds that in both fact and law the value of Ms. LeBeau's claim is
fairly debatable.   Hein, 731 N.W.2d at 235; Dakota, Minnesota & Eastern R.R.
Corp., 771 N.W.2d at 630; Anderson, 857 F. Supp. 2d at 905.   Plaintiff has not
shown that Progressive recklessly disregarded information in establishing the
value of Ms. LeBeau's claim or that the value of her claim was unquestionably

$25,000 or greater.   Dakota, Minnesota & Eastern R.R. Corp., 771 N.W.2d at

629.   Defendant is entitled to judgment as matter of law on plaintiff's bad faith

claim and her request for punitive damages.

**ORDER**

Based on the above analysis, it is hereby

ORDERED defendant's motion for partial summary judgment (Docket 23)

is granted.

IT IS FURTHER ORDERED that counts two and three of plaintiff's

complaint asserting a bad faith claim and seeking punitive damages (Docket 1 at

pp. 4-7) are dismissed with prejudice.

Dated September 28, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE

31